# EXHIBIT R

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY | Reserved for Clerk's File Stamp |
|---|---|
| 1200 Aguajito Road<br>Monterey, California  93940<br><br>**Gozzi, Daniele,**<br>      Plaintiff/Petitioner<br><br>vs.<br><br>**Washington Mutual Bank FA et al,**<br>      Defendant/Respondent | **FILED**<br><br>**JUL 3 1 2014**<br><br>**TERESA A. RISI**<br>**CLERK OF THE SUPERIOR COURT**<br>R. ESMERALDA        DEPUTY |
| **ORDER SETTING ORDER TO SHOW CAUSE<br>RE SANCTIONS AND DISMISSAL** | Case No.  M122326 |

This matter is set for an ORDER TO SHOW CAUSE (OSC) WHY MONETARY SANCTIONS AND/OR DISMISSAL SHOULD NOT BE ORDERED BY THE COURT FOR PLAINTIFF'S FAILURE TO APPEAR FOR MANDATORY SETTLEMENT CONFERENCE ON JULY 11, 2014.

This matter is set for <u>August 22, 2014 at 1:30pm</u> in Courtroom 14, Monterey Superior Court, located at 1200 Aguajito Road, Monterey, California 93940.

Matter is set for <u>August 22, 2014 at 1:30pm</u> in Department 14 for Mandatory Settlement Conference.

<u>Plaintiff, Daniele Gozzi is ordered to personally appear on August 22, 2014 at 1:30pm in Department 14.</u>

An attorney/party knowledgeable in all aspects of the case shall be present.

Date: **JUL 3 1 2014** _____

_____
Thomas W. Wills
JUDGE OF THE SUPERIOR COURT

**CERTIFICATE OF MAILING**
(Code of Civil Procedure Section 1013a)

I do hereby certify that I am employed in the County of Monterey. I am over the age of eighteen years and not a party to the within stated cause. I placed true and correct copies of the **Order to Show Cause**, for collection and mailing this date following our ordinary business practices.  I am readily familiar with the Court's practices for collection and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Services in Salinas, California, in a sealed envelope with postage fully prepaid. The names and addresses of each person to whom notice was mailed is as follows:

Daniele Gozzi
225 Crossroads Blvd., #199
Carmel, CA  93923

Date: **AUG 0 1 2014** _____

Monique Jewett-Brewster, Esq.
560 Mission Street, 25th Floor
San Francisco, CA  94105

Teresa A. Risi, Clerk of the Court

By:_____
R. ESMERALDA
Deputy Clerk

//

# EXHIBIT S

| ATTORNEY (Name and Address): | TELEPHONE NO.: (949) 223-7321 | LEVYING OFFICER (Name and Address): |
|---|---|---|
| **Ethan Schatz, Esq. of Bryan Cave LLP**<br>**3161 Michelson Drive, 1500**<br>**Irvine, CA 92612-4414**<br><br>Ref #:<br><br>ATTORNEY FOR: JPMorgan Chase Bank, N.A. | | **Monterey County Sheriff's Office**<br>**Sheriff's Civil Unit**<br>**Office of the Sheriff**<br>**1414 Natividad Road**<br>**Salinas, CA 93906** |

| NAME OF COURT, JUDICIAL DISTRICT or BRANCH COURT, IF ANY: | |
|---|---|
| **Monterey County Superior Court**<br>**1200 Aguajito Road**<br>**Monterey, CA 93940** | **(831) 755-3712**<br>**Fax: (831) 755-3830**<br><br>**California Relay Service Number**<br>**(800) 735-2929 TDD or 711** |

| PLAINTIFF: | COURT CASE NO.: |
|---|---|
| **JPMorgan Chase Bank, N.A.** | |
| DEFENDANT: | **M110621** |
| **Daniele Gozzi, et al** | |

| | LEVYING OFFICER FILE NO.: |
|---|---|
| **Return on Writ of Possession** | **2014039458** |

I, Scott Miller, Sheriff, County of Monterey, State of California, hereby certify that I received the annexed writ on 7/14/2014, and that the herein defendant(s):

Daniele Gozzi, All Occupants in Care of Named Tenant Daniele Gozzi

Eviction Address:     31549 Highway 1
                      Carmel, Ca 93923

Was/were served with a notice to surrender the premises within five (5) days or I would proceed to enforce said writ.  My proceedings under the writ, and the return there on, are those as indicated below:

Copy of Notice posted at premises on 07/15/2014
Copy of Notice mailed to defendant(s) on 7/15/2014

I served the same by placing the plaintiff in quiet and peaceful possession of the premises on 07/22/2014, I returned said writ satisfied as to plaintiff's possession only and with accrued costs of $125.00.

Executed on: Wednesday, July 23, 2014

Scott Miller
Sheriff/Coroner

_Maureen Martin_

Sheriff's Authorized Agent



# RECEIPT

**Receipt #:** 00012202

**Receipt Date:** 7/15/2014

For transactions processed from
7/14/2014 to 7/14/2014

**FROM:** Sheriff's Civil Unit
Office of the Sheriff
1414 Natividad Road
Salinas, CA 93906

**TO:** Ethan Schatz, Esq. of Bryan Cave LLP
3161 Michelson Drive, 1500
Irvine, CA 92612-4414

| Trxn Date | Trxn # | Service Type/Debtor Name Court Case # | Levying Officer File # | Requestor's Reference # | Check # | Debtor Pymt | Svc Fee Deposit |
|---|---|---|---|---|---|---|---|
| 7/14/2014 | 001/00045613 | Notice of Eviction M110621 JPMorgan Chase Bank, N.A. Daniele Gozzi, et al. | 2014059458 | | 152760 | | 125.00 |

| | | |
|---|---|---|
| **Debtor Payment Total** | | $0.00 |
| **Svc Fee/Deposit Total** | | $125.00 |

This is a receipt of funds received. In the case of a debtor payment it may be up to 30 days before the
Levying Officer will remit the funds to the appropriate party per CCP 701.820. The amount received by
the appropriate party will be the amount shown herein less fees the Levying Officer is REQUIRED to
withhold for processing the payment per GC 26746.

_____
Not a valid receipt until signed.

# EXHIBIT T

B 5 (Official Form 5) (12/07)

| UNITED STATES BANKRUPTCY COURT<br>Central District of California | INVOLUNTARY PETITION |
|---|---|

| IN RE (Name of Debtor – If Individual:  Last, First, Middle)<br><br>Gozzi, Danielle | ALL OTHER NAMES used by debtor in the last 8 years<br>(Include married, maiden, and trade names.) |
|---|---|
| Last four digits of Social-Security or other Individual's Tax-I.D. No./Complete EIN<br>(If more than one, state all.):<br>Unknown | |

| STREET ADDRESS OF DEBTOR (No. and street, city, state, and zip code)<br><br>2192 Sierra Mar Drive<br>Los Angeles, CA<br><br>COUNTY OF RESIDENCE OR PRINCIPAL PLACE OF BUSINESS<br>Los Angeles<br><br>ZIP CODE<br>90069 | MAILING ADDRESS OF DEBTOR (If different from street address)<br><br>31549 Highway 1<br>Carmel, CA<br><br><br><br>ZIP CODE<br>93923 |
|---|---|

| LOCATION OF PRINCIPAL ASSETS OF BUSINESS DEBTOR (If different from previously listed addresses) |
|---|

| CHAPTER OF BANKRUPTCY CODE UNDER WHICH PETITION IS FILED<br><br>    ✓ Chapter 7    ☐ Chapter 11 |
|---|

**INFORMATION REGARDING DEBTOR (Check applicable boxes)**

| Nature of Debts<br>(Check one box.)<br><br>Petitioners believe:<br><br>☑ Debts are primarily consumer debts<br>☐ Debts are primarily business debts | Type of Debtor<br>(Form of Organization)<br><br>☑ Individual (Includes Joint Debtor)<br>☐ Corporation (Includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities,<br>check this box and state type of entity below.) | Nature of Business<br>(Check one box.)<br><br>☐ Health Care Business<br>☐ Single Asset Real Estate as defined in<br>    11 U.S.C. § 101(51)(B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☐ Other |
|---|---|---|

| VENUE<br><br>☑ Debtor has been domiciled or has had a residence, principal<br>place of business, or principal assets in the District for 180<br>days immediately preceding the date of this petition or for<br>a longer part of such 180 days than in any other District.<br><br>☐ A bankruptcy case concerning debtor's affiliate, general<br>partner or partnership is pending in this District. | FILING FEE (Check one box)<br><br>☑ Full Filing Fee attached<br><br>☐ Petitioner is a child support creditor or its representative, and the form<br>specified in § 304(g) of the Bankruptcy Reform Act of 1994 is attached.<br>*[If a child support creditor or its representative is a petitioner, and if the<br>petitioner files the form specified in § 304(g) of the Bankruptcy Reform Act of<br>1994, no fee is required.]* |
|---|---|

| PENDING BANKRUPTCY CASE FILED BY OR AGAINST ANY PARTNER<br>OR AFFILIATE OF THIS DEBTOR (Report information for any additional cases on attached sheets.) |
|---|

| Name of Debtor | Case Number | Date |
|---|---|---|
| Relationship | District | Judge |

| ALLEGATIONS<br>(Check applicable boxes) | COURT USE ONLY |
|---|---|
| 1.  ☑ Petitioner (s) are eligible to file this petition pursuant to 11 U.S.C. § 303 (b).<br>2.  ☐ The debtor is a person against whom an order for relief may be entered under title 11 of the United<br>States Code.<br>3.a. ☑ The debtor is generally not paying such debtor's debts as they become due, unless such debts are<br>the subject of a bona fide dispute as to liability or amount;<br>or<br>b. ☐ Within 120 days preceding the filing of this petition, a custodian, other than a trustee receiver, or<br>agent appointed or authorized to take charge of less than substantially all of the property of the<br>debtor for the purpose of enforcing a lien against such property, was appointed or took possession. | |

B 5 (Official Form 5) (12/07) – Page 2          Name of Debtor   Gozzi, Danielle

Case No._____

| TRANSFER OF CLAIM |
|---|
| ☐ Check this box if there has been a transfer of any claim against the debtor by or to any petitioner. Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a). |

| REQUEST FOR RELIEF |
|---|
| Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition. If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached. |

Petitioner(s) declare under penalty of perjury that the foregoing is true and correct according to the best of their knowledge, information, and belief.

| x_____ | x_____ |
|---|---|
| Signature of Petitioner or Representative (State title) | Signature of Attorney        Date |
| Benjamin Becal     07/21/2014 | |
| Name of Petitioner     Date Signed | Name of Attorney Firm (If any) |
| Name & Mailing Address of Individual Signing in Representative Capacity | Address |
| | Telephone No. |

| x_____ | x_____ |
|---|---|
| Signature of Petitioner or Representative (State title) | Signature of Attorney        Date |
| Nicole Giangrosso     07/21/2014 | |
| Name of Petitioner     Date Signed | Name of Attorney Firm (If any) |
| Name & Mailing Address of Individual Signing in Representative Capacity | Address |
| | Telephone No. |

| x_____ | x_____ |
|---|---|
| Signature of Petitioner or Representative (State title) | Signature of Attorney        Date |
| Rachel Nussbar     07/21/2014 | |
| Name of Petitioner     Date Signed | Name of Attorney Firm (If any) |
| Name & Mailing Address of Individual Signing in Representative Capacity | Address |
| | Telephone No. |

| PETITIONING CREDITORS | | |
|---|---|---|
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Benjamin Becal 1692 Stradella Rd Los Angeles, CA 90077 | Personal | 22,000.00 |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Nicole Giangrosso 9024 Glencoe Ave Venice, CA 90291 | Personal | 17,000.00 |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Rachel Nussbar 3104 Lyceum Ave Los Angeles, CA 90066 | Personal | 19,000.00 |
| Note: If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above. | Total Amount of Petitioners' Claims | 58,000.00 |

_____ continuation sheets attached

Benjamin Becal
1692 Stradella Rd
Los Angeles, CA 90077

Nicole Giangrosso
9024 Glencoe Ave
Venice, CA 90291

Rachel Nussbar
3104 Lyceum Ave
Los Angeles, CA 90066

# EXHIBIT U

SHARON Z. WEISS (State Bar No. 169446)
NATALIE B. DAGHBANDAN (State Bar No. 273957)
**BRYAN CAVE LLP**
120 Broadway, Suite 300
Santa Monica, CA 90401
Telephone:    (310) 576-2100
Facsimile:    (310) 576-2200
sharon.weiss@bryancave.com
natalie.daghbandan@bryancave.com

Attorneys for Movant
JPMorgan Chase Bank, N.A.

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>DANIELLE GOZZI,<br><br>         Debtor. | Case No.: 14-bk-23862-ER<br><br>Chapter 7<br><br>**NOTICE OF ENTRY OF ORDER IN RELATED BANKRUPTCY PROCEEDING GRANTING JPMORGAN CHASE BANK, N.A.'S IN REM RELIEF FROM THE AUTOMATIC STAY**<br><br>[NO HEARING REQUIRED] |

**TO:    THE HONORABLE ERNEST M. ROBLES, THE DEBTOR, THE DEBTOR'S**

**COUNSEL, THE UNITED STATES TRUSTEE, AND ALL OTHER INTERESTED**

**PARTIES:**

SM01DOCS\1044483.1

1     Creditor JPMorgan Chase Bank, N.A., individually and as acquirer of certain assets and

2     liabilities of Washington Mutual Bank from the Federal Deposit Insurance Corporation, acting as the

3     receiver, and California Reconveyance Company ("Chase") files this *NOTICE OF ENTRY OF*

4     *ORDER IN RELATED BANKRUPTCY PROCEEDING GRANTING JPMORGAN CHASE BANK,*

5     *N.A.'S IN REM RELIEF FROM THE AUTOMATIC STAY* to confirm that the automatic stay in the

6     instant bankruptcy case does not apply to Chase regarding the real property located at 31549

7     Highway 1, Carmel, California (the "Property").

8     On or about April 2, 2013, the United States Bankruptcy Court for the Northern District of

9     California, San Jose Division, entered its *Order Granting JPMorgan Chase Bank, N.A,'S Motion for*

10    *Relief From Stay to Proceeds with Possession of Property Following Unlawful Detainer Judgment,*

11    in the related bankruptcy case of *In re Helinda K. Patel*, case number 13-51236 [Doc. #33].  A true

12    and correct copy of that order, which was recorded in with the Monterey County Recorder's office

13    on August 26, 2013 as document number 2013053929, is attached hereto as Exhibit "1".  This

14    involuntary bankruptcy case was filed in at 3:26 p.m. on July 21, 2014 in the Central District of

15    California just one day before the scheduled lock out by the Monterey's sheriff's department.

16    The underlying involuntary bankruptcy case is yet another defensive maneuver by Debtor

17    Danielle Gozzi ("Debtor") to remain – rent free –in property that was foreclosed on by Chase in

18    2010.

19    On February 8, 2011, Chase filed its Complaint for Unlawful Detainer against Debtor in the

20    Monterey County Superior Court.  On June 27, 2011, the Court entered its Judgment granting to

21    Chase possession of the Property against Debtor and all unknown occupants.  Five (5) days before

22    the first lock-out, Debtor filed his first bankruptcy case on November 3, 2011, filing a chapter 13

23    petition.  Chase filed a motion for relief from stay, which the bankruptcy court granted on January 3,

24    2012.  Debtor's first bankruptcy was dismissed on January 4, 2012 for Debtor's failure to file a plan.

25    Debtor then immediately filed his second bankruptcy case on January 13, 2012. Chase filed

26    another motion for relief from stay, which the bankruptcy court granted on March 23, 2012.  The

27    lock-out was then scheduled for April 11, 2012. The day before the scheduled lock-out, Debtor's

28    daughter, Helina K. Patel ("Patel") filed her first bankruptcy case under chapter 13, claiming to be a

1   tenant of the Property with Debtor.  Chase once again filed for relief from stay, but the case was

2   quickly dismissed on April 26, 2012, for Patel's failure for file a plan. Chase's pending motion for

3   relief from stay was rendered moot, and a new lock-out date was scheduled for May 10, 2012.

4          Two (2) days before the scheduled lock-out, on May 8, 2012, Debtor initiated an adversary

5   proceeding in the second bankruptcy action by filing a wrongful foreclosure complaint.  This

6   complaint was never served on Chase and the adversary proceeding was dismissed for that reason.

7   Nevertheless, Chase entered into, what it believed at the time to be, good faith negotiations with

8   Debtor for his repurchase of the Property. These discussions lasted throughout the summer of 2012.

9   Despite repeated promises, Debtor never submitted any offer for repurchase of the Property.

10          The second bankruptcy case was dismissed for cause on August 29, 2012, due in part to

11   unreasonable delay causing prejudice to the creditors.  Notwithstanding the dismissal of the second

12   bankruptcy case, Chase held off on pursing Debtor's eviction during a time it believed Debtor was

13   acting in good faith to purchase the Property.  That belief ended on September 27, 2012, when Chase

14   received a letter and a check in excess of six (6) millions from Debtor, alleging that Chase had

15   "effectively discharged the associated debt in this matter."  Chase was unable to verify funds in the

16   account and therefore in September 2012, renewed its eviction efforts by resubmitting a Writ of

17   Possession. After obtaining a new Writ, Chase rescheduled the lock-out date for January 8, 2013, to

18   avoid an eviction during the holidays.

19          On January 7, 2013, one (1) day before the scheduled lock-out was set to occur, Debtor filed

20   his third bankruptcy action. Chase did not file a motion for relief from stay, as the automatic stay

21   terminated pursuant to the United States Bankruptcy Code.  The lock-out of the Property was re-

22   noticed for March 5, 2013. However, on March 4, 2013, Patel filed her second bankruptcy petition,

23   once again claiming to be an occupant and tenant of the Property, and alleging that Debtor was her

24   landlord.  This bankruptcy filing was the fifth bankruptcy action filed in an attempt to stall the

25   eviction process. In an abundance of caution, Chase cancelled the lock-out.  On April 2, 2013, Chase

26   successfully obtained an Order from the United States Bankruptcy Court, granting Chase in rem

27   relief from the automatic stay as it pertains to the Property for a period of two (2) years from the date

28   of the Order, pursuant to 11 U.S.C. §§ 105(a), 362(d)(4). (Exhibit "1").

1    The next lock-out attempt was scheduled for January 24, 2014. Despite the Order granting in

2    rem relief for a two year period, Debtor filed his fourth bankruptcy action on January 23, 2014, this

3    time in the Central District of California; not the Northern District where both the Debtor and his

4    daughter filed their other bankruptcy cases.  Several days before this scheduled lock-out, in a

5    continuing pattern of delay tactics, Debtor instructed his counsel of record to file a groundless ex

6    parte application for temporary restraining order in the instant litigation. The Court declined to enter

7    Debtor's requested temporary restraining order.

8         Then on the morning of the lock-out, Debtor and his representative faxed a largely

9    indecipherable document entitled "Notice of Misprision of Felony, Cease and Decist [sic], Demand

10   for Bond! Indemnity Claim-on Tort" ("Notice") to: (i) Bryan Cave's Santa Monica office; (ii) the

11   Federal Bureau of Investigation; (iii) the California Attorney General; (iv) the U.S. Attorney's

12   Office; (v) the chambers of the Hon. Marla O. Anderson, Presiding Judge, Superior Court of

13   California, County of Monterey; and (vi) the office of Connie Mazzei, Monterey Clerk of Court,

14   among others.  In the Notice, notwithstanding this Court's issuance of multiple Writs of Possession

15   and its recent order denying Debtor's application for a temporary restraining order, Debtor contends

16   that Chase's lawful attempts to take possession of the Property amount to "terrorism, … trespass, …

17   and slavery" and threatens new legal action should Chase proceed with the lock-out. Most

18   importantly, in the voluminous papers faxed to the parties referenced above, Debtor advised – for the

19   very first time – of a special needs child residing on the Property.

20        Despite these papers, the Monterey County Sheriff's Department confirmed it would proceed

21   with the lock-out, finding no legal impairment from doing so. While Chase agreed with the legal

22   position of the Monterey County Sheriff's Department, it nevertheless called off the lock-out in

23   deference to the special needs child. Chase opted instead to request a settlement conference in a last-

24   ditch effort to reach an amicable resolution.

25        As noted above, the Debtor failed to appear at the Mandatory Settlement Conference.  The

26   Sheriff thereafter posted notice of the eviction set for Tuesday, July 22, 2014.  This involuntary

27   bankruptcy yesterday afternoon along with a new complaint served by the Debtor against various

28   parties for alleged civil rights violations.

1    Based on the In Rem Order and the underlying facts of this case, Chase asserts that the

2   automatic stay does not apply to it regarding the Property.

3

4   Dated: July 22, 2014                          BRYAN CAVE LLP

5

6                                         By:    /s/ Sharon Z. Weiss

7                                                Sharon Z. Weiss
                                                 Natalie B. Daghbandan
8                                                Attorneys for Movant
                                                 JPMorgan Chase Bank, N.A.
9

EXHIBIT 1

EXHIBIT 1

Stephen L. Vagnini                          CRREBECCA
Monterey County Recorder                    8/26/2013
Recorded at the request of                  15:22:51
**Filer**

DOCUMENT: **2013053929**    Titles: 1/ Pages:  6

Fees....    30.00
Taxes...
Other...     2.00
AMT PAID   $32.00

RECORDING REQUESTED BY
AND WHEN RECORDED
RETURN TO:

Cristy L. Hicks Koster
Bryan Cave LLP
3161 Michelson Drive, Suite 1500
Irvine, California 92612-4414

APN: 243-221-027-000

---

**THIS DOCUMENT IS BEING RECORDED PURSUANT TO CALIFORNIA
GOVERNMENT CODE SECTIONS 27280 AND 27326**

ORDER GRANTING JPMORGAN CHASE BANK, N.A.'S MOTION FOR RELIEF FROM
THE AUTOMATIC STAY TO PROCEED WITH POSSESSION OF PROPERTY
FOLLOWING UNLAWFUL DETAINER JUDGMENT

Affects real property located at 31549 Highway 1, Carmel, California 93923

Assessor's Parcel No.:  243-221-027-000

654263.1



**Entered on Docket**
**April 03, 2013**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

1  Sharon Z. Weiss (SBN: 169446)
   Natalie B. Daghbandan (SBN: 273957)
2  BRYAN CAVE LLP
   120 Broadway, Suite 300
3  Santa Monica, CA 90401
   Telephone: (310) 576-2100
4  Facsimile: (310) 576-2200
   sharon.weiss@bryancave.com
5  natalie.daghbandan@bryancave.com

6  Attorneys for Movant
   JPMorgan Chase Bank, N.A.

**The following constitutes**
**the order of the court. Signed April 2, 2013**



Charles Novack
U.S. Bankruptcy Judge

7

8            **UNITED STATES BANKRUPTCY COURT**

9      **NORTHERN DISTRICT OF CALIFORNIA — SAN JOSE DIVISION**

10  In re                        CASE NO. 13-51236
                                      [Chapter 13]
11  HELINDA K. PATEL
                                  RS No. SZW-1
12           Debtor.
                                  **ORDER   GRANTING   JPMORGAN**
13                                **CHASE BANK, N.A.'S MOTION FOR**
                                  **RELIEF   FROM   THE   AUTOMATIC**
14                                **STAY   TO   PROCEED   WITH**
                                  **POSSESSION   OF   PROPERTY**
15                                **FOLLOWING   UNLAWFUL   DETAINER**
                                  **JUDGMENT**
16
                                  **[PROPERTY ADDRESS: 31549 Highway**
17                                **1, Carmel, California 93923]**

18                                <u>HEARING DATE:</u>
                                  Date:   March 13, 2013
19                                Time:   2:00 p.m.
                                  Place:  Courtroom 3070
20                                        280 South First Street
                                        San Jose, CA 95113-3099
21

22

23                                UNITED STATES BANKRUPTCY COURT
                                  Northern District of California
24                                I certify that this is a true, correct and full copy
                                  of the original document on file in my custody.
25            Dated 4/9/2013
                                  by _____
26                                Deputy Clerk

27

28

1      This Court has reviewed *JPMorgan Chase Bank, N.A.'s Motion for Relief from the*

2  *Automatic Stay to Proceed with Possession of Property Following Unlawful Detainer Judgment*

3  ("Stay Motion"), along with the pleadings and evidence in support of the Stay Motion,

4  considered the Debtor's opposition, the argument of counsel, and its review of the record.  For

5  good cause appearing and the reasons stated on the record, it is

6      ORDERED:

7      1.      Notice of the Stay Motion was timely and adequately given to all persons entitled

8  to notice.

9      2.      The Stay Motion is granted, as provided for in this Order.

10     3.      This Order applies to the residential real property located at 31549 Highway 1,

   Carmel, California 93923 (the "Property").

11

12     4.      The Stay Motion is granted under 11 U.S.C. §§ (d)(1), (d)(2) and (d)(4).

13     5.      The stay of 11 U.S.C. § 362(a) is modified as to Debtor Helina Patel and Debtor's

   bankruptcy estate with respect to Movant JPMorgan Chase Bank, N.A., its successors,

14 transferees and assigns ("Movant").

15     6.      Relief from stay is granted in rem under 11 U.S.C. § 105(a), with reference to 11

16 U.S.C. § 362(d)(4) where the Debtor's bankruptcy filing was part of a scheme involving multiple

17 bankruptcy filings affecting the Property to delay, hinder or defraud Movant and an abuse of the

18 bankruptcy code.

19     7.      Movant may enforce its remedies to obtain possession of the Property in

20 accordance with applicable non-bankruptcy law, but may not pursue any deficiency claim

21 against the Debtor or property of the estate, except by filing a Proof of Claim in this bankruptcy

22 case pursuant to 11 U.S.C. § 501.

23     8.      This Order shall be binding and effective despite any conversion of this

24 bankruptcy case to a case under any other chapter of Title 11 of the Bankruptcy Code.

25     9.      This Order shall be binding and effective in any case under this title purporting to

26 affect the Property filed not later that two years after the date of entry of the order, except that a

27 debtor in a subsequent case under this title may move for relief from this Order based upon

28 changed circumstances or for good cause shown, after notice and a hearing.

10.      The 14-day stay provided by Federal Rule of Bankruptcy Procedure 4001(a)(3) is waived.

**\*\* END OF ORDER \*\***

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COURT SERVICE LIST

Debtor
Helina K. Patel
31549 Highway 1
Carmel, CA 93923

## Notice Recipients

District/Off: 0971−5          User: kdu                    Date Created: 4/3/2013
Case: 13−51236               Form ID: pdfeoc              Total: 1

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
db          Helina K Patel          31549 Highway 1          Carmel, CA 93923

TOTAL: 1

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
Bryan Cave LLP, 120 Broadway, Suite 300, Santa Monica, CA 90401

A true and correct copy of the foregoing document entitled: **NOTICE OF ENTRY OF ORDER IN RELATED BANKRUPTCY PROCEEDING GRANTING JPMORGAN CHASE BANK, N.A.'S IN REM RELIEF FROM THE AUTOMATIC STAY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On July 22, 2014, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On July 22, 2014, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Ernest M. Robles
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1560
Los Angeles, CA 90012

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 22, 2014 | Raul Morales | /s/ Raul Morales |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

2. **SERVED BY UNITED STATES MAIL**:

Benjamin Becal
1692 Stradella Rd.
Los Angeles, CA 90077

Nicole Giangrosso
9024 Glencoe Ave.
Venice, CA 90291

Danielle Gozzi
2192 Sierra Mar Drive
Los Angeles, CA 90069

Rachel Nussbar
3104 Lyceum Ave.
Los Angeles, CA 90066

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

# EXHIBIT V

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*



FILED

MAR 18 2013

CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
J. NICHOLSON    DEPUTY

**NOTICE TO DEFENDANT:** WASHINGTON MUTUAL BANK, F.A.; WASHINGTON MUTUAL
*(AVISO AL DEMANDADO):* BANK; JP MORGAN CHASE BANK, NATIONAL ASSOCIATION;
CALIFORNIA RECONVEYANCE COMPANY; ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL
OR EQUITABLE RIGHT, TITLE, ESTATE, LIEN, OR INTEREST IN THE PROPERTY DESCRIBED IN
THE CLAIM, COMMONLY KNOWN AS 31549 HIGHWAY 1, CARMEL, CA 93923, ADVERSE TO
PLAINTIFF'S TITLE, OR ANY CLOUD ON PLAINTIFF'S TITLE THERETO; and DOES 1-100,
INCLUSIVE,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Daniele Gozzi

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* <br> 1200 Aguajito Road <br> Monterey, CA 93940 | **CASE NUMBER:** <br> *(Número del Caso):* <br> M122326 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Law Offices of Linda Z. Voss, 1900 S. Norfolk Street, Suite 350, San Mateo, CA 94403-1511
Phone: 650 576-2545      Fax: 877-653-5117

**J. NICHOLSON**

| DATE:   March 18, 2013 <br> *(Fecha)* | CONNIE MAZZEI Clerk, by <br> *(Secretario)* | , Deputy <br> *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
         ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
         ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
         ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

Page 1 of 1

| Form Adopted for Mandatory Use <br> Judicial Council of California <br> SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 <br> www.courtinfo.ca.gov |
|---|---|---|

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Law Offices of Linda Z. Voss<br>Linda Z. Voss. Esq.          SBN 111434<br>1900 S. Norfolk Street, Suite 350<br>San Mateo, CA 94403-1511<br>  TELEPHONE NO.: 650-576-2545      FAX NO.: 877 653-5117<br>ATTORNEY FOR *(Name)*: Daniele Gozzi | **FILED**<br>MAR 12 2013<br>CONNIE MAZZEI<br>CLERK OF THE SUPERIOR COURT<br>J. NICHOLSON___DEPUTY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF   MONTEREY
  STREET ADDRESS: 1200 Aguajito Road
  MAILING ADDRESS:
  CITY AND ZIP CODE: Monterey, CA 93940
  BRANCH NAME: Monterey

CASE NAME: Daniele Gozzi vs.
Washington Mutual Bank, FA, JPMorgan Chase Bank, et al

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [X] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | **M122326**<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[X] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [X] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
  a. [ ] Large number of separately represented parties
  b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
  c. [ ] Substantial amount of documentary evidence
  d. [ ] Large number of witnesses
  e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
  f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [X] monetary   b. [X] nonmonetary; declaratory or injunctive relief   c. [ ] punitive
4. Number of causes of action *(specify)*:  7
5. This case [ ] is  [X] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date:  March 18, 2013

Linda Z. Voss, Esq.
(TYPE OR PRINT NAME)                    ▶  *Linda Z. Voss, Esq.*
                                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Law Offices of Linda Z. Voss<br>Linda Z. Voss, Esq.                    SBN 111434<br>1900 S. Norfolk Street, Suite 350<br>San Mateo, CA 94403-1511<br>TELEPHONE NO.: 650 576-2545          FAX NO. *(Optional):* 877 653-5117<br>E-MAIL ADDRESS *(Optional):* lzvoss@pacbell.net<br>ATTORNEY FOR *(Name):* Plaintiff Daniele Gozzi | **FILED**<br>MAR 12 2013<br>CONNIE MAZZEI<br>CLERK OF THE SUPERIOR COURT<br>J. NICHOLSON    DEPUTY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF   MONTEREY

STREET ADDRESS: 1200 Aguajito Road

MAILING ADDRESS:

CITY AND ZIP CODE: Monterey, CA  93940

BRANCH NAME: Monterey

| PLAINTIFF/PETITIONER:   Daniele Gozzi | CASE NUMBER: **M122326** |
|---|---|
| DEFENDANT/RESPONDENT:   Washington Mutual Bank, FA, JPMorgan Chase Bank, et al | JUDICIAL OFFICER: |
| **NOTICE OF RELATED CASE** | DEPT: |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title:  JP Morgan Chase Bank , NA vs. Daniel Gozzi, et al

   b. Case number:  M110621

   c. Court: [X]  same as above

      [ ]  other state or federal court *(name and address):*

   d. Department:

   e. Case type: [X]  limited civil  [ ]  unlimited civil  [ ]  probate  [ ]  family law  [ ]  other *(specify):*

   f. Filing date:  Feghruary 8, 2011

   g. Has this case been designated or determined as "complex?"   [ ]  Yes  [X]  No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      [X]  involves the same parties and is based on the same or similar claims.

      [X]  arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      [X]  involves claims against, title to, possession of, or damages to the same property.

      [ ]  is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         [ ]  Additional explanation is attached in attachment 1h

   i. Status of case:

      [ ]  pending

      [ ]  dismissed  [ ]  with  [ ]  without prejudice

      [X]  disposed of by judgment

2. a. Title:

   b. Case number:

   c. Court: [ ]  same as above

      [ ]  other state or federal court *(name and address):*

   d. Department:

| Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal Rules of Court, rule 3.300<br>www.courtinfo.ca.gov |
|---|---|---|

CM-015

| | | CASE NUMBER: |
|---|---|---|
| PLAINTIFF/PETITIONER: | Daniele Gozzi | |
| DEFENDANT/RESPONDENT: | Washington Mutual Bank, FA, JPMorgan Chase Bank, et al | |

2. *(continued)*

   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         ☐ Additional explanation is attached in attachment 2h

   i. Status of case:

      ☐ pending

      ☐ dismissed ☐ with ☐ without prejudice

      ☐ disposed of by judgment

3. a. Title:

   b. Case number:

   c. Court: ☐ same as above

      ☐ other state or federal court *(name and address):*

   d. Department:

   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         ☐ Additional explanation is attached in attachment 3h

   i. Status of case:

      ☐ pending

      ☐ dismissed ☐ with ☐ without prejudice

      ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: March 18, 2013

Linda Z. Voss, Esq.
_____
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ *Linda Z. Voss, Esq.*
_____
(SIGNATURE OF PARTY OR ATTORNEY)

CM-015

| PLAINTIFF/PETITIONER: Daniele Gozzi | CASE NUMBER: |
| DEFENDANT/RESPONDENT: Washington Mutual Bank, FA, JPMorgan Chase Bank, et al | |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*

   a. ☐ deposited the sealed envelope with the United States Postal Service.

   b. ☐ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:

   a. on *(date):*

   b. from *(city and state):*

4. The envelope was addressed and mailed as follows:

   a. Name of person served:

   Street address:
   City:
   State and zip code:

   b. Name of person served:

   Street address:
   City:
   State and zip code:

   c. Name of person served:

   Street address:
   City:  .
   State and zip code:

   d. Name of person served:

   Street address:
   City:
   State and zip code:

   ☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____        ▶ _____
(TYPE OR PRINT NAME OF DECLARANT)              (SIGNATURE OF DECLARANT)

**FILED**

MAR 1 8 2013

CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
J. NICHOLSON
DEPUTY

1  Linda Z. Voss (SBN 111434)
   Law Offices of Linda Z. Voss
2  1900 S. Norfolk Street, Suite 350
   San Mateo, CA 94403-1511
3  Phone: 650 576-2545
4  Fax: 877-653-5117
   Email: lzvoss@pacbell.net
5
6  Attorney for Plaintiff
   DANIELE GOZZI
7

CASE MANAGEMENT CONFERENCE
DATE: _____9-17-13_____
TIME: 9:00 AM
PLACE: Courtroom ___14___, 2nd Floor
1200 Aguajito Rd. Monterey CA 93940

8           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9                **FOR THE COUNTY OF MONTEREY**

10 DANIELE GOZZI,                         | **CASE #:   M122326**
11          Plaintiff,                     | **VERIFIED COMPLAINT**
12 v.                                      | **1. CANCELLATION OF INSTRUMENTS:**
13                                         |    **CALIFORNIA CIVIL CODE §3412**
14 WASHINGTON MUTUAL BANK, F.A.;
   WASHINGTON MUTUAL BANK; JP            | **2. VIOLATION OF CALIFORNIA**
15 MORGAN CHASE BANK, NATIONAL           |    **BUSINESS & PROFESSIONS CODE**
   ASSOCIATION; CALIFORNIA               |    **§17200, ET SEQ**
16 RECONVEYANCE COMPANY; ALL
   PERSONS UNKNOWN, CLAIMING ANY         | **3. DECLARATORY RELIEF**
17 LEGAL OR EQUITABLE RIGHT, TITLE,
   ESTATE, LIEN, OR INTEREST IN THE      | **4. WRONGFUL FORECLOSURE**
18 PROPERTY DESCRIBED IN THE CLAIM,
   COMMONLY KNOWN AS 31549 HIGHWAY       | **5. VIOLATION OF 15 U.S.C. § 1641(g)**
19 1, CARMEL, CA 93923, ADVERSE TO
   PLAINTIFF'S TITLE, OR ANY CLOUD ON    | **6. VIOLATION OF 15 U.S.C. § 1692e**
20 PLAINTIFF'S TITLE THERETO; and DOES 1-
   100, INCLUSIVE,                       | **7. QUIET TITLE**
21
22          **DEFENDANTS.**               | AMOUNT DEMANDED EXCEEDS $75,000.00
23

24 **COMES NOW** the Plaintiff, DANIELE GOZZI, complaining of the **DEFENDANTS**, and each of
25 them, to wit:
26
27
28

                                    1
                        VERIFIED COMPLAINT

1

**INTRODUCTION**

2    1.    This is a Verified Complaint brought by Plaintiff for Cancellation of Instruments, Unfair

3    Business Practices under CA Business and Professions code §§ 17200, et seq, Declaratory Relief,

4    Wrongful Foreclosure, Violation of Federal laws including TILA and the Fair Debt Collection

5    Practices Act, injunctive and equitable relief, and for compensatory, special, general, and punitive

6    damages.

7    2.    On August 10, 2007, Plaintiff purportedly signed a Deed of Trust and Adjustable Rate

8    Rider (hereafter collectively "DOT") after completing closing documents for the purchase of, and a

9    purported loan from **DEFENDANT WASHINGTON MUTUAL BANK, F.A.**, (hereafter

10   **"WAMUFA"**) secured by real property commonly known as 31549 Highway 1, Carmel, CA 93923

11   ("Plaintiff's Home"). The Plaintiff's Home is further described as Assessor's Parcel Number 243-221-

12   027-000. The DOT was recorded 8/28/2007 as Document Number 2007067285 with the Monterey

13   County Recorder's Office and is attached hereto as Exhibit 1 and incorporated herein by this

14   reference.

15   3.    Also on August 10, 2007, Plaintiff's now ex-wife, Anita Gozzi, purportedly signed an

16   Adjustable Rate Note and Prepayment Fee Note Addendum (hereafter collectively "Note"), which

17   were purportedly secured by the DOT, a copy of which is attached hereto as Exhibit 2 and

18   incorporated herein by this reference. Plaintiff did not sign the Note.

19   4.    Plaintiff is informed and believes, and therefore alleges, that because only Anita was

20   named on the Note, all correspondence regarding the default and subsequent foreclosure of Plaintiff's

21   Home was sent to Anita Gozzi, not Plaintiff. Said correspondence was not sent to Plaintiff.

22   5.    Plaintiff and Anita Gozzi have been involved in protracted divorce proceedings for

23   several years and as a result, Plaintiff has not received cooperation, correspondence, or any other

24   information necessary for him to protect his interest in Plaintiff's Home.

25   6.    On or about January 14, 2011, Anita Gozzi, after numerous motions and discussions,

26   pursuant to a Dissolution of Marriage Judgment and Order, recorded a grant deed, conveying her

27   interest in and to the Plaintiff's Home to Plaintiff.

28   .

7.   Plaintiff disputes the Note and DOT, the purported security interest at issue in this Complaint, and requests the court for a judgment for Cancellation of Instruments, Unfair Business Practices under CA Business and Professions code §§ 17200, et seq, Declaratory Relief and Wrongful Foreclosure in favor of Plaintiff and against the disputed ownership, right, title and interest of **DEFENDANTS WAMUFA, WASHINGTON MUTUAL BANK ("WAMU"), JP MORGAN CHASE BANK, NATIONAL ASSOCIATION ("CHASE"), and DOES 1 – 53, INCLUSIVE, ("DOE DEFENDANTS") (collectively "BANK DEFENDANTS")** as not having legal standing to pursue collection under said Note and DOT. Plaintiff alleges that the **BANK DEFENDANTS** have failed to perfect said ownership, right, title and interest after the securitization of the Note and DOT, by use of unlawful practices, and numerous unlawful violations of mortgage laws. Plaintiff further alleges that said **DEFENDANTS** dispute these allegations.

8.   Plaintiff alleges that **DEFENDANT CALIFORNIA RECONVEYANCE COMPANY ("CRC"), and DOES 54 – 100, INCLUSIVE, ("DOE DEFENDANTS")** including **DEBORAH BRIGNAC ("BRIGNAC"),** have, along with the **BANK DEFENDANTS,** used unlawful business practices and have committed numerous unlawful violations of mortgage laws. Plaintiff further alleges that **DEFENDANT CRC** and **BRIGNAC** were and are not valid agents of any of the **BANK DEFENDANTS** and therefore any actions taken by these two parties are void. Plaintiff further alleges that said **DEFENDANTS** and **BRIGNAC** named in this paragraph 8 dispute these allegations.

9.   Plaintiff alleges that **DEFENDANT CRC** is responsible and liable for any and all wrongful actions of **BRIGNAC.**

10.   This matter constitutes a core proceeding as defined by 28 U.S.C. §157(b)(2).

### THE PARTIES

11.   Plaintiff is now, and at all times relevant to this action, was a resident of the County of Monterey, State of California.

12.   Plaintiff does not know the true names, capacities, or basis for liability of **DEFENDANTS** sued as the **DOE DEFENDANTS**, as each fictitiously named **DEFENDANT** is in some manner liable to Plaintiff, or claims some right, title, or interest in the Plaintiff's Home.

1   Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

2   Plaintiff is informed and believes, and therefore alleges, that at all relevant times mentioned in this

3   Complain, each of the fictitiously named **DEFENDANTS** is responsible in some manner for the

4   injuries and damages to Plaintiff so alleged and that such injuries and damages were proximately

5   caused by such **DEFENDANTS**.

6      13.   Whenever reference is made in this Complaint to any act of any **DEFENDANT**(s),

7   that allegation shall mean that each **DEFENDANT** acted individually and jointly with the other

8   **DEFENDANTS**.

9      14.   Any allegation about acts of any corporate or other business **DEFENDANT** means

10   that the corporation or other business did the acts alleged through its officers, directors, employees,

11   agents and/or representatives while they were acting within the actual or ostensible scope of their

12   authority.

13      15.   At all relevant times, each **DEFENDANT** committed the acts, caused or directed

14   others to commit the acts, or permitted others to commit the acts alleged in this claim. Additionally,

15   some or all of the **DEFENDANTS** acted as the agent, employee, servant and/or joint venturer of the

16   remaining **DEFENDANTS**, and in doing the things alleged, were acting within the course and scope

17   of such agency, employment and/or joint venture.

18      16.   At all relevant times, each **DEFENDANT** knew or realized that the other

19   **DEFENDANTS** were engaging in or planned to engage in the violations of law alleged in this

20   claim. Knowing or realizing that the other **DEFENDANTS** were engaging in or planning to engage

21   in unlawful conduct, each **DEFENDANT** nevertheless facilitated the commission of those unlawful

22   acts. Each **DEFENDANT** intended to and did encourage, facilitate, or assist in the commission of

23   the unlawful acts, and thereby aided and abetted the other **DEFENDANTS** in the unlawful conduct.

24      17.   Plaintiff alleges that **DEFENDANT WAMUFA**, a national banking association, was

25   the purported lender named in the Note and DOT, in the amount of $5,800,000.00 recorded on

26   8/28/2007.

27

28

---

4

VERIFIED COMPLAINT

1    18.   Plaintiff alleges that **DEFENDANT WAMUFA** ceased to exist as of 1/1/2005,

2    pursuant to the 12/31/2005 10K filing of Washington Mutual, Inc. with the Securities and Exchange

3    Commission ("SEC"), when **DEFENDANT WAMUFA** merged with **WAMU.**[i]

4    19.   Plaintiff alleges that **DEFENDANT WAMU** stepped into the shoes of

5    **DEFENDANT WAMUFA**, without the authority to do so, as the original lender to Plaintiff, and

6    also may have acted in some other capacity, such as Servicer and/or Custodian for the Senior Debt

7    Security, a copy of the Prospectus which is attached hereto as Exhibit 3 and incorporated herein by

8    this reference.

9    20.   Plaintiff alleges that **DEFENDANT CHASE**, a national banking association, at all

10   times herein mentioned was and is presumed to be doing business in the County of Monterey, State of

11   California and is the alleged successor in interest to **DEFENDANTS WAMUFA** and/or **WAMU.**

12   On or about September 24, 2008, **DEFENDANT CHASE** purchased **DEFENDANT WAMU**

13   from the **FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC")** one day after the **FDIC**

14   had taken control of **DEFENDANT WAMU** under a receivership.

15   21.   Plaintiff alleges that the Senior Debt Security,  see Exhibit 3, the instrument into which

16   the Note and DOT at issue were transferred, was established under the State of New York or the State

17   of Delaware laws and not registered with and yet doing business in the State of California and the

18   County of Monterey. A copy of a fax, attached hereto as Exhibit 4 and incorporated herein by this

19   reference, addressed only to Anita Gozzi, dated 8/6/2011, indicates not only that "the loan was sold

20   into a public trust managed by JP Morgan Chase Bank, N.A.", but also that **DEFENDANT**

21   **CHASE** was merely the servicer of the loan.

22   22.   Plaintiff alleges that **DEFENDANT CRC,** a California corporation, is the original

23   appointed trustee under the DOT at issue, as well as the foreclosing Trustee, and at all times herein

24   mentioned was and is doing business in the County of Monterey, State of California.

25   23.   Plaintiff alleges that **DEFENDANT CRC** is a subsidiary of **DEFENDANT**

26   **CHASE**, was not an independent third party conducting the non-judicial foreclosure sale and

27   breached its implied covenant of good faith and fair dealing by not protecting the rights of both

28   Plaintiff and **BANK DEFENDANTS**.

24.   Plaintiff alleges that one **JOHN GILVARRY ("GILVARRY")** is and was at all times mentioned herein an employee of **DEFENDANT CHASE,** was and is presumed not to be doing business in the State of California, and is the person who, without any first hand knowledge whatsoever, falsely and fraudulently signed, on or about 7/15/2010, the Declaration of Compliance pursuant to California Code of Civil Procedure ("CCP") §2923.5(b). Plaintiff further alleges that neither **GILVARRY** nor any other party performed the due diligence required by CCP §2923.5.The Declaration of Compliance is attached to the Notice of Default ("NOD"), recorded 7/26/2010 as Document # 2010040537, which is attached hereto as Exhibit 5, and incorporated herein by this reference. Plaintiff alleges that **DEFENDANT CHASE** is responsible and liable for any and all wrongful actions of **GILVARRY.**

25.   Plaintiff alleges that **BRIGNAC** is and was at all times mentioned herein an employee of **DEFENDANT CRC,** was and is presumed to be doing business in the State of California, and is the person who falsely and fraudulently signed the Notice of Trustee Sale ("NOTS") on or about 11/1/2010 and recorded 11/3/2010 as Document # 2010064947. A copy of the NOTS is attached hereto as Exhibit 6 and incorporated herein by this reference. Plaintiff alleges that **DEFENDANT CRC** is responsible and liable for any and all wrongful actions of **BRIGNAC.**

## GENERAL ALLEGATIONS

26.   Plaintiff does now, and at all times relevant to this action, own Plaintiff's Home and is a resident of the County of Monterey, State of California.

27.   Plaintiff alleges that **DEFENDANT WAMUFA** ceased to exist as of 1/1/2005; however, it continued to make home loans under this nonexistent name to thousands of homeowners, including Plaintiff herein, in California and elsewhere after the merger through the year 2007.

28.   Plaintiff alleges that **DEFENDANT WAMUFA** continued to make home loans in violation of California law, including but not limited to Civil Code § 1558, which states: "It is essential to the validity of a contract, not only that the parties should exist, but that it should be possible to identify them."

29.   Plaintiff alleges that **DEFENDANT CHASE,** the party on whose behalf the wrongful foreclosure was conducted, was never a real party in interest and was never assigned a valid interest in the DOT.

30.   Plaintiff alleges that **DEFENDANT CHASE,** the party on whose behalf the wrongful foreclosure was conducted, was never in possession of or granted any legal, equitable or any other interest in the Note and therefore could never conduct a legal and enforceable non-judicial foreclosure of the DOT.

31.   Plaintiff alleges that **DEFENDANT CHASE,** the party on whose behalf the wrongful foreclosure was conducted, did not have standing to order the non-judicial foreclosure of Plaintiff's Home.

32.   Plaintiff alleges that subsequent to the date of purchase of the Plaintiff's Home and execution of the purported DOT by the Plaintiff, the alleged debt or obligation evidenced by the Note and secured by the DOT was not properly transferred to the Senior Debt Security, see Exhibit 3, according to California and/or other relevant law, and therefore any alleged beneficiary of the Note and DOT, including the **BANK DEFENDANTS,** does not have the requisite ability or legal standing to so claim, and/or is not a real party in interest.

33.   Plaintiff alleges, that at all times herein mentioned, any Assignment of the DOT without *proper transfer of the obligation it secures, i.e., proper endorsements of the Note, and proper assignments of the DOT, is a legal nullity.*

34.   Plaintiff alleges that" "according to the U.S. Senate Permanent Subcommittee on Investigations, the mortgages issued by Washington Mutual, and listed as "assets," were sold off before the ink was dry. So the fact is that thousands of the mortgages that JPMorgan Chase is now claiming the right to foreclose on were sold by Washington Mutual ... long before JPMorgan Chase acquired the assets of Washington Mutual. That means that JPMorgan Chase never acquired thousands of the notes they now claim to own as a purchaser of Washington Mutual's assets." [ii]

35.   Moreover, Plaintiff alleges that **DEFENDANTS WAMUFA, WAMU, CHASE,** nor any of the **BANK DEFENDANTS,** as evidenced by testimony to the U.S. Senate Permanent

1 | Subcommittee on Investigations, ever acquired Plaintiff's loan, and cannot now and never could claim

2 | to own said loan as a purchaser of **DEFENDANTS WAMUFA** and **WAMU** assets from **FDIC**.

3 |     36.   Consequently, any subsequent non-judicial foreclosure sale by **DEFENDANTS**

4 | **CHASE** and **CRC** was and is void.

5 |     37.   Nonetheless, the **BANK DEFENDANTS** are attempting to take advantage of the

6 | complex structured finance system to defraud yet another homeowner. Having already benefitted from

7 | an American taxpayer bailout of unprecedented proportions, Plaintiff alleges that the **BANK**

8 | **DEFENDANTS** will oppose this CLAIM and seek a Court - sanctioned bailout by attempting to

9 | validate the blatantly fabricated NOD and NOTS, Exhibits 5 and 6 attached hereto and incorporated

10 | herein by this reference. As a consequence the Trustee's Deed upon Sale, recorded 1/10/2011 as

11 | Document # 2011001839, a copy of which is attached hereto as Exhibit 7 and incorporated herein by

12 | this reference, was also obtained fraudulently. By the **BANK DEFENDANTS** attempting to

13 | validate their existence, they are misleading the Plaintiff into believing that the **BANK**

14 | **DEFENDANTS** were his actual creditors and were entitled to foreclose on his home. They are also

15 | committing fraud on the Court.

16 |     38.   The issue for which Plaintiff is seeking resolution does not include the question of

17 | whether or how much he may owe on the loan. The issue needing to be resolved is what entity actually

18 | owns the loan and has the right and standing to enforce the terms of the Note and DOT. The Court

19 | should not condone the **BANK DEFENDANTS'** fraudulent and predatory lending and servicing

20 | practices and allow it to collect money it was and is not owed. Simply put, the Court should not allow

21 | the **BANK DEFENDANTS** to trample over 200 years of well-settled property laws just because

22 | Plaintiff may "owe somebody the money".

23 |     39.   Plaintiff's allegations are based on: (1) analysis of the Plaintiff's Home's recorded

24 | county records; (2) direct written and oral communication with **DEFENDANTS WAMUFA,**

25 | **WAMU, CHASE** and/or **CRC;** (3) his counsel's research, experience, and extensive review of

26 | depositions, case law, amicus briefs, correspondence, news articles, reports, and publicly available

27 | securitization documents & practices; (4) a review of the purported Notice of Trustee Sale fraudulently

28 | signed by **BRIGNAC;** (5) a review of the purported Declaration of Compliance fraudulently signed

1   by **GILVARRY**; (5) a review of the Affidavit of William McCaffrey and the Senior Debt Security

2   Prospectus attached hereto as Exhibits 8 and 3, respectively and incorporated herein by this reference.

3       40.   Plaintiff alleges that none of the **BANK DEFENDANTS** can demonstrate or

4   document that Plaintiff's Note was ever properly endorsed, and the DOT simultaneously assigned and

5   both ultimately properly perfected and transferred to the Senior Debt Security or any other entity.

6       41.   Plaintiff relied on the **BANK DEFENDANTS'** misrepresentations and has been

7   damaged in the following ways: (1) he has been paying the wrong party for an undetermined amount

8   of time and overpaid interest and other penalties that were miscalculated; (2) he has suffered damage

9   to his credit reports and scores; (3) the title to Plaintiff's Home has been lost through a wrongful

10  foreclosure; (4) Plaintiff is facing imminent eviction from his home; (5) Plaintiff has expended

11  significant funds to cover the cost of attorneys' fees and related costs; (6) Plaintiff has suffered damage

12  to his reputation in the community; (7) Plaintiff is unable to determine whether he sent monthly

13  mortgage payments to the right party; (8) multiple parties may seek to enforce this debt obligation

14  against Plaintiff; and (9) any would-be buyer of Plaintiff's home will find themselves in legal limbo,

15  unable to know with any certainty whether they can safely buy Plaintiff's home or get title insurance.

16      42.   Plaintiff seeks a court ruling as to whether the DOT secured any obligation of Plaintiff

17  such that **BANK DEFENDANTS** could foreclose on the Plaintiff's Home or collect Plaintiff's loan

18  payments; a final judgment granting Plaintiff's quiet title to his Home; and a final judgment of

19  wrongful foreclosure against the **BANK DEFENDANTS** and **DEFENDANT CRC.**

20      43.   Plaintiff alleges that **BANK DEFENDANTS** have received more than 100%

21  compensation for Plaintiff's loan through moneys paid by the **FDIC** and other insurance and have

22  been paid in full by the investors in the Senior Debt Security, or otherwise.

23      44.   For all of the foregoing reasons, Plaintiff alleges a controversy surrounding the title is

24  evident because there are no recorded Assignments of the DOT to the proper Note Holder. Plaintiff

25  claims the Note and DOT are still separated, and the DOT cannot therefore enforce the Note.

26      45.   Additionally, Plaintiff claims the **BANK DEFENDANTS** and **DEFENDANT CRC**

27  had no authority to foreclose for lack of standing because said **DEFENDANTS** did not have any

28  perfected security or beneficial interest in the Note.

**THE FABRICATED DECLARATION OF COMPLIANCE WAS FRAUDULENTLY**

**SIGNED AND RECORDED AND IS IN VIOLATION OF CCP §§2923.5 & 2923.55**

46.     On 7/15/2010, **GILVARRY** signed the Declaration of Compliance, attached to Exhibit 5, to be recorded with the County of Monterey. Plaintiff alleges that **GILVARRY** is not now and never was employed in the office of **DEFENDANT CHASE,** where he purportedly signed the Declaration of Compliance.

47.     Plaintiff alleges that **GILVARRY** is what has come to be known as a "robo-signer" - an individual who simply signs thousands of property record documents without any legal or corporate authority whatsoever.

48.     Plaintiff alleges that **GILVARRY** does not have first hand knowledge that "mortgagee, beneficiary or authorized agent (i.e. **DEFENDANT CHASE**) tried with due diligence but was unable to contact the borrower to discuss the borrower's financial situation and to explore options for the borrower to avoid foreclosure as required by Cal. Civ. Code Section 2923.5. Thirty days or more have elapsed since these due diligence efforts were completed." Therefore, his statement contained in the Declaration of Compliance is strictly hearsay, inadmissible as evidence, and was fraudulently executed and recorded.

49.     This was an intentional act undertaken by **GILVARRY** and **DEFENDANTS CHASE,** and other **BANK DEFENDANTS,** done knowingly with the specific intent that the consequences of their actions be brought to fruition.

50.     The Declaration of Compliance is a fraudulent claim, and the execution, filing, and recordation of this document was performed for the purpose of facilitating and aiding & abetting the illegal, deceptive, and unlawful foreclosure and collection of Plaintiff's loan payments.

**THE FABRICATED NOTICE OF TRUSTEE SALE IS A FRAUDULENTLY SIGNED AND**

**RECORDED DOCUMENT**

51.     On March 7, 2011, **BRIGNAC** caused a purported NOTS, Exhibit 6, to be recorded with the County of Monterey. The NOTS contains the following: "in compliance with California Civil Code § 2923.5(c) mortgagee, beneficiary or authorized agent (i.e. **DEFENDANT CHASE**) declares: that it has contacted the borrower(s) to assess their financial situation and to explore options

1  to avoid foreclosure; or that it has made efforts to contact the borrower(s) to assess their financial

2  situation and to explore options to avoid foreclosure by one of the following methods: by telephone;

3  by United States mail; either 1st class or certified; by overnight delivery; by personal delivery; by e-

4  mail; by face to face meeting. ... SEE ATTACHED EXHIBIT"

5      52.    Plaintiff did not receive any such contact from **DEFENDANTS CHASE** or

6  **BRIGNAC.**

7      53.    Moreover, there was no such exhibit attached to the NOTS.

8      54.    Plaintiff alleges that **BRIGNAC** is an individual who simply signs thousands of

9  property documents without any legal authority to do so. See a document obtained from the

10 Internet showing different signatures for **BRIGNAC** on documents across the country, Exhibit 9,

11 attached hereto and incorporated herein by this reference.[iii]

12     55.    Plaintiff alleges that **BRIGNAC** is not a "Vice President" for **DEFENDANT CRC**

13 and in fact, the NOTS was fraudulently signed or worse yet, only stamped. [iv]

14     56.    Plaintiff alleges that **BRIGNAC** was never, in any manner whatsoever, appointed as a

15 "Vice President" by **DEFENDANT CRC**, and thus she had no corporate or legal authority from

16 **DEFENDANTS CRC, CHASE,** or other **BANK DEFENDANTS,** to execute the purported

17 NOTS. This was an intentional act undertaken by **BRIGNAC** and/or **DEFENDANTS CRC,** and

18 **CHASE,** done knowingly with the specific intent that the consequences of these actions be

19 brought to fruition.

20     57.    Plaintiff alleges that the NOTS is a fraudulent document, and the execution, filing, and

21 recordation of the document was performed for the purpose of facilitating and aiding & abetting the

22 illegal, deceptive, and unlawful collection and attempts to non-judicially foreclose on Plaintiff's

23 Home.

24                    **RELATIVELY RECENT DEVELOPMENTS**

25     58.    On or about September 24, 2010, Edmund G. Brown, Jr., as former California Attorney

26 General, (aka Jerry Brown, "AG"), directed ALLY Financial, Inc., which owns GMAC, Mortgage

27 LLC, to stop foreclosures in California until it proves it is complying with State law.

28

59. On or about October 1, 2010, the AG similarly requested that **DEFENDANT CHASE** stop foreclosures in California until it proved it was complying with State law.

60. Since then, other banks, have halted foreclosures in judicial foreclosure States.

61. On or about April 13, 2011, **DEFENDANT CHASE** entered into a Cease and Desist and Consent Order with the Office of the Comptroller of the Currency ("OCC"), a copy of which is available at: http://www.occ.gov/static/enforcement-actions/ea2011-050.pdf.

62. The OCC made the following findings with regard to **DEFENDANT CHASE'S** conduct:

### ARTICLE I
### COMPTROLLER'S FINDINGS
The Comptroller finds, and the Bank neither admits nor denies, the following:
...
In connection with certain foreclosures of loans in its residential mortgage servicing portfolio, the Bank:

(a)    filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;

(b)    filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary; [v]

(c)    litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time;

(d)    failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes;

(e)    failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and

(f)    failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services."

63. Article VII of the Cease and Desist and Consent Order requires, inter alia, the following:

### ARTICLE VII
### FORECLOSURE REVIEW
(1) Within forty-five (45) days of this Order, the Bank shall retain an independent consultant acceptable to the Deputy Comptroller and the Examiner-in-Charge to conduct an independent review

1    of certain residential foreclosure actions regarding individual borrowers with respect to the Bank's

2    mortgage servicing portfolio. The review shall include residential foreclosure actions or proceedings
     (including foreclosures that were in process or completed) for loans serviced by the Bank, whether

3    brought in the name of the Bank, the investor, the mortgage note holder, or any agent for the mortgage
     note holder (including MERS), that have been pending at any time from January 1, 2009 to December

4    31, 2010, as well as residential foreclosure sales that occurred during this time period ("Foreclosure

5    Review")."

6             64.    Plaintiff alleges that **DEFENDANT CHASE** failed and refused to perform according

7    to the terms of the OCC's Order and made no review of Plaintiff's Note and DOT, as required by that

8    Order.

9             65.    The impetus of these necessary but drastic measures stems from allegations of document

10   fraud on the part of the banks and their servicers. This epidemic is not limited to the banks listed

11   above, but is an industry wide problem.

12            66.    During the securitization era, Banks and the resulting trusts and Senior Debt Securities,

13   in the rush to securitize and monetize loans and sell them to investors, routinely ignored the critical

14   step of obtaining DOT assignments and Note endorsements from the original lenders to the various

15   intervening parties.

16            67.    Now, years later, when the company "servicing" the loan, **DEFENDANT CHASE,**

17   intends to foreclose, there are no documents available to document the proper chain of title because

18   none were originally created. As a result, banks are creating the missing documents or outsourcing the

19   documents to companies like Lender Processing Services to produce the needed assignments. This

20   practice was admitted by deposed bank executives such as GMAC's Jeffrey Stephen, who admitted in

21   sworn deposition testimony to signing more than 500 documents a day and up to 10,000 documents a

22   month related to foreclosures without reviewing them. A copy of the Jeffrey Stephen's Deposition is

23   available at:

24   http://api.ning.com/files/s4SMwlZXvPu4A7kq7XQUsGW9xEcYtqNMPCm0a2hISJu88PoY6ZNqanX

25   7XK41Fyf9gV8JIHDme7KcFO2cvHqSEMcplJ8vwnDT/091210gmacmortgagevsannmneu1.pdf.

26            68.    Due to the strict timelines and guidelines to complete a foreclosure, banks are also

27   fabricating other documents to comply with California's foreclosure guidelines.

28

1       69.   The impact of these allegations is so cogent that Old Republic National Title Company

2 and Stewart Title Company stopped insuring the title on homes foreclosed by **DEFENDANT**

3 **CHASE** and others. See USA Today 10/2/2010 article at:

4 http://www.usatoday.com/money/economy/housing/2010-10-02-old-republic-foreclosures_N.htm

5       70.   Plaintiff alleges that **DEFENDANT CHASE**, among others, was and is a party to the

6 Consent Judgment reached in the case of *THE UNITED STATES OF AMERICA, et al, v. BANK OF*

7 *AMERICA CORPORATION, et al*, in the United States District Court for the District of Columbia,

8 Case # 1:12-cv-00361-RMC.

9       71.   Plaintiff further alleges that the actions of **DEFENDANT CHASE** as alleged in this

10 Complaint were and are in violation of said Consent Judgment.

11                **PLAINTIFF HAS SUFFERED, AND CONTINUES TO SUFFER**

12        **SIGNIFICANT MONETARY, LEGAL AND EQUITABLE DAMAGE**

13       72.   The conduct described above of **DEFENDANTS WAMUFA, WAMU, CHASE,**

14 **CRC** and/or other **BANK DEFENDANTS,** was malicious because said **DEFENDANTS** knew

15 that they were not acting on behalf of the current pecuniary beneficiary of the Note and DOT.

16 However, despite such knowledge, said **DEFENDANTS** foreclosed on Plaintiff's Home.

17       73.   **BANK DEFENDANTS** and **DEFENDANT CRC** engaged and are engaging in a

18 pattern and practice of defrauding Plaintiff, in that, during the entire life of the loan, **BANK**

19 **DEFENDANTS** and **DEFENDANT CRC** failed to properly credit payments made; incorrectly

20 calculated interest on the accounts; and failed to accurately debit and credit fees.

21       74.   At all times material, Plaintiff alleges that **BANK DEFENDANTS** and

22 **DEFENDANT CRC** had and have actual knowledge that Plaintiff's accounts were not accurate, and

23 relied that Plaintiff would make further payments based on **BANK DEFENDANTS'** and

24 **DEFENDANT CRC'S** inaccurate accounts.

25       75.   Plaintiff made payments based on the improper, inaccurate and fraudulent

26 representations as to Plaintiff's accounts.

27       76.   As a direct and proximate result of the actions of the **BANK DEFENDANTS** and

28 **DEFENDANT CRC** set forth above, Plaintiff overpaid in interest.

77. As a direct and proximate result of the actions of the **BANK DEFENDANTS** and **DEFENDANT CRC** set forth above, Plaintiff's credit and credit score have been severely damaged.

78. As a direct and proximate result of the actions of the **BANK DEFENDANTS** and **DEFENDANT CRC** set forth above, the title to Plaintiff's home has been slandered, clouded, and its salability has been rendered unmarketable.

79. As a direct and proximate result of the actions of the **BANK DEFENDANTS** and **DEFENDANT CRC** set forth above, multiple parties can potentially claim an interest in the subject loan.

80. The conduct of **BANK DEFENDANTS** and **DEFENDANT CRC** and one or more of the **DOE DEFENDANTS** have led to the imminent loss of Plaintiff's home and to pecuniary damages. The pecuniary damages include, but are not limited to, the costs of removing the cloud from the title, attorneys' fees and costs, in an amount to be proven at trial.

81. The conduct of **BANK DEFENDANTS** and **DEFENDANT CRC** and one or more of the **DOE DEFENDANTS'** conduct was malicious because said **DEFENDANTS** knew the identity of the current and true beneficiary of Plaintiff's Note and Deed of Trust, yet still wrongfully recorded the fabricated documents so as to illegally foreclose, slander the Plaintiff's credit and title to the Plaintiff's Home, and make said title unmarketable.

82. The title to Plaintiff's Home has been rendered unmarketable and unsalable because of the possibility of multiple claims being made against it. If the NOD, NOTS and Trustee's Deed upon Sale are not cancelled, Plaintiff will be incurably prejudiced. Plaintiff will be denied the opportunity to identify the true and current creditor and exercise his statutory right to cure any alleged default.

83. Plaintiff alleges that any amount allegedly owed under the Note is subject to equitable offset by the damages owed to Plaintiff from the **BANK DEFENDANTS, DEFENDANT CRC** and others yet to be determined.

84. Plaintiff alleges that due to improper procedures conducted by **BANK DEFENDANTS, DEFENDANTS CRC, DOE DEFENDANTS and BRIGNAC,** the true owner of the Note and DOT is certainly is does not any of these **DEFENDANTS**.

1       85.   Plaintiff does *not* allege that **BANK DEFENDANTS** must be in "physical possession"

2 or "hold" Plaintiff's Note to foreclose on the Plaintiff's Home - a requirement that has been rejected in

3 California. [vi] Rather, Plaintiff alleges that prior to demanding mortgage payments from Plaintiff and

4 recording the NOD, none of the **BANK DEFENDANTS** or **DOE DEFENDANTS** had, nor

5 presently have, a secured or unsecured, legal or equitable interest in Plaintiff's Note and/or DOT as

6 required under California law, irrespective of who is actually in physical possession of Plaintiff's

7 Note.

8       86.   Plaintiff alleges that **BANK DEFENDANTS** and **DEFENDANT CRC** enforced a

9 debt obligation in which they had no pecuniary, equitable or legal interest. **BANK DEFENDANTS'**

10 and **DEFENDANT CRC'S** conduct is part of a fraudulent debt collection scheme.

11 **FIRST CAUSE OF ACTION**

12 **CANCELLATION OF INSTRUMENTS; CALIFORNIA CIVIL CODE SECTION 3412**

13 **[Against all DEFENDANTS, and Doe DEFENDANTS]**

14       85.   Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs

15 as if the same were fully set forth herein.

16       86.   Each of the written instruments described below in this cause of action was recorded in

17 Monterey County, California. The Property to which all of the written instruments sought to be

18 cancelled relates is situated in Monterey County.

19       87.   Plaintiff alleges that the Notice of Default Notice of Sale, and Trustees Deed Upon Sale

20 are all void for the reasons stated herein.

21       88.   The written instruments sought to be cancelled in this cause of action should be cancelled

22 and Plaintiff is entitled to attorney's fees. If the written instruments are not canceled Plaintiff will be

23 deprived of title and possession of his home, and title to his Property will have been stolen from him.

24 **SECOND CAUSE OF ACTION**

25 **VIOLATION OF BUSINESS & PROFESSIONS CODE §§17200, ET SEQ**

26 **[Against all BANK DEFENDANTS, CRC and Doe DEFENDANTS]**

27       89.   Plaintiff hereby incorporates by reference each and every one of the preceding

28 paragraphs as if the same were fully set forth herein.

1    90.  **DEFENDANTS** have engaged in unfair, unlawful, and fraudulent business practices in

2 the State of California, as set forth above.

3    91.  By engaging in the above-described acts and practices, **DEFENDANTS** have

4 committed one or more acts of unfair competition within the meaning of Cal. Bus. & Prof. Code

5 §§17200, et seq.

6    92.  Cal. Bus. & Prof. Code §§17200, et seq., prohibits acts of unfair competition, which

7 means and includes any unlawful, unfair or fraudulent business act and conduct which is likely to

8 deceive and is fraudulent in nature. [vii]

9    93.  **DEFENDANTS** have violated Cal. Penal Code §115 and §532(f)(a)(4) by filing or

10 causing the Documents to be filed with the Monterey County Recorder in connection with Plaintiff's

11 mortgage Loan transaction with knowledge that the Documents contained deliberate misstatements and

12 misrepresentations, including, *inter alia*, that **BANK DEFENDANTS** were the owners of Plaintiff's

13 loan.

14    94.  **DEFENDANTS** facilitated, aided, and abetted the illegal, deceptive, and unlawful

15 foreclosure proceedings.

16    95.  **BANK DEFENDANTS** and **CRC** have been acting in a manner to mislead Plaintiff

17 into believing that **BANK DEFENDANTS** owned an interest in the Loan, and as such had the

18 authority to initiate foreclosure proceedings on Plaintiff's Property.

19    96.  The conduct described above by **BANK DEFENDANTS** and **CRC** was malicious

20 because they knew that **BANK DEFENDANTS** did not own a valid interest in the Loan. However,

21 despite such knowledge, **BANK DEFENDANTS** and **CRC** completed a foreclosure action on

22 Plaintiff's Property, and engaged in other unlawful foreclosure practices. Moreover, **BANK**

23 **DEFENDANTS** and **CRC** have developed a practice of recording false documents in order to

24 initiate foreclosure proceedings on California consumers.

25    97.  As more fully described above, **DEFENDANTS'** acts and practices are unlawful. This

26 conduct is ongoing and continues to this date.

27    98.  As more fully described above, **DEFENDANTS'** acts and practices are likely to

28 deceive members of the public. This conduct is ongoing and continues to this date.

99.  As more fully described above, **DEFENDANTS'** acts and practices are unfair and the harm caused by their conduct outweighs any benefit that their conduct may have. This conduct is ongoing and continues to this date.

100.  Plaintiff alleges that by engaging in the above described acts and/or practices as alleged herein, **DEFENDANTS** violated several laws including Cal. Bus. & Prof. Code §§17200, et seq. and must pay restitution related to their unfair, unlawful, and deceptive business practices.

101.  Plaintiff alleges that **DEFENDANTS'** misconduct as alleged herein, gave them an unfair competitive advantage over their competitors. The scheme implemented by **DEFENDANTS** is designed to defraud California consumers and enrich **DEFENDANTS**.

102.  The foregoing acts and practices have caused substantial harm to California co-owners, including Plaintiff.

103.  As a direct and proximate result of the actions of **DEFENDANTS**, and each of them, state above, Plaintiff has been injured in that a cloud has been placed upon title to Plaintiff's Property and **DEFENDANT** has failed to remove this cloud from Plaintiff's title

104.  As a direct and proximate result of **DEFENDANTS'** violations of Cal. Bus. & Prof. Code §§17200, Plaintiff has been damaged in the following ways: (1) the title to his home has been stolen from him; (2) he is unable to determine whether he sent his monthly mortgage payments to the right party; *and* (3) *he has expended significant funds to cover the cost of attorneys' fees and related costs.*

### THIRD CAUSE OF ACTION

### DECLARATORY RELIEF

### [Against All DEFENDANTS and Doe DEFENDANTS]

105.  Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

106.  An actual controversy has arisen and now exists between Plaintiff, on the one hand, and **BANK DEFENDANTS** on the other, with respect to the duties and obligations of the respective parties with regard to the Loan and/or the foreclosure.

107.  These disputes concern, but are not limited to, the ownership rights and the validity of the

1 foreclosure process.

2      108. Pursuant to the recorded documents, **BANK DEFENDANTS** have asserted that they
3 were assigned and transferred, by the **FDIC**, a secured enforceable interest in, and a perfected lien
4 against the Plaintiff's Note, Deed of Trust, and Property.

5      109. Plaintiff disputes the validity and legal effect of any Assignment or transfer or any
6 recorded document on the following separate grounds: 1) **FDIC** lacked any ownership interests in the
7 property to convey via any Assignment or transfer; 2) the NOD was executed by **GILVARRY** who is
8 an employee of **CHASE** and the NOTS executed by **BRIGNAC** who is actually an employee of **CRC**
9 both lacked the legal and corporate authority to sign on behalf of their employers.

10      110. Given the competing allegations made by Plaintiff and **BANK DEFENDANTS**
11 regarding the validity of the recorded documents, should the Court deem these Documents invalid,
12 Plaintiff seeks a declaratory judgment to establish whether **BANK DEFENDANTS** obtained the
13 Note and/or Deed of Trust by any legal means, and the respective rights and obligations of the parties
14 under the Loan.

15      111. Plaintiff will suffer prejudice if the Court does not determine the rights and obligations of
16 the parties because:(1) he will be denied the right to conduct discovery and have **BANK**
17 **DEFENDANTS'** claims verified by a custodian of records who has personal knowledge of the Loan
18 and all transaction related to it; and (2) he will be denied the opportunity to challenge the Notice of
19 Default, Notice of Sale and Trustees Deed Upon Sale which resulted in an improper foreclosure.

20      112. Due to the actual case and controversy regarding competing claims and allegations, it is
21 necessary that the Court declare the actual rights and obligations of the parties and make a
22 determination as to (1) whether the Recorded Documents have any legal effect such that **BANK**
23 **DEFENDANTS** and **CRC** had a right to initiate foreclose proceedings on the Property; and (2) to the
24 extent the Court finds the Recorded Documents are invalid, whether **BANK DEFENDANTS**
25 obtained the Note and/or Deed of Trust by any other legal means.

26

27

28

**FOURTH CAUSE OF ACTION**

**WRONGFUL FORECLOSURE**

**(Against DEFENDANTS CHASE and CRC and all Doe DEFENDANTS)**

113.   Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

114.   **DEFENDANTS CHASE** and **CRC** were the purported foreclosing parties upon Plaintiff's Home. **DEFENDANTS CHASE** and **CRC** were the entities that exercised the power of sale within the DOT.

115.   As set forth above, since the purported status of **DEFENDANT CHASE** as beneficiary is void *ab initio,* **DEFENDANTS CHASE** and **CRC** and/or other **DEFENDANTS** did not have the authority to exercise the power of sale within the DOT, and **DEFENDANTS CHASE** and **CRC** could not initiate foreclosure based upon any alleged defaults known or believed to exist.

116.   Currently, Plaintiff is at risk of having to relocate from his Home and lose all right, title and interest in his Home due to the actions of the **DEFENDANTS**, and each of them.

117.   **DEFENDANTS CHASE** and **CRC** initiated foreclosure without privilege and with malice, as said **DEFENDANTS** knew that they had no interest in the Note and Deed of Trust. As stated, **FDIC** was not owed any money, and **DEFENDANT CHASE** had no pecuniary interest in the Note and DOT and were not beneficiaries of the Note and DOT. Therefore, despite the fact that said **DEFENDANTS** had no standing to proceed with a non judicial foreclosure, they proceeded with the foreclosure sale.

118.   The **DEFENDANTS** falsely represented to Plaintiff that if he did not pay, Plaintiff's Home would be sold at a public auction. Such actions were malicious and fraudulent. In fact, the sale that took place was *void,* for the reasons stated herein.

119.   Plaintiff alleges said Notices of Default and of Sale were false, void, and without privilege, for the reasons stated and discussed herein. To claim the trustee, rather than the beneficiary, is the party who holds the power of sale under the deed of trust, elevates form over substance. The beneficiary is the real party in interest and should comply with California Civil Code § 2932.5.

120.   This fallacy does not comport with substantial justice or fair play, and is contrary to the

1 | underlying policy upon which the foreclosure laws are founded; to protect the borrowers.

2 |     121. At no point in time did the purported original beneficiary of the DOT, properly endorse,

3 | assign, sell, transfer or in any way convey any perfected security interest in Plaintiff's Home to any of

4 | the **DEFENDANTS** herein.

5 |     122. As set forth above, at the time **DEFENDANTS CHASE** and **CRC** commenced non-

6 | judicial foreclosure proceedings, they had no legal or equitable interest in the Note and DOT, and thus

7 | no amount was owed from Plaintiff to **DEFENDANTS CHASE** and **CRC** or any other purported

8 | beneficiary of the Note and DOT.

9 |     123. In addition to **DEFENDANTS CHASE** and **CRC** never having the legal authority to

10 | non-judicially foreclose, the foreclosure is *void* and cancelled as set forth above due to the security

11 | interest in the DOT being nullified by the actions of **DEFENDANTS WAMUFA** and **WAMU**.

12 |     124. Plaintiff alleges that a fraudulent foreclosure is void against all parties.

13 |     125. The estate of interest claimed in Plaintiff's Home by the **DEFENDANTS**, and each of

14 | them, prior to and after the recording of the Trustee's Deed has deprived Plaintiff the right to the use

15 | and enjoyment of his Home, and hinders Plaintiff's right to unrestricted alienation of his Home. If the

16 | Trustee's Deed is not determined void and cancelled, and the foreclosure sale, set aside, Plaintiff's

17 | home will basically have been stolen from him.

18 |     126. Plaintiff further alleges that any amount allegedly owing under the Note and DOT is

19 | offset by the damages owed to them from all **DEFENDANTS** or any of the **Doe DEFENDANTS**

20 | in this.

21 |     127. The tender rule only applies if the foreclosure sale was voidable, not void.

22 |           a. Plaintiff alleges that the foreclosure sale is VOID, not voidable. [viii]

23 |           b. The rule often requiring "tender or return of consideration … is not

24 | inflexible" (*Carruth, supra,* 36 Cal. 2nd at p. 430, 224 P. 2nd 702). [ix] Moreover, tender may

25 | not be required where it would be inequitable to do so (*Onofrio v. Rice* (1997) 55 C.A.4th

26 | 413, 424), and if the tender rule does apply, it is only to set aside a VOIDABLE sale.

27 | (*Karlsen v. American Savings & Loan Assn* (1971) 15 Cal. App. 3rd 117; See also *Karlsen,*

28 | 15 Cal. App. 3rd at 117, 92 Cal. Rptr. at 854. (This rule generally applies to a claim to

1            cancel a *voidable* sale under a deed of trust). (See also Exhibit 10, *Suarez vs. BONY*

2            (2013) Sup. Ct. of Orange Cty, Case # 12-560082.)

3      128.   Even where the general rule is that a tender or return of the consideration be made, it has

4 been recognized that the rule is not inflexible and that there are exceptions thereto.[x] The tender-or-

5 return of consideration requirement may not be imposed where it would be inequitable to do so or

6 where the underlying action is for money damages against which the value of the consideration could

7 be set off against a recovery. A Court may also find strict application of the tender rule inequitable, in

8 its sound discretion, to enforce even legally protected rights where the effect would be prejudicial or

9 contrary to public policy. [xi]

10      129.   Accordingly, Plaintiff hereby requests this Court for an order holding that the non-

11 judicial foreclosure sale of Plaintiff's Home was legally void and conducted without any right or

12 privilege by **DEFENDANTS CHASE** and **CRC** and any of the Doe **DEFENDANTS** in this

13 matter.

14 **FIFTH CAUSE OF ACTION**

15 **VIOLATION OF 15 U.S.C. § 1641(g)**

16 **[Against BANK DEFENDANTS and Doe DEFENDANTS]**

17      130.   Plaintiff hereby incorporates by reference each and every one of the preceding

18 paragraphs *as if* the same were fully set forth herein.

19      131.   Plaintiff resides in the Subject Property and it is his principal residence.

20      132. The new subsection (g) added to § 131 of TILA by § 404 of The Helping Families Save

21 Their Homes Act of 2009 states:

22            (g) NOTICE OF NEW CREDITOR-

23                 (1)    IN GENERAL. In addition to other disclosures required by this title,

24                 not later than 30 days after the date on which a mortgage loan is sold or

25                 otherwise transferred or assigned to a third party, the creditor that is the new

26                 owner or assignee of the debt shall notify the borrower in writing of such

27                 transfer, including:

28                      (A) the identity, address, telephone number of the new creditor;

1                        (B) the date of transfer;

2                        (C) how to reach an agent or party having authority to act on

3                        behalf of the new creditor;

4                        (D) the location of the place where transfer of ownership of the

5                        debt is recorded; and

6                        (E) any other relevant information regarding the new creditor."

7              Failure to comply with the requirements of this new subsection 131(g) of

8              TILA may result in civil liability for actual damages, legal fees and statutory

9              damages under§ 130(a) of TILA.

10     131. Irrespective of who effected the recordation of the "Assignment" recorded on January 11,

11 2011, the purported transfer of ownership of Plaintiff's Note occurred after May 2009.

12     132. Plaintiff alleges that Section 131(g) of TILA applies to **CHASE** as purported and alleged

13 assignee of Plaintiff's loan. Plaintiff is unable to determine which **DEFENDANT** is the purported

14 beneficiary of Plaintiff's Note and Mortgage.

15     133. Plaintiff alleges that § 131(g) of TILA applies to **CHASE** as it has admitted that

16 Plaintiff's loan is owned by a public security, as evidenced in Exhibit 4.

17     134. Section 131(g) of TILA requires **CHASE** to perform and comply with the requirements

18 of the statute, otherwise face statutory and civil penalties and damages.

19     135. **CHASE** purports to be a <u>creditor</u> under and is alleged to have violated 15 U.S.C. §

20 164l(g).

21     136. **DEFENDANT CHASE** alleges that it is the purported owner of Plaintiff's debt.

22 Plaintiff disputes the validity of **CHASE'S** claim, for the reasons stated herein.

23     137. **CHASE** did not provide Plaintiff with written notice within 30 days after the date on

24 which it was allegedly assigned the mortgage.

25     138. Plaintiff did not receive notice indicating the exact date of the purported assignment of

26 the interest in his loan, as required by§ 131(g)(I)(B).

27     139. Plaintiff did not receive notice indicating how to reach an agent or party having authority

28 to act on **DEFENDANT CHASE'S** behalf, as required by§ 131(g)(I)(C).

140. Plaintiff did not receive notice indicating the location of the place where transfer of ownership of the debt is recorded, as required by §131(g)(1)(D).

141. Plaintiff did not receive notice indicating any other relevant information regarding the new creditor, a public security, as required by § 131(g)(l)(E).

142. As a result of **DEFENDANT CHASE'S** violations, Plaintiff's home was foreclosed and he has had to pay attorneys' fees to defend against an eviction and fraudulent foreclosure, including filing fees and costs, both in amounts to proven at trial.

143. Plaintiff did not discover that **DEFENDANT CHASE** had violated U.S.C. §1641, et seq. until on or about August 2011, when he received a copy of Exhibit 4 and discovered that their mortgage had allegedly been "sold into a public security". **DEFENDANT CHASE** has still not complied with § 131(g)(l)(E) because he has yet to receive a copy of any "assignment" as required by law. Therefore, the statute of limitations on his claims against **DEFENDANT CHASE** and other Doe **DEFENDANTS** is equitably tolled.

144. Thus, **CHASE** violated § 131(g) 15 U.S.C. § 1641 and is subject to statutory damages, civil liability, penalties, attorneys' fees and actual damages. *See* §131 (g) 15 U.S.C. § 1640. The actual pecuniary damages include, but are not limited to, the over calculation and overpayment of interest on Plaintiff's loan, the costs of repairing Plaintiff's credit, the reduction and/or elimination of Plaintiff's credit limits, costs associated with removing the cloud on his property tide, and attorneys' fees and costs, in an amount to be proven at trial, but in excess of $75,000.00.

145. As a result of **DEFENDANT CHASE'S** violation, Plaintiff's home has fallen into foreclosure on and he has suffered actual damages in that they are in the process of being foreclosed upon. Further, Plaintiff has had to pay attorneys' fees and filing fees and costs, both in amounts to proven at trial.

146. Plaintiff is entitled to a private right of action to enforce § 131(g) U.S.C. §§1641, et seq.

1

## SIXTH CAUSE OF ACTION

2

### VIOLATION OF 15 U.S.C. § 1692e

3

**[Against BANK DEFENDANTS, CRC, and Doe DEFENDANTS]**

4      147. Plaintiff hereby incorporates by reference each and every one of the preceding

5  paragraphs as if the same were fully set forth herein.

6      148. **DEFENDANT CHASE**, acting as the servicer for the public security that purportedly

7  owns the loan at issue, is in the business where the principal purpose is to collect debts on behalf of the

8  investors in the senior security. **DEFENDANT CHASE** attempted to collect Plaintiff's debt

9  obligation on behalf of the senior security investors and thus is a debt collector pursuant to the Federal

10  Debt Collection Practices Act ("FDCPA").

11      149. **DEFENDANT CRC** acted as the Trustee under the Deed of Trust after the subject loan

12  was in default and thus is considered a debt collector under the FDCPA. 15 U.S.C. § 1692a(6)(F)(iii).

13  "The term 'debt collector' means any person who uses any instrumentality of interstate commerce or the

14  mails in any business the principal purpose of which is the collection of any debts, or who regularly

15  collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due

16  another." 15 U.S.C. § 1692a(6).

17      150. Federal law prohibits the use of "any false, deceptive, or misleading representation or

18  means in connection with the collection of any debt ... including the false representation of ... the

19  character, amount, or legal status of any debt ... and the threat to take any action that cannot legally be

20  taken ..." 15 U.S.C. §1692e(2)(A), (5).

21      151. **DEFENDANT CHASE** attempted to collect on the loan under false pretenses, namely

22  that it was the owner of Plaintiff's' loan when in fact it was not.

23      152. **DEFENDANTS CHASE** and **CRC** threatened to take action, namely engaging in

24  collection activities that cannot legally be taken by them.

25      153. As alleged herein, Plaintiffs' loan was not ever transferred to **DEFENDANT CHASE**

26  who seeks to cause its purported authorized agent, **DEFENDANT CRC** to collect mortgage

27  payments and engage in other unlawful collection practices.

28

154. **DEFENDANT CHASE** does not have a perfected security interest in Plaintiff's loan or Note such that it can enforce Plaintiff's obligation and/or collect mortgage   payments.

155. Plaintiff alleges that **DEFENDANTS CHASE** and CRC falsely represented the status of Plaintiff's debt and the ability of **DEFENDANTS CHASE** and CRC, and their agents to enforce Plaintiff's debt obligation, in which they have no pecuniary, equitable, or legal interest.

156. The conduct described above by **DEFENDANTS CHASE** and CRC was malicious because **DEFENDANTS CHASE** and CRC knew that they were not acting on behalf of the current pecuniary beneficiary of the Note and loan. However, despite such knowledge, **DEFENDANTS CHASE** and CRC continued to demand and collect Plaintiff's mortgage payments.

157. Plaintiff alleges that **DEFENDANTS CHASE** and CRC engaged and are engaging in a pattern and practice of defrauding Plaintiff, in that during the entire life of the mortgage Loan, **DEFENDANTS CHASE** and CRC failed to properly credit payments made, incorrectly calculated interest on the account, and failed to accurately debit fees.

158. Plaintiff alleges that at all times material, **DEFENDANTS CHASE** and CRC had, and have, actual knowledge that Plaintiff's' account was not accurate, but that Plaintiff would continue to make further payments based on **DEFENDANTS'** inaccurate account. Plaintiff made payments based on these improper, inaccurate, and fraudulent representations.

159. The foregoing acts and omissions of **DEFENDANTS CHASE** and CRC constitute numerous and multiple violations of the FDCPA including, but not limited to, each and every one of the above-cited provisions of the FDCPA, 15 U.S.C. § 1692e, with respect to Plaintiff.

160. Plaintiff could not have reasonably known of the existence of a claim for violation of 15 U.S.C. § 1692e because **DEFENDANTS CHASE** and CRC fraudulently concealed the fact that they were not entitled to enforce Plaintiff's debt obligation and that they were falsely representing to Plaintiff the character and amount of money Plaintiff still owed on the debt.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### SEVENTH CAUSE OF ACTION

### QUIET TITLE

### (Against all BANK DEFENDANTS & DOES 1-100, Inclusive)

161. Plaintiff incorporates each and every one of the preceding paragraphs of the COMPLAINT into this cause of action, as though fully set forth herein.

162. Plaintiff is informed and believes, and therefore alleges that at all relevant times mentioned in this COMPLAINT, **BANK DEFENDANTS**, and each of them, claim an interest in the Plaintiff's Home as follows: that they are the title and/or fee simple owner(s) of the Plaintiff's Home, and/or that each of the **BANK DEFENDANTS** claims to have perfected a beneficial interest, security interest or other legal claim in the Plaintiff's Home. Some of the unknown **DOE DEFENDANTS** may also claim an interest or interests in the Plaintiff's Home adverse to Plaintiff as assignees, successors or otherwise.

163. Assignments of real property within California must be recorded, otherwise there is no uniform method that would operate to provide constructive notice of the transfer. (Cal. Civ. C. § 2934).

164. "Under California law, to perfect the transfer of mortgage paper as collateral the owner should *physically* deliver the note to the transferee" (*Bear v. Golden Plan of California, Inc.* (9th Cir. 1986), 829 F. 2d 705, 709). California law requires that a promissory note be unambiguously endorsed and *physically delivered* to the intended assignee.[xii] "Without physical transfer, the sale of the note could be invalid as a *fraudulent conveyance* [pursuant to CCP § 3440] or as *unperfected* [under Cal. Comm. C. §§ 9313-9314]."[xiii] Actual ownership and physical possession is a condition of enforcement of a note.[xiv]

165. An assignment by endorsement and delivery of the note alone may accomplish a transfer of the security, but is insufficient in that it is without the necessity of a formal assignment of the DOT itself,[xv] and the DOT securing a note is a mere incident of the debt secured thereby, but an incident with no independent, separate, or separable ascertainable market value. (Cal. Civ. C. § 657; See also *Kirby v. Palos Verdes Escrow Company* (1986) 183 Cal. App. 3d 57, 62, 227 Cal. Rptr. 785).

166. Assignment of a mortgage [DOT] without a transfer of the indebtedness confers no right, since *debt* and *security* are **inseparable** and the mortgage alone is not a subject of transfer. (*Hyde v.*

1  *Mangan* (1891) 88 Cal. 319, 26 P. 180; *Johnson v. Razy* (1919) 181 Cal. 342, 184 P. 657; *Treat v.*

2  *Burns* (1932) 216 Cal. 216, 13 P.2d 724). A mortgagee's purported assignment of the mortgage [DOT]

3  without a joint simultaneous transfer of the debt [promissory note] that is secured is a legal nullity.

4  (*Kelley v. Upshaw* (1952) 39 Cal.2d 179, 246 P. 2d 23) A DOT possesses no assignable quality

5  independent of the debt; it may be neither assigned nor transferred apart from the debt, and any attempt

6  to assign the DOT without a transfer of the debt is without legal effect. (*Domarad v. Fisher & Burke,*

7  *Inc.* (1969) 270 Cal. App.2d 543, 76 Cal. Rptr. 529)

8  167. "The note and the mortgage are inseparable; the former as essential, the latter as an

9  incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone

10  is a nullity."[xvi] A DOT is inseparable from the debt and always abides with the debt; alone it is

11  worthless.[xvii] A DOT possesses no assignable quality independent of the debt; it may be neither

12  assigned nor transferred apart from the debt, and any attempt to assign the trust deed without a transfer

13  of the debt is without legal effect. (*Domarad v. Fisher & Burke, Inc.* (1969) 270 Cal. App. 2d 543, 76

14  Cal.Rptr. 529).

15  168. California statutory law has been designed to protect mortgage borrower's rights in the

16  nonjudicial foreclosure context by requiring the recording of any assignment of mortgage to assignee in

17  order for assignee to foreclose non-judicially. The law is not limited in scope only to assignees of

18  mortgage interests, but also applies to successors and assignees under deeds of trust to mandate the

19  recording of any such transfer of interest in order for the event to meet the legal validity necessary to

20  permit nonjudicial foreclosure. (Cal. Civ. C. § 2932.5).[xviii] A recent interpretation of California law led

21  to the conclusion that an alternative method of recording practices did not obviate need for recording of

22  instruments affecting any of deed of trust. (Cal. Civ. C. § 2932.5).[xix]

23  169. The non-judicial foreclosure "process was created long before things such as the

24  secondary market and mortgage brokers existed. When laws were first enacted, lenders 'originated-to-

25  hold' loans for their portfolio and rarely sold mortgage loans."[xx] Under the modern scheme, these

26  requirements, by and large, have become the subject of [unlawful] neglect or deliberate [unlawful]

27  omission.

28

170. A paramount requirement under long-standing traditional principles of property law requires that the DOT was to "follow the Note." There was virtually no exception. In fact, once the original Note and original DOT were *physically separated*, their mutually dependent existence was terminated and the DOT became a nullity. Such consequence may appear archaic, but this corollary has served an important function since its inception: protection of the parties. This deep-seated imperative remains sound law today. California law intends the same effect.[xxi] A purported transferee of a Note does not acquire status as "holder" of that Note where the rights were transferred by separate instrument without valid endorsement or negotiation of the subject note. (*Security Pacific National Bank v. Chess*, (1976) 58 Cal.App.3d 555).

171. Plaintiff is seeking to quiet title against the claims of the **BANK DEFENDANTS**, and each of them, as follows: any and all of the **BANK DEFENDANTS'** alleged claims to perfection of a beneficial interest, security interest or other legal claim in the Plaintiff's Home, and/or any foreclosure action is invalid and/or without any legal or other effect. The claims of the **BANK DEFENDANTS**, and each of them, are therefore without any right whatever and such **BANK DEFENDANTS** and each of them, have no right, title, estate, lien, or interest whatsoever in the Plaintiff's Home.

## CLOSING STATEMENTS

172. Undeniably, foreclosure is an equitable remedy. The so-called doctrine of unclean hands applies. "[He] who comes into equity must come with clean hands" (*United States v. Perez-Torres* (1994) 15 F. 3rd 403, 407 (5th Cir.), *cert. denied*, 513 U.S. 840, 115 S. Ct. 125, 130 L. Ed. 2nd 69). "This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief" (*Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.* (1945) 324 U.S. 806, 814, 65 S. Ct. 993, 89 L. Ed. 1381).

173. As set forth above, tender may not be required where it would be inequitable to do so. (*Onofrio v. Rice, supra,* 55 C. A. 4th 413, 424). California recognizes that: "Equity does not wait upon precedent which exactly squares with the facts in controversy, but will assert itself in those situations where right and justice would be defeated but for its intervention" (*Bisno v. Sax* (1959) 175 Cal. App. 2nd 714, 728).

174. When considering matters in equity, a court may, "in its sound discretion, refuse to enforce or protect legal rights, the exercise of which may be prejudicial to public interest" (*Burford v. Sun Oil Co.* (1943) 319 U.S. 315, 63 S. Ct. 1098, 87 L. Ed. 1424).

175. A State court will be deemed to have acted within the sovereign "constitutional power of the State to take appropriate action to protect the industry and protect the public interest" (*Id.* At 320).

176. In *Quackenbush v. Allstate Ins. Co.*, the United States Supreme Court made clear that a declaratory relief action may be a case in which the relief sought is "otherwise discretionary" (1996, 517 U.S. 706, 116 S. Ct. 1712, 135 L. Ed. 2d 1).

177. It should go without saying that unnecessary foreclosures cause substantial injury to consumers. The foreclosure rate is now more than three times what it was in 1933, at the height of the Great Depression. The crisis has impacted every part of our country and most of the world. As the chairman of the Federal Reserve Board has noted, the crisis threatens our national economy.

178. The United States Supreme Court has upheld the prohibition of conduct that: "although legally proper, [is] unfair to the public" (*F.T.C. v. Sperry & Hutchinson Co.* (1972) 405 U.S. 233, 92 S. Ct. 898, 31 L. Ed. 2nd 170). The phrase "unfair or deceptive" is broad and flexible, and it is intentionally so. In construing the meaning of "unfair or deceptive acts or practices" courts are guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)).

179. Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. s 45(a)(1), Supp.1975) declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

180. Ultimately, whether or not it is inequitable to require tender is a question of fact inappropriate to decide in a Demurrer. In *Storm v. America's Servicing Company et. al.*, the court stated that it was "unaware of any case holding there is a bright-line rule requiring tender of the unpaid debt to set aside a sale in other circumstances" and that tender was a "matter of discretion left up to the Court" (No. 09cv1206, 2009 WL 3756629, 6 (S.D. Cal. Nov. 2009); citing *Bell Atl. Corp. v. Twombly* (2007) 550 U.S. 544, 570, 127 S .Ct. 1955, 167 L.Ed.2d 929).

1    181. Plaintiff believes that the tender requirement does not apply to this case because Plaintiff
2    is challenging the beneficial interest held by **DEFENDANT CHASE** and other **BANK**
3    **DEFENDANTS** in the deed of trust, rendering the non-judicial foreclosure sale void, in addition to
4    the procedural sufficiency of the foreclosure itself. *Vogan v. Wells Fargo Bank, N.A.* (2011) WL
5    5826016 (E.D. Cal. 2011). (See also Exhibit 10, *Suarez vs. BONY* (2013) Sup. Ct. of Orange Cty, Case
6    # 12-560082.)

7                                         **PRAYER FOR RELIEF**

8    **WHEREFORE** Plaintiff prays for relief for each cause of action as follows:

9        1.  That this court enjoin the **DEFENDANTS**, and each of them, their agents and/or
10           employees from conducting Unlawful Detainer, Eviction or other actions against
11           Plaintiff until this court has made a determination of this matter.

12       2.  That the court issue a temporary restraining order, preliminary injunction and permanent
13           injunction restraining **DEFENDANTS**, and each of them, their agents and/or
14           employees from continuing or initiating any further legal or other activity against
15           Plaintiff's Home.

16       3.  That this court find that **DEFENDANTS**, acting prior to the institution of foreclosure
17           proceedings on Plaintiff's Home, violated California statutes regarding foreclosure
18           procedures, and that these acts were done fraudulently.

19       4.  That the **DEFENDANT CHASE** was and is acting in a manner contrary to the
20           mandates set forth in the *United States v. Bank of America, et al* Consent Judgment
21           rendered in the above referenced case in the District of Columbia

22       5.  For Declaratory relief voiding the NOD, NOTS, the Trustees Deed Upon Sale and
23           voiding any other unlawful action or document;

24       6.  For a judgment that Plaintiff is the owner in fee simple of Plaintiff's Home and that
25           **DEFENDANTS**, and each of them, have no interest whatsoever in Plaintiff's Home;

26       7.  That the Court issue an order or other appropriate document or instrument Quieting Title
27           to Plaintiff's Home in Plaintiff or otherwise void the Trustees Deed upon Sale;

28       8.  For a judgment of Wrongful Foreclosure against the **BANK DEFENDANTS**.

9.  For Restitution according to proof;

10. That Plaintiff be awarded any attorney's fees as allowed by law;

11. For costs of suit incurred; and,

12. For such other and further relief and damages as the court may deem just and proper.

Dated this 18th day of March, 2013

Respectfully Submitted by,
The Law Offices of Linda Z. Voss

By: Linda Z. Voss, Esq.
Attorney for Plaintiff Daniele Gozzi

32
VERIFIED COMPLAINT

**ENDNOTES**

[i]  In the Washington Mutual, Inc. 10KA filing dated 12/31/2005, at page 141, it states: "On January 1, 2005 the former Washington Mutual Bank merged into Washington Mutual Bank, FA (*"WMBFA"*), and ceased to exist; subsequently, WMBFA changed its name to Washington Mutual Bank (*"WMB"*)." The entire 10KA filing is available at: http://www.sec.gov/Archives/edgar/data/933136/000110465906053228/a06-17516_110ka.htm

[ii]  This quote was contained in an article by Dr. Kenneth Lehrer, of Lehrer Financial and Economic Advisory Services, from Houston, Texas, and can be seen in its entirety at http://www.hgcxperts.com/article.asp?id=25917.

[iii]  A recent "60-Minutes" television news segment reported on the epidemic of "phony" and "forged" documents used to evict homeowners, including the various different and forged signatures of "Linda Green" added to thousands of foreclosure documents filed in foreclosure proceedings all over the country, available at http://www.youtube.com/watch?v=UdeFyPC5MNI. Ms. Green was interviewed by "60-Minutes" and admitted that their signature was forged by many DocX employees who were paid only $10 an hour and required to forge 4,000 documents a day.

[iv]  The instant case is analogous to *Kingman Holdings, LLC v. Citimortgage, Inc. and Mortgage Electronic Registration Systems, Inc.,* WL 1883829 (E.D. Tex. 2011) (*"Kingman"*), where the Court denied a Motion to Dismiss with similar causes of action as those that are pled here on the basis that the Plaintiff had adequately challenged the signatory's alleged title as "Vice President" of MERS. The *Kingman* court held that the Plaintiff had adequately pled that the assignment executed by Nate Blackstun as "Vice President" on behalf of MERS, was void because Blackstun was not actually appointed by MERS to be its Vice President.

[v]  California Penal Code § 532(f)(a) provides that " a person commits mortgage fraud if, with the intent to defraud, the person does any of the following ... (4) files or causes to be filed with the recorder of any county in connection with a mortgage loan transaction any document the person knows to contain a deliberate misstatement, misrepresentation, or omission,"

[vi]  *Chilton Federal Nat. Mortgage Assn.,* 2009 WL 5197869 (E.D. Cal:) (holding that possession of the original note is not a requirement for initiating foreclosure). Plaintiff does not allege Defendants need to be in physical possession of the "original note" in order to initiate foreclosure, but rather that Defendants must demonstrate that they own the subject loan in order to collect payments and foreclose whether by presenting the original note or a copy of the original.

[vii]  See *Jolley v. Chase Home Finance (2013)* C.A. 1st A134019.

[viii]  According to the second edition of Black's Law Dictionary something that is "void" is something that is "[o]f no legal effect; null. The distinction between void and voidable is often of great practical importance. Whenever technical accuracy is required, void can be properly applied only to those provisions that are of no effect whatsoever-those that are an absolute nullity." Something that is "voidable" is "[v]alid until annulled; esp., (of a contract) capable of being affirmed or rejected at the option of one of the parties. This term describes a valid act that may be voided rather than an invalid act that may be ratified."
ix  Village Northridge Homeowners Ass'n v. State Farm Fire and Cas. Co. (2010) 50 Cal. 4th 913, 928, 114 Cal. Rptr. 3rd 280, 290, 237 P. 3rd 598, 606

[x]  *Id., citing Carruth v. Fritch* (1950) 36 Cal. 2d 426, 224 P. 2nd 702, 24 A.L.R. 2nd 1403.

[xi]  *Burford v. Sun Oil Co. (1943)* 319 U.S. 315, 320, 63 S. Ct. 1098, 87 L. Ed. 1424 (there is no question of the constitutional power of the State to take appropriate action to protect the industry and protect the public interest); citing; *Ohio Oil Co. v. Indiana,* 177 U.S. 190, 20 S.Ct. 576, 44 L. Ed. 729; *Champlin Refining Co. v. Corporation Commission,* 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403

[xii]  California Commercial Code § 3203(a) & 3203(b)

[xiii]  See also *In re Walker,* (Bankr. E.D. Cal. 2010) Case No.: 10-21656-E-11

[xiv]  California Commercial Code §§ 1201(b), 3-104(a), 3-109, 3-109(b), 3-201(a), 3-201(b), 3-205(a), 3-205(c), 3301, 3601(b), 3602(a), and 9313.

[xv]  California Civil Code §§ 2936, 1084;
Also *Cockerell v. Title Ins. & Trust Co.* (1954) 42 Cal.2d 284, 291, 267 P.2d 16; *Lewis v. Booth* (1935) 3 Cal.2d 345, 349, 44 P.2d 560; *Union Supply Co. v. Morris* (1934) 220 Cal. 331, 338, 30 P.2d 394; *Treat v. Burns* (1932) 216 Cal. 216, 217, 13 P.2d 724; *Seidell v. Tuxedo Land Co.* (1932) 216 Cal. 165, 170, 13 P.2d 686; *Pitman v. Walker* (1922) 187 Cal. 667, 668-669, 203 P. 739; *Savings & Loan Soc. V. McKoon* (1898) 120 Cal. 177, 179, 52 P. 305; *Adler v. Sargent* (1895) 109 Cal. 42, 48, 41 P. 799; *Domarad v. Fisher & Burke, Inc.* (1st Dist. 1969) 270 Cal.App.2d 543, 553.

[xvi]  Civil Minute Order, *In Re Walker;* Citing *Carpenter v. Longan,* (1872) 83 U.S. 271, 274; accord *Henley v. Hotaling,* (1871) 41 Cal. 22, 28; *Seidell v. Tuxedo Land Co.,* (1932) 216 Cal. 165, 170; See also Cal.Civ.C. § 2936.

[xvii]  *Domarad v. Fisher & Burke, Inc.* (1969) 270 Cal.App.2d 543, 76 Cal.Rptr. 529; *Buck v. Superior Court* (1965) 232 Cal.App.2d 153, 158, 42 Cal.Rptr. 527; *Nagle v. Macy* (1858) 9 Cal. 426, 428. 1858 WL (Cai) 818; *Hyde v. Mangan, supra; Polhemus v. Trainer* (1866) 30 Cal. 685, 688, 1866 WL (Cai) 831.

[xviii]  See also *In re Salazar* (April 12, 2011) 448 B.R. 814

[xix]  *In re Salazar, supra*

[xx]  Ting, P., Office of the Assessor-Recorder, San Francisco, Cal. (Feb. 2012) *Foreclosure in California: A Crisis of Compliance,* p. 3; Data compiled and independently analyzed by Aequitas Compliance Solutions, Inc., 422 31st Street, Newport Beach, California 92663; Available electronically at: http://aequitasaudit.com/images/aequitas_sf_report.pdf

[xxi]  *Domarad v. Fisher & Burke, Inc.* (1969) 270 Cal.App.2d 543, 76 Cal.Rptr. 529; *Kelley v. Upshaw* (1952) 39 Cal.2d 179, 246 P.2d 23; *Treat v. Burns* (1932) 216 Cal. 216, 13 P.2d 724; *Johnson v. Razy* (1919) 181 Cal. 342, 184 P. 657; *Hyde v. Mangan* (1891) 88 Cal.319, 26 P. 180.

**VERIFICATION**

I, Daniele Gozzi, the Plaintiff in the above-entitled action, declare:

I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters alleged on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed at Carmel, California.

Dated: March 12 2013

By: _____
      Daniele Gozzi

EXHIBIT 1

Recording Requested By:
**WASHINGTON MUTUAL BANK   FA**

Return To:
**WASHINGTON MUTUAL BANK   FA**
**2210 ENTERPRISE DR**
**FLORENCE, SC 29601**
**DOC OPS M/S FSCE 440**

Prepared By:
**JAIME BOATRIGHT**

RECORDING REQUESTED BY:
LandAmerica Commonwealth Title

Stephen L. Vagnini
Monterey County Recorder
Recorded at the request of
**Filer**

DOCUMENT: **2007067285**

RANJELIQUE
8/28/2007
11:19:40

Titles: 1/ Pages: 25

Fees....  80.00
Taxes...
Other...
AMT PAID  $80.00

—————————— [Space Above This Line For Recording Data] ——————————

ZCA1
M35

APN 243-221-027
047474-2

# DEED OF TRUST

3013987478-057

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **AUGUST 10, 2007**
together with all Riders to this document.
(B) "Borrower" is

**DANIELE GOZZI AND ANITA GOZZI, HUSBAND AND WIFE AS JOINT TENANTS**

Borrower's address is   **31649 HIGHWAY 1, CARMEL, CA 93923**
. Borrower is the trustor under this Security Instrument.
(C) "Lender" is  **WASHINGTON MUTUAL BANK, FA**

Lender is a  **FEDERAL SAVINGS BANK**
organized and existing under the laws of  **THE UNITED STATES OF AMERICA**

**CALIFORNIA** – Single Family – Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**       Form 3005 1/01

–6(CA) (0207)
Page 1 of 15               Initials
VMP MORTGAGE FORMS – (800)521-7291

Lender's address is 2273 N. GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV 89014
Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is CALIFORNIA RECONVEYANCE COMPANY, A CALIFORNIA CORP

(E) "Note" means the promissory note signed by Borrower and dated AUGUST 10, 2007
The Note states that Borrower owes Lender FIVE MILLION EIGHT HUNDRED THOUSAND
AND 00/100                                                            Dollars
(U.S. $   5,800,000.00     ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than SEPTEMBER 01, 2037
(F) "Property" means the property that is described below under the heading "Transfer of Rights
in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower (check box as applicable):

| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as well as
all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a condominium
association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize
a financial institution to debit or credit an account. Such term includes, but is not limited to,
point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire
transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.)
and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended
from time to time, or any additional or successor legislation or regulation that governs the same
subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

-6(CA) (0207)                    Page 2 of 15                          Form 3005 1/01

                                                            Initial

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the  COUNTY        of  MONTEREY                                 :
            [Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]
      THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE EXHIBIT A
      AND IS MADE A PART HEREOF.

Parcel ID Number:  243-221-027                    which currently has the address of
31549 HIGHWAY 1                                                        [Street]
CARMEL                                          [City], California 93923   [Zip Code]
("Property Address"):

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

   BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

   THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

   UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

   1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

                                        Initials

-6(CA) (0207)                Page 3 of 15                       Form 3005 1/01

# EXHIBIT A

All that certain real property situated in the County of Monterey, State of California, described as follows:

PARCEL ONE:

Parcel B-2 as said Parcel is shown on the Parcel Map recorded July 22, 1983 in Volume 15 of Parcel Maps, at Page 157, Monterey County Records.

PARCEL TWO:

Easement for road and utilities 60 feet wide over Parcels B-3 and B-1, as said easement and parcels are shown on the Parcel Map recorded July 22, 1983 In Volume 15 of Parcel Maps, at Page 157, Monterey County Records.

PARCEL THREE:

An easement for road and utilities, over that strip of land described In the Deed from Rosemarie Preh, a widow, to the University of California San Francisco Foundation, a non-profit public benefit Corporation, et al, recorded June 14, 1991 in Reel 2656 at Page 47, Official Records of Monterey County, California.

PARCEL FOUR:

An easement for road and utility purposes, in the Rancho San Jose y Sur Chiquito County of Monterey, State of California, over that portion of the land described in Deed to Clinton and Margaret Eastwood filed for record on 15 May 1980 In Reel 1408 of Official Records of said County at Page 585, lying within the easement strip 50 feet wide described in the Deed of Easement executed by Rosemarie Preh, as Grantor to Helen Bibbero et al, Grantees, filed for record on June 14, 1991 In Reel 2659 of Official Records of said County at Page 47, said portion being graphically shown on the sketch map attached thereto as Exhibit "Bank of America National Trust and Savings Association, a National Banking Association" as contained in the Deed from Clinton Eastwood, et al to the State of California, et al recorded September 16, 1995, in Reel 3276, at Page 1386 and re-recorded November 20, 1995 in Reel 3302 of Official Records, Page 1429.

PARCEL FIVE:

An easement for road and utility purposes; in the Rancho San Jose y Sur Chiquito, County of Monterey, State of California, over that portion of the Parcel of Land described in Deed from Charles G. Sawyer, et ux to Clinton Eastwood, et ux, dated December 24, 1967 and recorded December 28, 1967 in Reel 536 of Official Records of said County at Page 947, bounded and described as follows:

Beginning at the angle point connecting courses numbered (1) and (2) of the boundary of said parcel as described In said deed thence;

- (1)   North 8°05' West along said courses numbered (1) of said boundary, distance of 60.00 feet; thence leaving said courses and boundary.
- (2)   East, 55.00 feet; thence

legal rev. (010698)

# EXHIBIT A

(3) South 54°28' East, 54.42 feet, to said courses numbered (2) of said Parcel Boundary; thence

(4) South 73°00" West, along said course numbered (2), a distance of 95.00 feet, to the Point of Beginning, as contained in the Deed from Clinton Eastwood, et al to the State of California, et al, recorded September 16, 1995, in Reel 3276, Page 1386 and re-recorded November 20, 1995 in Reel 3302 of Official Records, Page 1429.

## PARCEL SIX:

An easement for road and utility purposes, located in the rancho San Jose y Sur Chiquito, County of Monterey, State of California, over a portion of Parcel of Land described in the Deed from Gerhard R. Fisher, et al, to Rosemarie Preh, dated March 15, 1973 and recorded April 12, 1973, in Reel 840 of Official Records of said County at Page 472 and also over a portion of the parcel of land described in the Deed from Gordon A. Vetter to Rosemarie Preh, dated March 15, 1973 and recorded April 12, 1973, in Reel 840 of Official Records of said County at Page 477, said portion being a strip of land 60 feet wide, the centerline of which is described as follows:

Beginning at a point on the Easterly line of State Highway No. 1, which bear South 8°05' East, 1382.36 feet along the Easterly line of said State Highway from concrete Monument Standing North 81°55' East, 40.00 feet from said highway centerline station 240+95.16, as said highway and said monument are shown on that certain map entitled "State of California, Department of Public Works, Division of Highways, Plan and Profile of State Highway in Monterey County Between Rock Creek and San Remo Divide, V-Mont' -56-18-23"; thence along the centerline of said easement.

(1) North 81°55' East, 36.79 feet; thence

(2) Along a tangent circular curve to the left with radius of 75 feet; through a central angle of 82°59'36", an arc distance of 108.64 feet; thence tangentially,

(3) North 1°04'36" West, 343.83 feet; thence

(4) Along a tangent circular curve to the right with radius of 225 feet, through a central angle of 100°35'36", an arc distance of 395.03 feet; thence, tangentially

(5) South 80°29'00" East, 43.90 feet to a point herein designated "Point A" for purposes of further description herein, thence

(6) South 80°29'00" East, 19.52 feet; thence

(7) Along a tangent circular curve to the right with radius of 250 feet, through a central angle of 51°51'17", an arc distance of 226.26 feet; thence tangentially

(8) South 28°37'43" East, 33.93 feet to a point in the approximate centerline of an existing private road, and the end of the easement herein being described as contained in that conditional easement Grant Deed, executed by Rosemarie Preh, a widow to the State of California, recorded August 12, 1996, in Reel 3406 of Official Records, Page 13.

## PARCEL SEVEN:

An easement for road and utility purposes, located in the Rancho San Jose y Sur Chiquito, County of Monterey, State of California, over a portion of the Parcel of Land described in Deed from Gerhard R. Fisher, et al to Rosemarie Preh, dated March 15, 1973 and

legal rev. (010698)

# EXHIBIT A

recorded April 12, 1973 in Reel 840 of Official Records of said County at Page 472 and also over a portion of the parcel of land described in the Deed from Gordon A. Vetter to Rosemarie Preh dated March 15, 1973 and recorded April 12, 1973 in Reel 840 of Official Records of said County at Page 477, said portion being a strip of land 60 feet wide, the centerline of which is described as follows:

Beginning at a point in the approximate centerline of an existing private road, lying within the property described in said Deed from Vetter to Preh, which point bears South 41°43'16" East, 700.19 feet from a concrete monument standing North 81°55' East, 40.00 feet from said highway centerline station 240+95.16 as said highway and said monument are shown on that certain map entitled, "State of California, Department of Public Works, Division of Highways, Plan and Profile of State Highway in Monterey County between Rock Creek and San Remo Divide V-Mont-56-18-23"; thence along the centerline of said easement.

- (1)  South 24°45'23" East, 90.62 feet; thence
- (2)  Along a tangent circular curve to the left with a radius of 200 feet, through a central angle of 14°37'20" an arc distance of 51.04 feet; thence
- (3)  South 39°22'42" East, 99.75 feet to a point herein before designated "Point Page"; thence
- (4)  South 39°22'42" East 79.83 feet thence
- (5)  Along a tangent circular curve to the right with radius of 150 feet, through a central angle of 37°49'43", an arc distance of 99.03 feet; thence tangentially
- (6)  South 1°33'00" East, 49.60 feet to a point herein designated "Point B" for purposes of further description herein thence
- (7)  South 1°33'09" East, 3.14 feet; thence
- (8)  Along a tangent circular, curve to the left with radius of 150 feet, through a central angle of 22°55'15" an arc distance of 60.01 feet; thence
- (9)  South 24°28'15" East, 132.34 feet; thence
- (10) Along a tangent circular curve to the left with radius of 200 feet, through a central angle of 54°46'48" an arc distance of 191.22 feet to a point in the Southeasterly boundary of said property described in said Deed from Fisher, et al, to Preh, and the end of the easement herein being described as contained in that Conditions Easement Grant Deed, executed by Rosemarie Preh, a widow to the State of California, recorded August 12, 1996 in Reel 3406, of Official Records, Page 13.

PARCEL EIGHT:

An easement for road and utility purposes, located in the Rancho San Jose y Sur Chiquito, County of Monterey, State of California, over a portion of the parcel of land described in the Deed from Gerhard R. Fisher, et al, to Rosemarie Preh, dated March 15, 1973 and recorded April 12, 1973 in Reel 840 of Official Records of said County at Page 472, said portion being a strip of land 60 feet wide, the centerline of which is described as follows:

Beginning at a point in the Northerly boundary of said property described in said Deed from Fisher, et al, to Preh, which bears North 80°29' West, 516.10 feet from the most Northeasterly corner of said property, said point also lying in the approximate centerline of an existing private road; thence along the centerline of said easement.

legal rev. (010698)

# EXHIBIT A

(1)  South 33°40'24" East, 12.21 feet; thence
(2)  Along a tangent of 88°41'52", an arc distance of 116.10 feet; thence tangentially
(3)  South 55°01'28" West, 48.15 feet; thence
(4)  Along a tangent circular curve to the left with a radius of 75 feet, through a
     central angle of 56°34'27", an arc distance of 74.06 feet to a point hereinbefore
     designated "Point B" and the end of the easement herein being described, as
     contained in that Conditions Easement Grant Deed, executed by Rosemarie
     Preh, a widow to the State of California, recorded August 12, 1996, in Reel 3406
     of Official Records, Page 13.

legal rev. (010698)

ZCA2

Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
DANIELE GOZZI                                                      -Borrower
                                           ANITA GOZZI

_____ (Seal)          _____ (Seal)
                       -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                                  -Borrower

-6(CA) (0207)                    Page 14 of 15                    Form 3005 1/01

MONTEREY (27),CA                    Page 18 of 25              Printed on 8/17/2010 4:31:46 PM
Document: TDD 2007.67285

State of California
County of **MONTEREY**                                    } ss.

On  August 16, 2007          before me, Debra J. Kelley, Notary Public
                                                              personally appeared
ANITA GOZZI    and Daniele Gozzi

~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.
WITNESS my hand and official seal.

_Debra J Kelley_ _____ (Seal)

DEBRA J. KELLEY
COMM. # 1670718
NOTARY PUBLIC-CALIFORNIA
MONTEREY COUNTY
My Comm. Exp. June 25, 2010

-6(CA) (0207)            Page 15 of 16            **Form 3006** 1/01

Initials: _____

RCOF                                    **ADJUSTABLE RATE RIDER**
M35                                    **(FHLB Index - Payment and Rate Caps)**

                                       3013987478-057

THIS ADJUSTABLE RATE RIDER is made this _____10TH_____ day of
AUGUST, 2007_____, and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same
date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the
"Note") to _WASHINGTON MUTUAL BANK, FA_____ (the "Lender") of the
same date and covering the property described in the Security Instrument and located at:

31549 HIGHWAY 1, CARMEL, CA  93923
                         (PROPERTY ADDRESS)

          **THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY
          INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT
          INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL
          AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY
          BORROWED, BUT NOT MORE THAN __115%__ OF THE ORIGINAL AMOUNT (OR
          $__6,670,000.00_____). MY INTEREST RATE CAN NEVER EXCEED THE
          LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE
          AT MATURITY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
     Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Up
until the first day of the calendar month that precedes the first payment due date set forth in Section 3
of the Note, I will pay interest at a yearly rate of __7.483__%. Thereafter, until the first Change
Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of __1.350__%.The
interest rate I will pay will thereafter change in accordance with Section 4 of the Note.

32842 (05-07)                    **Page 1 of 5**                    LRD01USA (Version 2.0)

Branch :F41,User :AT02                    Comment:                              Station Id :HLRZ

3013987478-057

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Interest Rate Change Dates

The interest rate I will pay may further change on the ____1ST____ day of OCTOBER, 2007_____, and on that day every month thereafter. Each such day is called a "Change Date".

### (B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the monthly weighted average cost of funds for Eleventh District savings institutions as announced by the Federal Home Loan Bank of San Francisco (the "11th District Monthly Weighted Average Cost of Funds Index"). The most recent Index figure available on each interest rate Change Date is called the "Current Index".

Information on the 11th District Monthly Weighted Average Cost of Funds Index may be obtained by writing to the Federal Home Loan Bank at P.O. Box 7948, San Francisco, California 94120, Attention: Public Information Department; or by calling the Federal Home Loan Bank at 1-415-616-2600.

If the Index is no longer available, the Note Holder will use the new index as if it were the Index. The new Index will be the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. This information may be available in your library, or you may write to the Federal Reserve Board, Board of Governors, Publications Services, Washington, D.C. 20551. The most recent figure available 15 days prior to each Interest Rate Change Date will be the Current Index. If the new Index is no longer available, the Note Holder will choose an alternate index which is based upon information comparable to the new Index. The Note Holder will give me notice as to this choice.

### (C) Interest Rate Change Calculation

Before each Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 20/100_____ percentage points __3.200__ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. If a new index is selected, the new Margin will be the difference between the average of the Index for the most recent three year period which ends on the last date the Index was available plus the then effective Margin and the average of the new Index for the most recent three year period which ends on that same date (or if not available for such three year period, for such time as it is available). If an alternate Index is selected, the new Margin will be the difference between the average of the new Index for the most recent three year period which ends on that last date the new Index was

32842 (05-07)                    **Page 2 of 5**                    LRD01USB (Version 2.0)

3013987478-057

available plus the then effective Margin and the average of the alternate index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). In either case, this difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than ___TEN_____ percentage points __10.000__% ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing ___OCTOBER 01, 2008_____, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my minimum monthly payment, subject to Section 4(F) below, and I will make payments in this new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new minimum monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my initial minimum monthly payment may not be based on the interest rate set forth in Section 2 of this Note, since the minimum monthly payment amount changes less frequently than the interest rate and since the minimum monthly payment is subject to the payment limitations described in Section 4(F), my minimum monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the minimum monthly payment is less than the interest portion and I choose to make only the minimum monthly payment, the Note Holder will subtract the minimum monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal balance, and interest will accrue on the amount of this difference at the current interest rate. For each month that my minimum monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a Principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Minimum Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to ___115%___ of the principal

32842 (05-07)                          **Page 3 of 5**                         LRD01USC (Version 2.0)

Branch :F41,User :AT02                Comment:                                    Station Id :HLRZ

3013987478-057

amount originally borrowed. In the event my unpaid Principal would otherwise exceed that __115%__ limitation, I will begin paying a new minimum monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new minimum monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the Maturity Date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the fifth anniversary of the due date of the first monthly payment, and on that same day every fifth year thereafter, my minimum monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my minimum monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (c) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect

32842 (05-07)                          **Page 4 of 6**                           LR001USD (Version 2.0)

RCO2                                                    3013987478-057

at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

ANITA GOZZI                              DANIELE GOZZI

32842 (05-07)                Page 6 of 6            LRD01USE (Version 2.0)

GOVERNMENT CODE 27361.7

I certify under penalty that the Notary Seal on the document to which this statement is attached read as follows:

NAME OF THE NOTARY: Debra J. Kelley

DATE COMMISSION EXPIRES: June 25, 2010

COUNTY WHERE BOND IS FILED: Monterey

COMMISSION NUMBER: 1670718                    VENDOR NUMBER: VSI1

I certify under penalty of perjury and the laws of the State of California that the illegible portion of this document to which this statement is attached reads as follows:

PLACE OF EXECUTION Monterey                    DATE 8/22/2007

SIGNATURE

*personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or entity upon behalf of which the person(s) acted, executed the instrument.

END OF DOCUMENT.

EXHIBIT 2

35US
M35

# ADJUSTABLE RATE NOTE
(FHLB Index - Payment and Rate Caps)

3013987478-057

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __115%__ OF THE ORIGINAL AMOUNT (OR $ ___6,670,000.00___ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

| AUGUST 10, 2007 | ORANGE | CALIFORNIA |
|---|---|---|
| | CITY | STATE |

31549 HIGHWAY 1, CARMEL, CA 93923
PROPERTY ADDRESS

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ ___5,800,000.00___ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is __WASHINGTON MUTUAL BANK, FA__
I will make all payments under this Note in the form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount has been paid. Up until the first day of the calendar month that precedes the first payment due date set forth in Section 3 of the Note, I will pay interest at a yearly rate of __7.403 %__. Thereafter, until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of __1.350 %__.The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay Principal and interest by making a payment every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on __FIRST__ day of each month beginning on __OCTOBER, 2007__. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on __SEPTEMBER 01, 2037__, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at __P.O. BOX 78148, PHOENIX, AZ 85062-8148__
_____, or at a different place if required by the Note Holder.

### (B) Amount of My Initial Minimum Monthly Payments

The lowest payment I can make each month and not be in default under this Note is called my "minimum monthly payment". Each of my minimum monthly payments until the first Payment Change Date will be in the amount of U.S. $ __18,802.17__, unless adjusted at an earlier time under Section 4(H) of this Note. I understand and agree that this minimum monthly payment may be based on

32743 (05-07)                    Page 1 of 8                    LNT65USA (Version 2.0)

3013997478

an interest rate that is less than the interest rate set forth in Section 2 of this Note and, if that is the case, even during the first month of my loan, my minimum monthly payment may not be sufficient to pay all of the interest that accrues on my loan during the month. In that case, the unpaid interest will be added to my Principal balance as provided in Section 4(G) of this Note and interest will accrue on such amount as provided in Section 4(G) of this Note.

**(C) Payment Changes**

My minimum monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my minimum monthly payment in accordance with Section 4 of this Note.

(D) In addition to the minimum monthly payment, I may have up to three (3) other payment options each month. These payment options are 1) the interest only payment 2) the full principal and interest payment (based on the then current interest rate, the then outstanding Principal balance and the then remaining loan term (the "Full Principal and Interest Payment") and 3) if my Loan has an original term of more than 15 years, a payment amount based on the then current interest rate and the then outstanding Principal balance but determined as if my loan had an original term of fifteen (15) years. I understand and agree that one or more of these three payment options will not be available for any month in which the payment option is equal to or less than the minimum monthly payment. In addition, if my minimum monthly payment is past due by more than forty-five (45) calendar days, the Note Holder reserves the right to require me to make a Full Principal and Interest Payment.

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Interest Rate Change Dates**

The interest rate I will pay may further change on the _____1ST_____ day of _____OCTOBER, 2007_____, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index** ·

On each Change Date, my interest rate will be based on an Index. The "Index" is the monthly weighted average cost of funds for Eleventh District savings institutions as announced by the Federal Home Loan Bank of San Francisco (the "11th District Monthly Weighted Average Cost of Funds Index"). The most recent Index figure available on each Interest rate Change Date is called the "Current Index".

Information on the 11th District Monthly Weighted Average Cost of Funds Index may be obtained by writing to the Federal Home Loan Bank at P.O. Box 7948, San Francisco, California 94120, Attention: Public Information Department; or by calling the Federal Home Loan Bank at 1-415-616-2600.

If the Index is no longer available, the Note Holder will use the new Index as if it were the Index. The new Index will be the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. This information may be available in your library, or you may write to the Federal Reserve Board, Board of Governors, Publications Services, Washington, D.C. 20551. The most recent figure available 15 days prior to each Interest Rate Change Date will be the Current Index. If the new Index is no longer available, the Note Holder will choose an alternate index which is based upon information comparable to the new Index. The Note Holder will give me notice as to this choice.

**(C) Interest Rate Change Calculation**

Before each Change Date, the Note Holder will calculate my new interest rate by adding _____THREE AND 20/100_____ percentage points _____3.200_____ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. If a new Index is selected, the new Margin will be the difference between the average of the index for the most recent three year period which ends on the last date the Index was available plus the then effective Margin and

3013987478

the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). If an alternate Index is selected, the new Margin will be the difference between the average of the new Index for the most recent three year period which ends on that last date the new Index was available plus the then effective Margin and the average of the alternate Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). In either case, this difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than ___TEN_____
percentage points _10.000_% ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing _OCTOBER 01, 2008_____, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my minimum monthly payment, subject to Section 4(F) below, and I will make payments in this new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new minimum monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G) Changes In My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my initial minimum monthly payment may not be based on the interest rate set forth in Section 2 of this Note, since the minimum monthly payment amount changes less frequently than the interest rate and since the minimum monthly payment is subject to the payment limitations described in Section 4(F), my minimum monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the minimum monthly payment is less than the interest portion and I choose to make only the minimum monthly payment, the Note Holder will subtract the minimum monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal balance, and interest will accrue on the amount of this difference at the current interest rate. For each month that my minimum monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a Principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Minimum Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to _115%____ of the principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that _115%____ limitation, I will begin paying a new minimum monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new minimum monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the Maturity Date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the fifth anniversary of the due date of the first monthly payment, and on that same day every fifth year thereafter, my minimum monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

35U2                                                          3013997478

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my minimum monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without payment of any Prepayment charge. The Note Holder will apply all of my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note.

If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits; then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any minimum monthly payment by the end of _FIFTEEN_____ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be _5.000_ % of my overdue payment of Principal (if applicable) and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each minimum monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

32743 (05-07)                          Page 4 of 6                    LNT55USD (Version 2.0)

3013987478

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (c) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) Payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

3013987478

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

ANITA GOZZI

32743 (05-07)  Page 6 of 6  LNT65USF (Version 2.0)

WP1V
M35

### *Prepayment Fee Note Addendum*
3013987478-057

This Note Addendum is made this 10TH day of AUGUST, 2007 and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") in favor of WASHINGTON MUTUAL BANK, FA (the "Lender") and dated as of even date herewith (the "Note").

This Note Addendum amends the provision in the Note regarding the Borrower's right to prepay as follows:

BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal before they are due. Any payment of principal, before it is due, is known as a "prepayment." A prepayment of only part of the unpaid principal is known as a *"partial prepayment."* A prepayment of the full amount of the unpaid principal is known as a "full prepayment."

If I make a full prepayment, I may be charged a fee as follows:

If Noteholder receives a prepayment on or before the first anniversary of the date of the Note, the Prepayment Fee shall be equal to TWO percent ( 2.000 %) of the original loan amount. Thereafter, prepayment of the Note shall be permitted without any Prepayment Fee.

The Prepayment Fee shall be payable upon a full prepayment, voluntary or involuntary, including but not limited to a prepayment resulting from Noteholder's permitted acceleration of the balance due on the Note. Notwithstanding the foregoing, nothing herein shall restrict my right to prepay at any time without penalty accrued but unpaid interest that has been added to principal.

When I make a full or partial prepayment I will notify the Noteholder in writing that I am doing so. Any partial prepayment of principal shall be applied to interest accrued on the amount prepaid and then to the principal balance of the Note which shall not reduce the amount of monthly installments of principal and interest (until reamortized as set forth in the Note at the next Payment Change Date) nor relieve me of the obligation to make the installments each and every month until the Note is paid in full. Partial prepayments shall have no effect upon the due dates or the amounts of my monthly payments unless the Noteholder agrees in writing to such changes.

4387 (08-01)  VERSION 1.0 (09/28/03)          Page 1 of 2                    LRI36USA

**NOTICE TO THE BORROWER**
Do not sign this Note Addendum before you read it. This Note Addendum provides for the payment of a Prepayment Fee if you wish to repay the loan prior to the date provided for repayment in the Note.

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Note Addendum.

_____          _____
ANITA GOZZI

_____          _____

4387 (03-01)  VERSION 1.0 (09/29/03)          Page 2 of 2          LR13SUSD

EXHIBIT 3

## $5,000,000,000



### Debt Securities
### Preferred Stock
### Depositary Shares

---

This prospectus is part of a registration statement that we filed with the Securities and Exchange Commission using a "shelf" registration process. This means:

- we may sell any of the following securities from time to time:

    - debt securities

    - preferred stock

    - depositary shares

- we will provide a prospectus supplement each time we issue the securities; and

- the prospectus supplement will provide specific information about the terms of that issuance and also may add, update or change information contained in this prospectus.

We may also issue common stock upon conversion or exchange of any of the securities listed above. We will provide the specific terms of these securities in supplements to this prospectus. You should read this prospectus and the applicable prospectus supplement carefully before you invest.

The securities may be sold directly to investors, through agents designated from time to time or to or through underwriters or dealers. See "Plan of Distribution." If any underwriters are involved in the sale of any securities in respect of which this prospectus is being delivered, the names of such underwriters and any applicable commissions or discounts will be set forth in the applicable prospectus supplement. The net proceeds we expect to receive from such sale also will be set forth in the applicable prospectus supplement.

This prospectus may not be used to offer or sell any securities unless accompanied by a prospectus supplement.

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

---

The date of this prospectus is November 6, 2003.

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Where You Can Find Additional Information | 3 |
| Incorporation of Certain Documents by Reference | 3 |
| Factors That May Affect Future Results | 4 |
| Special Note Regarding Forward-Looking Statements | 4 |
| Washington Mutual, Inc. | 5 |
| Use of Proceeds | 6 |
| Ratio of Earnings to Fixed Charges | 6 |
| Ratio of Earnings to Combined Fixed Charges and Preferred Dividends | 6 |
| Description of Debt Securities | 7 |
| Description of Capital Stock | 20 |
| Description of Depositary Shares | 22 |
| Plan of Distribution | 24 |
| Legal Matters | 25 |
| Experts | 25 |

2

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We file annual, quarterly and current reports and other information with the Securities and Exchange Commission ("SEC"). You may read and copy these reports and other information at the public reference room of the SEC at Judiciary Plaza, Room 1024, 450 Fifth Street N.W., Washington, D.C. 20549. You may also obtain copies of these documents by mail from the SEC reference room at prescribed rates. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. These reports and other information are also filed by us electronically with the SEC and are available at the SEC's website, www.sec.gov.

We have filed a registration statement on Form S-3 with the SEC covering the securities described in this prospectus. For further information with respect to us and those securities, you should refer to our registration statement and its exhibits. You may inspect and copy the registration statement, including exhibits, at the SEC's Public Reference Room or website. We have summarized certain key provisions of contracts and other documents that we refer to in this prospectus. Because a summary may not contain all the information that is important to you, you should review the full text of each document. We have included copies of these documents as exhibits to our registration statement.

The indentures pursuant to which the debt securities will be issued require us to file reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Quarterly and annual reports will be made available upon request of holders of the debt securities, which annual reports will contain financial information that has been examined and reported upon by, with an opinion expressed by, an independent public or certified public accountant.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The SEC allows us to "incorporate by reference" the information we file with it, which means that we can disclose important information to you by referring you to another document that we filed with the SEC. The information incorporated by reference is an important part of this prospectus, and information that we file later with the SEC will automatically update and supersede this information. We incorporate by reference the documents listed below and any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act, until we sell all of the securities:

- Our Annual Report to Shareholders on Form 10-K for the fiscal year ended December 31, 2002;

- Our Quarterly Report on Form 10-Q for the quarters ended March 31 and June 30, 2003;

- Current Report on Form 8-K dated March 12, 2003;

- The description of our capital stock contained in Item 5 of Current Report on Form 8-K dated November 29, 1994, and any amendment or report filed for the purpose of updating this description; and

- Form 8-A/12B dated February 8, 2001, as amended.

You may obtain a copy of these filings at no cost, by writing or telephoning us at 1201 Third Avenue, Seattle, Washington 98101, telephone (206) 461-3187, attention Investor Relations Department WMT0735.

You should rely only on the information contained or incorporated by reference in this prospectus, any supplemental prospectus or any pricing supplement. We have not authorized anyone to provide you with any other information. We are not making an offer of these securities in any state where the offer is not permitted. You should not assume that the information in this prospectus, any accompanying prospectus supplement or any document incorporated by reference is accurate as of any date other than the date on the front of the document.

3

## FACTORS THAT MAY AFFECT FUTURE RESULTS

An investment in our securities involves a high degree of risk. See "Factors That May Affect Future Results", which are incorporated by reference, under Item 1 of our Annual Report on Form 10-K for the Year Ended December 31, 2002, filed with the SEC, for a list of some of the risks and uncertainties you should consider before making an investment decision. See "Incorporation of Certain Documents by Reference" above for a discussion of our SEC filings incorporated by reference.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus and the documents incorporated by reference contain certain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 with respect to financial condition, results of operations, and other matters. Statements in this prospectus, including those incorporated by reference, that are not historical facts are "forward-looking statements" for the purpose of the safe harbor provided by Section 21E of the Exchange Act and Section 27A of the Securities Act of 1933, as amended (the "Securities Act"). Forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts. They often include words, such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," or words of similar meaning, or future or conditional verbs, such as "will," "should," "could," or "may."

Forward-looking statements provide our expectations or predictions of future conditions, events or results. They are not guarantees of future performance. By their nature forward-looking statements are subject to risks and uncertainties. These statements speak only as of the date they are made. We do not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statements were made. There are a number of factors, many of which are beyond our control, that could cause actual conditions, events or results to differ significantly from those described in the forward-looking statements.

# WASHINGTON MUTUAL, INC.

With a history dating back to 1889, Washington Mutual is a retailer of financial services that provides a diversified line of products and services to consumers and commercial clients. At September 30, 2003, we had stockholders' equity of $20.53 billion. Based on consolidated total assets of $286.72 billion at September 30, 2003, Washington Mutual was the largest savings institution and the seventh largest banking company in the United States.

Washington Mutual operates principally in California, Washington, Oregon, Florida, Texas and the greater New York/New Jersey metropolitan area, and has operations in 36 other states. Washington Mutual is divided into three operating segments:

- *Banking and Financial Services.* The Banking and Financial Services Group offers a comprehensive line of financial products and services to a broad spectrum of consumers and small to middle-market businesses. The Group serves 7.3 million consumer households and businesses through over 1,677 financial center stores, 64 commercial banking centers and 2,769 ATMs. The Group offers various deposit products including the Group's signature Free Checking accounts, as well as other personal and business checking accounts, savings accounts, money market deposit accounts and time deposit accounts.

- *Home Loans and Insurance Services.* The Home Loans and Insurance Services Group originates and services home loans, sells home loans in the secondary market, and manages our home loan portfolio. At September 30, 2003, Washington Mutual serviced a $764.45 billion loan portfolio predominantly consisting of home loans. The Group also provides insurance services to mortgage borrowers by offering homeowners, flood, earthquake and other property and casualty insurance products. The Group's products are offered to customers through multiple distribution channels, including 395 retail home loan stores, 37 wholesale home loan centers, correspondent channels, and directly to consumers through call centers and the internet.

- *Specialty Finance.* The Specialty Finance Group provides financing to developers, investors, mortgage bankers and homebuilders for the acquisition, construction and development of apartment buildings ("multi-family lending"), other commercial real estate and homes. The multi-family lending business accounts for a majority of the Group's revenues. The Group also services commercial real estate mortgages as part of its commercial asset management business and conducts a consumer finance business through Washington Mutual Finance Corporation's 428 branches.

5

## USE OF PROCEEDS

Unless otherwise specified in the applicable prospectus supplement, we will use the net proceeds from the sale of the securities for general corporate purposes. Examples of general corporate purposes include additions to working capital, repayment of existing debt, acquisitions, and office expansions.

## RATIO OF EARNINGS TO FIXED CHARGES

The following table sets forth our ratio of earnings to fixed charges for each of the periods indicated.

| Year Ended December 31, | | | | | |
|---|---|---|---|---|---|
| 1998 | 1999 | 2000 | 2001 | 2002 | Nine Months Ended September 30, 2003 |
| 1.34 | 1.38 | 1.31 | 1.60 | 2.02 | 2.30 |

For purposes of this ratio, earnings consist of income before income taxes plus fixed charges. Fixed charges consist of interest expense on borrowings and deposits, and the estimated interest portion of rent expense.

## RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED DIVIDENDS

The following table sets forth our ratio of earnings to combined fixed charges and preferred dividends for each of the periods indicated.

| Year Ended December 31, | | | | | |
|---|---|---|---|---|---|
| 1998 | 1999 | 2000 | 2001 | 2002 | Nine Months Ended September 30, 2003 |
| 1.33 | 1.38 | 1.31 | 1.59 | 2.02 | 2.30 |

For purposes of this ratio, earnings consist of income before income taxes plus fixed charges. Fixed charges consist of interest expense on borrowings and deposits, and the estimated interest portion of rent expenses.

6

## DESCRIPTION OF DEBT SECURITIES

The following description of the debt securities sets forth the material terms and provisions of the debt securities to which any prospectus supplement may relate. The particular terms of the debt securities offered by any prospectus supplement (the "Offered Debt Securities") and the extent, if any, to which such general provisions may apply to the Offered Debt Securities, will be described in the prospectus supplement relating to such Offered Debt Securities. Accordingly, for a description of the terms of a particular issue of debt securities, reference must be made to both the prospectus supplement relating thereto and to the following description.

The debt securities will be our general obligations. In the event that any series of debt securities will be subordinated to other securities that we have outstanding or may incur, the terms of the subordination will be set forth in the prospectus supplement relating to the subordinated debt securities. Senior debt securities will be issued under the senior indenture dated as of August 10, 1999 between Washington Mutual, Inc. and The Bank of New York, as trustee, as supplemented by a first supplemental indenture dated as of August 1, 2002 and a second supplemental indenture dated as of November 20, 2002. References to the senior indenture in this prospectus will mean the senior indenture as supplemented. Subordinated debt securities will be issued under a second supplemental indenture to the subordinated indenture dated April 4, 2000 between us and The Bank of New York, as supplemented by the first supplemental indenture dated August 1, 2002. References to the subordinated indenture in this prospectus will mean the subordinated indenture as supplemented. Together the senior indenture and the subordinated indenture and the supplemental indentures thereto are called the "indentures."

We have summarized selected provisions of the indentures below. The senior indenture and form of subordinated indenture have been filed as exhibits to the registration statement filed with the SEC and you should read the indentures for provisions that may be important to you. Accordingly, the following summary is qualified in its entirety by reference to the provisions of the indentures. Unless otherwise specified, capitalized terms used in this summary have the meanings specified in the indentures.

### General

The indentures do not limit the aggregate principal amount of debt securities which may be issued under the indentures and provide that debt securities may be issued from time to time in one or more series. The indentures do not limit the amount of other indebtedness or debt securities, other than certain secured indebtedness as described below, which may be issued by us or our subsidiaries.

Unless otherwise provided in a prospectus supplement, the debt securities will be our unsecured obligations. The senior debt securities will rank equally with all other unsecured and unsubordinated indebtedness of ours. The subordinated debt securities will be subordinated in right of payment to the prior payment in full of all Senior Indebtedness including our senior debt securities as described below under "Subordination of Subordinated Debt Securities" and in the applicable prospectus supplement.

The debt securities are our obligations exclusively. Because our operations are currently conducted substantially through our subsidiaries, our cash flow and the consequent ability to service our debt, including the debt securities, are dependent upon the earnings of our subsidiaries and the distribution of those earnings to us, or upon loans or other payments of funds to us by our subsidiaries. Our subsidiaries are separate and distinct legal entities and have no obligation, contingent or otherwise, to pay any amounts due with respect to the debt securities or to make funds available therefor, whether by dividends, loans or other payments. In addition, the payment to us of dividends and certain loans and advances by our subsidiaries may be subject to certain statutory or contractual restrictions. Payments are contingent upon the earnings of the subsidiaries, and are subject to various business considerations.

7

The debt securities will be effectively subordinated to all liabilities, including deposits, of our subsidiaries. At September 30, 2003, our subsidiaries had $164.14 billion of deposits and $79.14 billion of debt outstanding. Any right we may have to receive assets of a subsidiary upon its liquidation or reorganization (and the consequent right of the holders of the debt securities to participate in those assets) will be effectively subordinated to the claims of that subsidiary's creditors, except to the extent that we are recognized as a creditor of a subsidiary, in which case our claims would still be subordinate to any security interests in the assets of the subsidiary and any liabilities of the subsidiary senior to liabilities held by us. Our principal subsidiary, Washington Mutual Bank, F.A., has an existing program pursuant to which it may sell up to an additional $15 billion of senior and subordinated debt securities.

The debt securities may be issued in fully registered form without coupons ("registered securities") or in bearer form with or without coupons ("bearer securities") or in the form of one or more global securities (each a "Global Security"). Registered securities that are book-entry securities will be issued as registered Global Securities. Bearer securities may be issued in the form of temporary or definitive Global Securities. Unless otherwise provided in the prospectus supplement, the debt securities will be only registered securities. The debt securities will be issued, unless otherwise provided in the prospectus supplement, in denominations of $1,000 or an integral multiple thereof for registered securities, and in denominations of $5,000 or an integral multiple thereof for bearer securities.

The prospectus supplement relating to the particular debt securities offered thereby will describe the following terms of the Offered Debt Securities:

(1)   the title of the Offered Debt Securities;

(2)   whether the Offered Debt Securities are senior debt securities or subordinated debt securities;

(3)   the percentage of principal amount at which the Offered Debt Securities will be issued;

(4)   any limit on the aggregate principal amount of the Offered Debt Securities;

(5)   the date or dates on which the Offered Debt Securities will mature and the amount or amounts of any installment of principal payable on such dates;

(6)   the rate or rates (which may be fixed or variable) per year at which the Offered Debt Securities will bear interest, if any, or the method of determining such rate or rates and the date or dates from which such interest, if any, will accrue;

(7)   the date or dates on which interest, if any, on the Offered Debt Securities will be payable and the regular record dates for such payment dates;

(8)   the terms of any sinking fund and the obligation, if any, of ours to redeem or purchase the Offered Debt Securities pursuant to any sinking fund or analogous provisions;

(9)   the portion of the principal amount of Offered Debt Securities that is payable upon declaration of acceleration of the maturity of the Offered Debt Securities;

(10)   whether the Offered Debt Securities will be issued in registered form without coupons, in bearer form with or without coupons, including temporary and definitive global form, or a combination thereof and the circumstances, if any, upon which such Offered Debt Securities may be exchanged for Offered Debt Securities issued in a different form;

(11)   whether the Offered Debt Securities are to be issued in whole or in part in the form of one or more Global Securities and, if so, the identity of the depositary for such Global Security or Securities;

(12)   whether and under what circumstances we will pay additional amounts to any holder of Offered Debt Securities who is not a United States person in respect of any tax, assessment or other governmental charge required to be withheld or deducted and, if so, whether we will have the option to redeem rather than pay any additional amounts;

8

(13)    the place or places, if any, in addition to or instead of the corporate trust office of the trustee (in the case of securities in registered form) or the principal New York office of the trustee (in the case of securities in bearer form), where the principal, premium and interest with respect to the Offered Debt Securities shall be payable;

(14)    the terms, if any, upon which the debt securities of the series may be convertible into or exchanged for our common stock, preferred stock, other debt securities or other securities of any kind and the terms and conditions upon which such conversion or exchange shall be effected, including the initial conversion or exchange price or rate, the conversion or exchange period and any other additional provisions;

(15)    if the amount of principal, premium or interest with respect to the debt securities of the series may be determined with reference to an index or pursuant to a formula, the manner in which such amounts will be determined;

(16)    any authenticating or paying agent, transfer agent or registrar;

(17)    the applicability of, and any addition to or change in, the covenants and definitions then set forth in the indenture or in the terms then set forth in the indenture relating to permitted consolidations, mergers, or sales of assets; and

(18)    certain other terms, including our ability to satisfy and discharge our obligations under an indenture with respect to the Offered Debt Securities.

No service charge will be made for any transfer or exchange of the debt securities except for any tax or other governmental charge.

Debt securities of a single series may be issued at various times with different maturity dates and different principal repayment provisions, may bear interest at different rates, may be issued at or above par or with an original issue discount, and may otherwise vary, all as provided in the indentures. The prospectus supplement for any debt securities issued above par or with an original issue discount will state any applicable material federal income tax consequences and other special considerations.

**Subordination of Subordinated Debt Securities**

Payment of the principal of (and premium, if any) and interest, if any, on the subordinated debt securities will be subordinate and junior in right of payment to the prior payment in full of all Senior Debt (as defined herein). At September 30, 2003, we had an aggregate par value of $2.90 billion in Senior Debt and a par value of $845 million in Subordinated Debt (as defined herein) (exclusive of our subsidiaries). The subordinated indenture does not limit or restrict our ability to incur additional Senior Debt, but certain of our other debt instruments contain such limitations.

In the event of any sale pursuant to any judgment or decree in any proceeding by or on behalf of any holder, or of any distribution, division or application of all or any part of our assets to our creditors by reason of any liquidation, dissolution or winding up of us or any receivership, insolvency, bankruptcy or similar proceeding relative to us or our debts or properties, then the holders of Senior Debt shall be preferred in the payment of their claims over the holders of the subordinated debt securities, and such Senior Debt shall be satisfied in full before any payment or other distribution (other than securities which are subordinate and junior in right of payment to the payment of all Senior Debt then outstanding) shall be made upon the subordinated debt securities. In the event that any subordinated debt security is declared or becomes due and payable before its maturity because of an occurrence of an event of default (under circumstances not described in the preceding sentence), no amount shall be paid in respect of the subordinated debt securities in excess of current interest payments, except sinking fund payments or at maturity, unless all Senior Debt then outstanding shall have been paid in full or payments satisfactory to the holders thereof provided therefor. During the

9

continuance of any default on Senior Debt, no payments of principal, sinking fund, interest or premium shall be made with respect to any Subordinated Debt Security if either (i) notice of default has been given to us, provided judicial proceedings are commenced in respect thereof within 120 days, or (ii) judicial proceedings shall be pending in respect of such default. In the event that any subordinated debt security is declared or becomes due and payable before maturity, each holder of Senior Debt shall be entitled to notice of same and shall be entitled to declare payable on demand any Senior Debt outstanding to such holder.

"Debt" is defined in the indentures to include all indebtedness of ours or any Consolidated Subsidiary representing money borrowed, except indebtedness owed to us by any Consolidated Subsidiary or owed to any Consolidated Subsidiary by us or any other Consolidated Subsidiary, and includes indebtedness of any other person for money borrowed when such indebtedness is guaranteed by us or any Consolidated Subsidiary. The term "Debt" shall be deemed to include the liability of ours or any Consolidated Subsidiary in respect of any investment or similar certificate, except to the extent such certificates are pledged by purchasers as collateral for, and are offset by, receivables. "Senior Debt" is defined to mean all Debt of the Company except Subordinated Debt. "Subordinated Debt" is defined to mean our 7.875% Senior Subordinated Notes Due 2004, 8.875% Subordinated Notes due 2007 and 8.25% Subordinated Notes due 2010 and any other Debt of ours which is subordinate and junior in right of payment to any other Debt of ours by the terms of the instrument creating or evidencing such Subordinate Debt and senior to the Junior Subordinated Notes. "Junior Subordinated Notes" is defined to mean our 8.375% Junior Subordinated Debentures due 2027, 8.206% Subordinated Deferrable Interest Notes due 2027, 8.36% Subordinated Notes due 2026, 8.25% Subordinated Deferrable Interest Notes due 2025 and 5.375% Subordinated Defeasible Interest Debentures due 2041.

Subordinated debt securities will rank on a parity with all other Subordinated Debt other than the Junior Subordinated Notes. Subordinated debt securities are senior to the Junior Subordinated Note and to our common stock and preferred stock, and will be senior to any other class of capital stock which may be authorized.

## Exchange, Registration and Transfer

Registered securities (other than book-entry securities) of any series of Offered Debt Securities will be exchangeable for other registered securities of the same series and of a like aggregate principal amount and tenor of different authorized denominations. At the holder's option, if debt securities of any series are issuable as both registered securities and bearer securities, bearer securities (with all unmatured coupons, except as provided below, and all matured coupons in default) of such series may be exchangeable into registered securities of the same series of any authorized denominations and of a like aggregate principal amount and tenor. Bearer securities with coupons appertaining thereto surrendered in exchange for registered securities between a Regular Record Date or a Special Record Date and the relevant date for payment of interest shall be surrendered without the coupon relating to such date for payment of interest and interest due on such date will not be payable in respect of the registered security issued in exchange for such bearer security, but will be payable only to the holder of such coupon when due in accordance with the terms of the applicable indenture. Bearer securities will not be issued in exchange for registered securities.

Debt securities may be presented for exchange as provided above, and registered securities (other than book-entry securities) may be presented for registration of transfer (with the form of transfer endorsed thereon duly executed), at the office of the Security Registrar or at the office of any transfer agent designated by us for such purpose with respect to any series of debt securities and referred to in the prospectus supplement. No service charge will be charged for the transfer, but any tax or other governmental charge must be paid. Such transfer or exchange will be effected upon the Security Registrar or such transfer agent, as the case may be, being satisfied with the documents of title and

10

identity of the person making the request. If a prospectus supplement refers to any transfer agents (in addition to the Security Registrar) initially designated by us with respect to any series of debt securities, we may at any time rescind the designation of any such transfer agent or approve a change in the location through which any such transfer agent acts, except that, if debt securities of a series are issuable solely as registered securities, we will be required to maintain a transfer agent in each Place of Payment for such series and, if debt securities of a series are issuable as bearer securities, we will be required to maintain (in addition to the Security Registrar) a transfer agent in a Place of Payment for such series located in Europe. We may at any time designate additional transfer agents with respect to any series of debt securities.

In the event of any redemption in part, we will not be required to:

- issue, register the transfer of or exchange debt securities of any series during a period beginning at the opening of business 15 days before any selection of debt securities of that series to be redeemed and ending at the close of business on (a) if debt securities of the series are issuable only as registered securities, the day of mailing of the relevant notice of redemption and (b) if debt securities of the series are issuable only as bearer securities, the day of the first publication of the relevant notice of redemption or, if debt securities of the series are also issuable as registered securities and there is no publication, the day of mailing of the relevant notice of redemption;

- register the transfer of or exchange any registered security, or portion thereof, called for redemption, except the unredeemed portion of any registered security being redeemed in part; or

- exchange any bearer security called for redemption, except to exchange such bearer security for a registered security of that series and like tenor which is simultaneously surrendered for redemption.

For a discussion of restrictions on the exchange, registration and transfer of Global Securities, see "—Global Securities".

## Payment and Paying Agents

Unless otherwise provided in a prospectus supplement, payment of principal of (and premium, if any) and interest, if any, on bearer securities will be payable in U.S. dollars, subject to any applicable laws and regulations, at the offices of such Paying Agents outside the United States as we may designate from time to time, and payment of interest on bearer securities with coupons appertaining thereto on any Interest Payment Date will be made only against surrender of the coupon relating to such Interest Payment Date. No payment of interest on a bearer security will be made unless, on the earlier of the date of the first such payment by us or the delivery by us of the bearer security in definitive form, a written certificate in the form required by the applicable indenture is provided to the trustee. The certificate shall state that on such date the bearer security is owned by:

- a person that is not a United States person,

- a United States person that (a) is a foreign branch of a United States financial institution purchasing for its own account or for resale or (b) acquired and holds the bearer security through the foreign branch of a United States financial institution (and, in the case of either (a) or (b), such financial institution agrees to comply with the requirements of Section 165(j)(3)(A), (B) or (C) of the Internal Revenue Code of 1986, as amended (the "Code"), and the regulations thereunder) or

- a financial institution purchasing for resale during the restricted period (as defined under "—Global Securities— Temporary and Definitive Global Securities") and, in any case, if any such

11

owner is a financial institution, such financial institution has not acquired the bearer security for purposes of resale to United States persons or to persons within the United States (as defined under "—Limitations on Issuance of Bearer Securities").

Presentation of coupons for payment or other demands for payment of bearer securities must be made outside the United States, and no payment with respect to any bearer security will be made at any office or agency of ours in the United States or by check mailed to any address in the United States or by transfer to an account maintained with a bank located in the United States.

Notwithstanding the foregoing, payments of principal of (and premium, if any) and interest, if any, on bearer securities will be made at the office of our Paying Agent in The City of New York, only if:

- despite the appointment of Paying Agents outside the United States, payment of the full amount thereof at the offices of all such Paying Agents is illegal or effectively precluded by exchange controls or other similar restrictions,

- such payment is then permitted by applicable laws, and

- we would not suffer any fiscal or other sanction as a result of our appointing a Paying Agent in The City of New York.

Unless otherwise provided in the prospectus supplement, payment of principal of (and premium, if any) and interest, if any, on registered securities will be made in U.S. dollars at the office of such Paying Agent or Paying Agents as we may designate from time to time, except that at our option payment of any interest may be made by check mailed to the address of the Person entitled thereto as such address shall appear in the Security Register. Unless otherwise provided in a prospectus supplement, payment of any installment of interest on registered securities will be made to the Person in whose name such registered security is registered at the close of business on the Regular Record Date for such interest.

Unless otherwise provided in a prospectus supplement, the Corporate Trust Office of the trustee will be designated as our sole Paying Agent for payments with respect to Offered Debt Securities that are issuable solely as registered securities and the office of the trustee or its affiliate as our Paying Agent in The City of New York for payments with respect to Offered Debt Securities (subject to the limitations described above in the case of bearer securities) that are issuable solely as bearer securities or as both registered securities and bearer securities. Any Paying Agents outside the United States and any other Paying Agents in the United States initially designated by us for the Offered Debt Securities will be named in a prospectus supplement. We may at any time designate additional Paying Agents or rescind the designation of any Paying Agent or approve a change in the office through which any Paying Agent acts, except that, if debt securities of a series are issuable solely as registered securities, we will be required to maintain a Paying Agent in each Place of Payment for such series and, if debt securities of a series are issuable as bearer securities, we will be required to maintain (i) a Paying Agent in The City of New York for payments with respect to any registered securities of the series (and for payments with respect to bearer securities of the series in the circumstances described above, but not otherwise), and (ii) a Paying Agent in a Place of Payment located outside the United States where debt securities of such series and any coupons appertaining thereto may be presented and surrendered for payment; provided that if the debt securities of such series are listed on The International Stock Exchange of the United Kingdom and the Republic of Ireland Limited or the Luxembourg Stock Exchange or any other stock exchange located outside the United States and such stock exchange shall so require, we will maintain a Paying Agent in London or Luxembourg or any other required city located outside the United States, as the case may be, for the debt securities of such series.

All moneys paid by us to a Paying Agent for the payment of principal of (and premium, if any) or interest, if any, on any debt security or coupon that remain unclaimed at the end of two years after

12

such principal, premium or interest shall have become due and payable will be repaid to us and the holder of such debt security or coupon will thereafter look only to us for payment thereof.

## Global Securities

The debt securities of a series may be issued in whole or in part as one or more Global Securities that will be deposited with, or on behalf of, a depositary located in the United States (a "U.S. Depositary") or a common depositary located outside the United States (a "Common Depositary") identified in the prospectus supplement relating to such series. Global Securities may be issued in either registered or bearer form, and in either temporary or definitive form.

The specific terms of the depositary arrangement with respect to any debt securities of a series will be described in the Prospectus Supplement relating to such series. We anticipate that the following provisions will apply to all depositary arrangements with a U.S. Depositary or Common Depositary.

## Book-Entry Securities

Unless otherwise specified in a prospectus supplement, debt securities which are to be represented by a Global Security to be deposited with or on behalf of a U.S. Depositary will be represented by a Global Security registered in the name of such depositary or its nominee. Upon the issuance of a Global Security in registered form, the U.S. Depositary for such Global Security will credit, on its book-entry registration and transfer system, the respective principal amounts of the debt securities represented by such Global Security to the accounts of institutions that have accounts with such depositary or its nominee ("participants"). The accounts to be credited shall be designated by the underwriters or agents of such debt securities or by us, if such debt securities are offered and sold directly by us. Ownership of beneficial interests in such Global Securities will be limited to participants or persons that may hold interests through participants. Ownership of beneficial interests in such Global Securities will be shown on, and the transfer of that ownership will be effected only through, records maintained by the U.S. Depositary or its nominee for such Global Security or by participants or persons that hold through participants. The laws of some jurisdictions require that certain purchasers of securities take physical delivery of such securities in definitive form. Such limits and such laws may impair the ability to transfer beneficial interests in a Global Security.

So long as the U.S. Depositary for a Global Security in registered form, or its nominee, is the registered owner of such Global Security, such depositary or such nominee, as the case may be, will be considered the sole owner or holder of the debt securities represented by such Global Security for all purposes under the indenture governing such debt securities. Except as set forth below, owners of beneficial interests in such Global Securities will not be entitled to have debt securities of the series represented by such Global Security registered in their names, will not receive or be entitled to receive physical delivery of debt securities of such series in definitive form and will not be considered the owners or holders thereof under the indenture.

Payment of principal of (and premium, if any) and interest, if any, on debt securities registered in the name of or held by a U.S. Depositary or its nominee will be made to the U.S. Depositary or its nominee, as the case may be, as the registered owner or the holder of the Global Security representing such debt securities. We nor any trustee or Paying Agent, or the Security Registrar for such debt securities will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Security for such debt securities or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

We expect that the U.S. Depositary for debt securities of a series, upon receipt of any payment of principal of (and premium, if any) or interest on permanent Global Securities, will credit participants' accounts on the date such payment is payable in accordance with their respective beneficial interests in the principal amount of such Global Securities as shown on the records of such Depositary. We also

13

expect that payments by participants to owners of beneficial interests in such Global Security held through such participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers in bearer form or registered in "street name", and will be the responsibility of such participants.

Unless and until it is exchanged in whole for debt securities in definitive form, a Global Security may not be transferred except as a whole by the U.S. Depositary for such Global Security to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any such nominee to a successor of such Depositary or a nominee of such successor. If a U.S. Depositary for debt securities in registered form is at any time unwilling or unable to continue as depositary and a successor depositary is not appointed by us within ninety days, we will issue debt securities in definitive registered form in exchange for the Global Security or Securities representing such debt securities. In addition, we may at any time and in our sole discretion determine not to have any debt securities in registered form represented by one or more Global Securities and, in such event, will issue debt securities in definitive registered form in exchange for the Global Security or Securities representing such debt securities. In any such instance, an owner of a beneficial interest in a Global Security will be entitled to physical delivery in definitive form of debt securities of the series represented by such Global Security equal in principal amount to such beneficial interest and to have such debt securities registered in the name of the owner of such beneficial interest.

## Temporary and Definitive Global Securities

If so specified in a prospectus supplement, all or any portion of the debt securities of a series that are issuable as bearer securities initially will be represented by one or more temporary Global Securities, without interest coupons, to be deposited with a Common Depositary in London for Morgan Guaranty Trust Company of New York, Brussels Office, as operator of the Euro-clear System ("Euro-clear") and CEDEL S.A. ("CEDEL") for credit to the respective accounts of the beneficial owners of such debt securities (or to such other accounts as they may direct). On and after the exchange date determined as provided in any such temporary Global Security and described in a prospectus supplement, each such temporary Global Security will be exchangeable for definitive debt securities in bearer form, registered form, definitive global bearer form or any combination thereof, as specified in a prospectus supplement, upon written certification (as described under "—Payment and Paying Agents") of non-United States beneficial ownership. No bearer security delivered in exchange for a portion of a temporary Global Security shall be mailed or otherwise delivered to any location in the United States.

Unless otherwise provided in a prospectus supplement, interest in respect of any portion of a temporary Global Security payable in respect of an Interest Payment Date occurring prior to the issuance of definitive debt securities will be paid to each of Euro-clear and CEDEL with respect to the portion of the temporary Global Security held for its account upon delivery to the Trustee of a certificate of non-United States beneficial ownership signed by Euro-clear or CEDEL, as the case may be, in the form required by the applicable indenture dated no earlier than such Interest Payment Date.

If any debt securities of a series are issuable in definitive global bearer form, a prospectus supplement will describe the circumstances, if any, under which beneficial owners of interests in any such definitive Global Security may exchange such interests for debt securities of such series and of like tenor and principal amount in any authorized form and denomination. No bearer security delivered in exchange for a portion of a definitive Global Security shall be mailed or otherwise delivered to any location in the United States in connection with such exchange. A Person having a beneficial interest in a definitive Global Security, except with respect to payment of principal of (and premium, if any) and interest, if any, on such definitive Global Security, will be treated as a holder of such principal amount of outstanding debt securities represented by such definitive Global Security as shall be specified in a written statement of the holder of such definitive Global Security or, in the case of a definitive Global

14

Security in bearer form, of Euro-clear or CEDEL which is produced to the Trustee by such Person. Principal of (and premium, if any) and interest, if any, on a definitive Global Security will be payable in the manner described in a prospectus supplement.

In connection with the sale of a bearer security during the "restricted period," as defined in Section 1.163-5(c)(2)(i)(D)(7) of the United States Treasury regulations (generally, the first 40 days after the closing date and, with respect to unsold allotments, until sold), no bearer security (including a definitive bearer security in global form) shall be mailed or otherwise delivered to any location in the United States and a bearer security sold during the restricted period may be delivered only if the person entitled to receive such bearer security (including a definitive bearer security in global form) furnishes written certification (as described under "—Payment and Paying Agents") of non-United States beneficial ownership. See "—Limitations on Issuance of Bearer Securities".

## Limitations on Issuance of Bearer Securities

Generally, in compliance with United States federal tax laws and regulations, bearer securities may not be offered or sold during the restricted period (as defined under "—Global Securities—Temporary and Definitive Global Securities") or delivered in connection with their sale during the restricted period in the United States or to United States persons (each as defined below) other than foreign branches of United States financial institutions that agree in writing to comply with the requirements of Section 165(j)(3)(A), (B) or (C) of the Code or that purchase for resale during the restricted period only to non-United States persons outside the United States. Any underwriters, agents and dealers participating in the offering of debt securities must agree that they will not offer or sell any bearer securities in the United States or to United States persons (other than the financial institutions described above) or deliver bearer securities within the United States.

Bearer securities and their interest coupons will bear a legend substantially to the following effect: "Any United States person who holds this obligation will be subject to limitations under the United States income tax laws, including the limitations provided in Sections 165(j) and 1287(a) of the Internal Revenue Code". The Code Sections referred to in the legend provide that, with certain exceptions, a United States person holding a bearer security or coupon will not be permitted to deduct any loss, and will not be eligible for capital gain treatment with respect to any gain, realized on a sale, exchange or redemption of such bearer security or coupon.

As used in this prospectus, "United States person" means:

- an individual citizen or resident of the United States,

- a corporation or partnership organized in or under the laws of the United States or any state thereof or the District of Columbia,

- an estate or trust the income of which is subject to United States federal income taxation regardless of its source or

- a trust the administration of which is subject to the primary supervision of a court within the United States and for which one or more United States fiduciaries have the authority to control all substantial decisions, and the term "United States" means the United States of America (including the States and the District of Columbia), its territories, its possessions, the Commonwealth of Puerto Rico and other areas subject to its jurisdiction.

## Absence of Restrictive Covenants

We are not restricted by either of the indentures from paying dividends or from incurring, assuming or becoming liable for any type of debt or other obligations or from creating liens on our property for any purpose. The indentures do not require the maintenance of any financial ratios or

15

## Merger and Consolidation

Each indenture provides that we, without the consent of the holders of any of the outstanding debt securities, may consolidate with or merge into any other corporation or transfer or lease our properties and assets substantially as an entirety to any Person or may permit any corporation to merge into us, provided that:

- the successor is a corporation organized under the laws of any domestic jurisdiction;

- the successor, if other than us, assumes our obligations under such indenture and the debt securities issued thereunder;

- immediately after giving effect to such transaction, no Event of Default and no event which, after notice or lapse of time or both, would become an Event of Default, shall have occurred and be continuing; and

- certain other conditions are met

Each indenture provides that, upon any consolidation or merger or transfer or lease of our properties and assets of substantially as an entirety in accordance with the preceding paragraph, the successor corporation formed by such consolidation or into which we are merged or to which such transfer or lease is made shall be substituted for us with the same effect as if such successor corporation had been named as us. Thereafter, we shall be relieved of the performance and observance of all obligations and covenants of such indenture and the senior debt securities or subordinated debt securities, as the case may be, including but not limited to the obligation to make payment of the principal of (and premium, if any) and interest, if any, on all the debt securities then outstanding, and we may thereupon or any time thereafter be liquidated and dissolved.

## Satisfaction and Discharge

Unless a prospectus supplement provides otherwise, we will be discharged from our obligations under the outstanding debt securities of a series upon satisfaction of the following conditions:

- we have irrevocably deposited with the trustee either money, or U.S. Government Obligations together with the predetermined and certain income to accrue thereon without consideration of any reinvestment thereof, or a combination of which (in the written opinion of independent public accountants delivered to the trustee), will be sufficient to pay and discharge the entire principal of (and premium, if any), and interest, if any, to Stated Maturity or any redemption date on, the outstanding debt securities of such series;

- we have paid or caused to be paid all other sums payable with respect to the outstanding debt securities of such series;

- the trustee has received an Officers' Certificate and an Opinion of Counsel each stating that all conditions precedent have been complied with; or

- the trustee has received (a) a ruling directed to us and the trustee from the United States Internal Revenue Service to the effect that the holders of the debt securities of such series will not recognize income, gain or loss for federal income tax purposes as a result of our exercise of our option to discharge our obligations under the indenture with respect to such series and will be subject to federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit and discharge had not occurred or (b) an

16

opinion of tax counsel to the same effect as the ruling described in clause (a) above and based upon a change in law.

Upon such discharge, we will be deemed to have satisfied all the obligations under the indenture, except for obligations with respect to registration of transfer and exchange of the debt securities of such series, and the rights of the holders to receive from deposited funds payment of the principal of (and premium, if any) and interest, if any, on the debt securities of such series.

## Modification of the Indenture

Each indenture provides that we and the trustee thereunder may, without the consent of any holders of debt securities, enter into supplemental indentures for the purposes, among other things, of adding to our covenants, adding any additional Events of Default, establishing the form or terms of debt securities or curing ambiguities or inconsistencies in such indenture or making other provisions; provided such action shall not adversely affect the interests of the holders of any series of debt securities in any material respect.

Each indenture contains provisions permitting us, with the consent of the holders of not less than a majority in principal amount of the outstanding debt securities of all affected series (acting as one class), to execute supplemental indentures adding any provisions to or changing or eliminating any of the provisions of such indenture or modifying the rights of the holders of the debt securities of such series, except that no such supplemental indenture may, without the consent of the holders of all the outstanding debt securities affected thereby, among other things:

(1)  change the maturity of the principal of, or any installment of principal of or interest on, any of the debt securities;

(2)  reduce the principal amount thereof (or any premium thereon) or the rate of interest, if any, thereon;

(3)  reduce the amount of the principal of Original Issue Discount Securities payable on any acceleration of maturity;

(4)  change our obligation to maintain an office or agency in the places and for the purposes required by such indenture;

(5)  impair the right to institute suit for the enforcement of any such payment on or after the applicable maturity date;

(6)  reduce the percentage in principal amount of the outstanding debt securities of any series, the consent of the holders of which is required for any such supplemental indenture or for any waiver of compliance with certain provisions of, or of certain defaults under, such indenture; or

(7)  with certain exceptions, to modify the provisions for the waiver of certain defaults and any of the foregoing provisions.

## Events of Default

An Event of Default in respect of any series of debt securities (unless it is either inapplicable to a particular series or has been modified or deleted with respect to any particular series) is defined in each indenture to be:

*   failure to pay interest on such series of debt securities for 30 days after payment is due;

*   failure to pay the principal of (or premium, if any) on such series of debt securities when due;

17

- failure to perform any other covenant in the indenture that applies to such series of debt securities for 90 days after we have received written notice of the failure to perform in the manner specified in the indenture;

- an event of default under any mortgage, indenture (including the indenture) or other instrument under which any debt of Washington Mutual, Inc. or any Principal Subsidiary Bank (defined below) shall be outstanding which default shall have resulted in the acceleration of such debt in excess of $75,000,000 in aggregate principal amount and such acceleration shall not have been rescinded or such debt discharged within a period of 30 days after notice;

- certain events of bankruptcy, insolvency or reorganization; and

- any other event of default provided for in such series of debt securities.

"Principal Subsidiary Bank" is defined in the indenture as each of Washington Mutual Bank, FA and any other subsidiary bank the consolidated assets of which constitute 20% or more of the consolidated assets of Washington Mutual, Inc. and its subsidiaries. As of the date hereof, Washington Mutual Bank, FA is our only Principal Subsidiary Bank.

If an Event of Default shall have happened and be continuing, either the trustee thereunder or the holders of not less than 25% in principal amount of the outstanding debt securities of such series may declare the principal of all of the outstanding notes to be immediately due and payable.

Each indenture provides that the holders of not less than a majority in principal amount of the outstanding debt securities of any series may direct the time, method and place of conducting any proceeding for any remedy available to the trustee thereunder, or exercising any trust or power conferred on such trustee, with respect to the debt securities of such series; provided that:

- such direction shall not be in conflict with any rule of law or with the indenture,

- the trustee may take any other action deemed proper that is not inconsistent with such direction and

- the trustee shall not determine that the action so directed would be unjustly prejudicial to the holders of debt securities of such series not taking part in such direction.

Each indenture provides that the holders of not less than a majority in principal amount of the outstanding debt securities of any series may on behalf of the holders of all of the outstanding debt securities of such series waive any past default under such indenture with respect to such series and its consequences, except a default (1) in the payment of the principal of (or premium, if any) or interest, if any, on any of the debt securities of such series or (2) in respect of a covenant or provision of such indenture which, under the terms of such indenture, cannot be modified or amended without the consent of the holders of all of the outstanding debt securities of such series affected thereby.

Each indenture contains provisions entitling the trustee thereunder, subject to the duty of the trustee during an Event of Default in respect of any series of debt securities to act with the required standard of care, to be indemnified by the holders of the debt securities of such series before proceeding to exercise any right or power under such indenture at the request of the holders of the debt securities of such series.

Each indenture provides that the trustee will, within 90 days after the occurrence of a default in respect of any series of debt securities, give to the holders of the debt securities of such series notice of all uncured and unwaived defaults known to it; provided, however, that, except in the case of a default in the payment of the principal of (or premium, if any) or any interest on, or any sinking fund installment with respect to, any of the debt securities of such series, the trustee will be protected in withholding such notice if it in good faith determines that the withholding of such notice is in the interests of the holders of the debt securities of such series; and provided, further, that such notice

18

shall not be given until at least 30 days after the occurrence of an Event of Default regarding the performance of any covenant of ours under such indenture other than for the payment of the principal of (or premium, if any) or any interest on, or any sinking fund installment with respect to, any of the debt securities of such series. The term default for the purpose of this provision only means any event that is, or after notice or lapse of time, or both, would become, an Event of Default with respect to the debt securities of such series.

We will be required to furnish annually to the trustee a certificate as to compliance with all conditions and covenants under the indenture.

## Meetings

Each indenture contains provisions for convening meetings of the holders of debt securities of a series if debt securities of that series are issuable as bearer securities. A meeting may be called at any time by the trustee under the applicable indenture, and also, upon request, by us or the holders of at least 10% in principal amount of the outstanding debt securities of such series, in any such case upon notice given in accordance with "—Notices" below. Persons entitled to vote a majority in principal amount of the outstanding debt securities of a series shall constitute a quorum at a meeting of holders of debt securities of such series, except that in the absence of a quorum, a meeting called by us or the trustee shall be adjourned for a period of not less than 10 days, and in the absence of a quorum at any such adjourned meeting, the meeting shall be further adjourned for a period of not less than 10 days, at which further adjourned meeting persons entitled to vote 25% in aggregate principal amount of the outstanding debt securities of such series shall constitute a quorum. Except for any consent which must be given by the holder of each outstanding debt security affected thereby, as described above under "—Modification of the Indenture", and subject to the provisions described in the last sentence under this subheading, any resolution presented at a meeting or adjourned meeting duly reconvened at which a quorum is present may be adopted by the affirmative vote of the lesser of (1) the holders of a majority in principal amount of the outstanding debt securities of that series and (2) $66^2/3\%$ in aggregate principal amount of outstanding debt securities of such series represented and voting at the meeting; provided, however, that any resolution with respect to any request, demand, authorization, direction, notice, consent, waiver or other action which may be made, given or taken by the holders of a specified percentage, which is less than a majority, in principal amount of outstanding debt securities of a series may be adopted at a meeting or adjourned meeting duly reconvened at which a quorum is present by the affirmative vote of the lesser of (1) the holders of such specified percentage in principal amount of the outstanding debt securities of that series and (2) a majority in principal amount of outstanding debt securities of such series represented and voting at the meeting. Any resolution passed or decision taken at any meeting of holders of debt securities of any series duly held in accordance with the applicable indenture will be binding on all holders of debt securities of that series and the related coupons. With respect to any consent, waiver or other action which the applicable indenture expressly provides may be given by the holders of a specified percentage of outstanding debt securities of all series affected thereby (acting as one class), only the principal amount of outstanding debt securities of any series represented at a meeting or adjourned meeting duly reconvened at which a quorum is present as aforesaid and voting in favor of such action shall be counted for purposes of calculating the aggregate principal amount of outstanding debt securities of all series affected thereby favoring such action.

## Notices

Except as otherwise provided in each indenture, notices to holders of bearer securities will be given by publication at least once in a daily newspaper in The City of New York and London and in such other city or cities as may be specified in such bearer securities and will be mailed to such Persons whose names and addresses were previously filed with the trustee under the applicable indenture,

19

within the time prescribed for the giving of such notice. Notices to holders of registered securities will be given by mail to the addresses of such holders as they appear in the Security Register.

## Title

Title to any bearer securities and any coupons appertaining thereto will pass by delivery. We, the appropriate Trustee and any agent of ours or such Trustee may treat the bearer of any bearer security and the bearer of any coupon and the registered owner of any registered security (including registered securities in global registered form) as the absolute owner thereof (whether or not such Debt Security or coupon shall be overdue and notwithstanding any notice to the contrary) for the purpose of making payment and for all other purposes.

# DESCRIPTION OF CAPITAL STOCK

The following descriptions are summaries of the material terms of our Amended and Restated Articles of Incorporation ("articles of incorporation"), our bylaws and applicable provisions of law. Reference is made to the more detailed provisions of, and such descriptions are qualified in their entirety by reference to, our articles of incorporation and bylaws, which are incorporated by reference in the registration statement that we filed with the SEC. You should read our articles of incorporation and bylaws for the provisions that are important to you.

Our articles of incorporation currently authorize 1,600,000,000 shares of common stock, no par value, and 10,000,000 shares of preferred stock, no par value. On September 30, 2003, we had 913,854,221 shares of common stock outstanding. There were no shares of preferred stock outstanding.

## Common Stock

We do not intend to offer shares of our common stock pursuant to this prospectus except upon the conversion or exchange of debt securities or preferred stock that we offer under this prospectus.

Each share of common stock is entitled to one vote on all matters properly presented at a meeting of shareholders. Shareholders are not entitled to cumulative voting in the election of directors.

The number of our directors is determined by our bylaws. The bylaws currently set the number of directors at up to sixteen. Our board of directors is divided into three classes of as equal a number of directors as possible. The term of office of each class is three years, with each term expiring in a different year.

*Interested Stockholders.* Our articles of incorporation prohibit, except under certain circumstances, us (or any of our subsidiaries) from engaging in certain significant business transactions with a "major stockholder." A "major stockholder" is a person who, without the prior approval of our board of directors, acquires beneficial ownership of five percent or more of our outstanding voting stock. Prohibited transactions include, among others:

- any merger with, disposition of assets to, acquisition by us of the assets of, issuance of securities of ours to, or acquisition by us of securities of, a major stockholder;

- any reclassification of our voting stock or of any subsidiary beneficially owned by a major stockholder; or

- any partial or complete liquidation, spin off, split off or split up of us or any subsidiary.

The above prohibitions do not apply, in general, if the specific transaction is approved by:

- our board of directors prior to the major stockholder involved having become a major stockholder;

20

- a vote of at least 80% of the "continuing directors" (defined as those members of our board prior to the involvement of the major stockholder);

- a majority of the "continuing directors" if the major stockholder obtained unanimous board approval to become a major stockholder;

- a vote of 95% of the outstanding shares of our voting stock other than shares held by the major stockholder; or

- a majority vote of the shares of voting stock and the shares of voting stock owned by stockholders other than any major stockholder if certain other conditions are met.

Our articles of incorporation also provide that during the time a major stockholder exists, we may voluntarily dissolve only upon the unanimous consent of our stockholders or an affirmative vote of at least two-thirds of our board of directors and the holders of at least two-thirds of the shares entitled to vote on such a dissolution and of each class of shares entitled to vote on such a dissolution as a class, if any.

*Shareholder Rights Plan.* We have adopted a shareholder rights plan (the "Rights Plan") which provides that one right to purchase 1/1,000th of a share of our Series RP preferred stock (the "Rights") is attached to each outstanding share of our common stock. The Rights have certain anti-takeover effects and are intended to discourage coercive or unfair takeover tactics and to encourage any potential acquiror to negotiate a price fair to all shareholders. The Rights may cause substantial dilution to an acquiring party that attempts to acquire us on terms not approved by our board, but they will not interfere with any merger or other business combination that is approved by our board.

The Rights are attached to the shares of our common stock. The Rights are not presently exercisable. At the time a party acquires beneficial ownership of 15% or more of the outstanding shares of our common stock or commences or publicly announces for the first time a tender offer to do so, the Rights will separate from the common stock and will become exercisable. Each Right entitles the holder to purchase 1/1,000th share of Series RP preferred stock, for an exercise price that is currently $200 per share. Once the Rights become exercisable, any Rights held by the acquiring party will be void and, for the next 60 days, all other holders of Rights will receive upon exercise of the Right that number of shares of our common stock having a market value of two times the exercise price of the Right. The Rights, which expire on January 4, 2011, may be redeemed by us for $0.001 per right prior to becoming exercisable. Until a Right is exercised, the holder of that Right will have no rights as a shareholder, including, without limitation, the right to vote or receive dividends.

## Preferred Stock

In this section we describe the general terms that will apply to preferred stock that we may offer by this prospectus in the future. When we issue a particular series, we will describe the specific terms of the series of preferred stock in a prospectus supplement. The description of provisions of our preferred stock included in any prospectus supplement may not be complete and is qualified in its entirety by reference to the description in our articles of incorporation and our certificate of designation, which will describe the terms of the offered preferred stock and be filed with the SEC at the time of sale of that preferred stock. At that time, you should read our articles of incorporation and any certificate of designation relating to each particular series of preferred stock for provisions that may be important to you.

Our board of directors is authorized to provide for the issuance from time to time of preferred stock in series and, as to each series, to fix the designation, the dividend rate, whether dividends are cumulative, the preferences which dividends will have with respect to any other class or series of capital stock, the voting rights, the voluntary and involuntary liquidation prices, the conversion or exchange

21

privileges, the redemption prices and the other terms of redemption, and the terms of any purchase or sinking funds applicable to the series. The terms of any series of preferred stock will be described in a prospectus supplement. Cumulative dividends, dividend preferences and conversion, exchange and redemption provisions, to the extent that some or all of these features may be present when shares of our preferred stock are issued, could have an adverse effect on the availability of earnings for distribution to the holders of common stock or for other corporate purposes.

## DESCRIPTION OF DEPOSITARY SHARES

We describe in this section the general terms of the depositary shares. We will describe the specific terms of the depositary shares in a prospectus supplement. The following description of the deposit agreement, the depositary shares and the depositary receipts is only a summary and you should refer to the forms of the deposit agreement and depositary share certificate that will be filed with the SEC in connection with any particular offering of depositary shares.

### General

We may offer fractional interests in preferred stock, rather than full shares of preferred stock. In that case, we will provide for the issuance by a depositary to investors of receipts for depositary shares, each representing a fractional interest in a share of a particular series of preferred stock.

The shares of any series of preferred stock underlying the depositary shares will be deposited under a separate deposit agreement between us and the depositary, which must be a bank or trust company having its principal office in the United States and having a combined capital and surplus of at least $50 million. The applicable prospectus supplement will set forth the name and address of the depositary. Subject to the terms of the deposit agreement, each owner of a depositary share will have a fractional interest in all the rights and preferences of the preferred stock underlying such depositary share. Those rights include any dividend, voting, redemption, conversion and liquidation rights.

The depositary shares will be evidenced by depositary receipts issued under the deposit agreement. If you purchase fractional interests in shares of the related series of preferred stock, you will receive depositary receipts as described in the applicable prospectus supplement. While the final depositary receipts are being prepared, we may order the depositary to issue temporary depositary receipts substantially identical to the final depositary receipts although not in final form. The holders of the temporary depositary receipts will be entitled to the same rights as if they held the depositary receipts in final form. Holders of the temporary depositary receipts can exchange them for the final depositary receipts at our expense.

### Withdrawal

Unless otherwise indicated in the applicable prospectus supplement and unless the related depositary shares have been called for redemption, if you surrender depositary receipts at the principal office of the depositary, then you are entitled to receive at that office the number of shares of preferred stock and any money or other property represented by the depositary shares. We will not issue partial shares of preferred stock. If you deliver depositary receipts evidencing a number of depositary shares that represent more than a whole number of shares of preferred stock, the depositary will issue to you a new depositary receipt evidencing the excess number of depositary shares at the same time that the preferred stock is withdrawn. Holders of shares of preferred stock received in exchange for depositary shares will no longer be entitled to deposit those shares under the deposit agreement or to receive depositary shares in exchange for those shares of preferred stock.

22

**Dividends and Other Distributions**

The depositary will distribute all cash dividends or other cash distributions received with respect to the preferred stock to the record holders of depositary shares representing the preferred stock in proportion to the numbers of depositary shares owned by the holders on the relevant record date. The depositary will distribute only the amount that can be distributed without attributing to any holder of depositary shares a fraction of one cent. The balance not distributed will be added to and treated as part of the next sum received by the depositary for distribution to record holders of depositary shares.

If there is a distribution other than in cash, the depositary will distribute property to the holders of depositary shares, unless the depositary determines that it is not feasible to make such distribution. If this occurs, the depositary may, with our approval, sell the property and distribute the net proceeds from the sale to the holders of depositary shares.

**Conversion, Exchange and Redemption**

Unless otherwise specified in the applicable prospectus supplement, neither the depositary shares nor the series of preferred stock underlying the depositary shares will be convertible or exchangeable into any other class or series of our capital stock.

If the series of the preferred stock underlying the depositary shares is subject to redemption, the depositary shares will be redeemed from the redemption proceeds, in whole or in part, of the series of the preferred stock held by the depositary. The redemption price per depositary share will bear the same relationship to the redemption price per share of preferred stock that the depositary share bears to the underlying preferred stock. Whenever we redeem preferred stock held by the depositary, the depositary will redeem, as of the same redemption date, the number of depositary shares representing the preferred stock redeemed. If less than all the depositary shares are to be redeemed, the depositary shares to be redeemed will be selected by lot or pro rata as determined by the depositary.

**Voting**

Upon receipt of notice of any meeting at which the holders of the preferred stock are entitled to vote, the depositary will mail information about the meeting contained in the notice to the record holders of the depositary shares relating to the preferred stock. Each record holder of the depositary shares on the record date (which will be the same date as the record date for the preferred stock) will be entitled to instruct the depositary as to how the preferred stock underlying the holder's depositary shares should be voted.

The depositary will try, if practical, to vote the preferred stock underlying the depositary shares according to the instructions received. We will agree to take all action requested by and deemed necessary by the depositary in order to enable the depositary to vote the preferred stock in that manner. The depositary will not vote any preferred stock for which it does not receive specific instructions from the holders of the depositary shares relating to the preferred stock.

**Amendment and Termination of the Deposit Agreement**

We may amend the form of depositary receipt evidencing the depositary shares and any provision of the deposit agreement by agreement with the depositary at any time. Any amendment that materially and adversely alters the rights of the existing holders of depositary shares will not be effective, however, unless approved by the record holders of at least a majority of the depositary shares then outstanding. A deposit agreement may be terminated by us or the depositary only if:

- all outstanding depositary shares relating to the deposit agreement have been redeemed or converted into or exchanged for other securities; or

23

- there has been a final distribution on the underlying preferred stock in connection with our liquidation, dissolution or winding up and the distribution has been made to the holders of the related depositary shares

## Charges of Depositary

We will pay all transfer and other taxes and governmental charges arising solely from the existence of the depositary arrangements. We will pay charges of the depositary in connection with its duties under the deposit agreement. Holders of depositary shares will pay transfer and other taxes and governmental charges and any other charges that are stated to be their responsibility in the deposit agreement.

## Miscellaneous

The depositary will forward to the holders of depositary shares all reports and communications that we must furnish to the holders of the preferred stock.

Neither we nor the depositary will be liable if either of us is prevented or delayed by law or any circumstance beyond our control in performing our respective obligations under the deposit agreement. Our obligations and the depositary's obligations under the deposit agreement will be limited to performance in good faith of duties set forth in the deposit agreement. Neither we nor the depositary will be obligated to prosecute or defend any legal proceeding connected with any depositary shares or preferred stock unless satisfactory indemnity is furnished. We and the depositary may rely upon written advice of counsel or accountants, or information provided by persons presenting preferred stock for deposit, holders of depositary shares or other persons believed to be competent and on documents believed to be genuine.

## Resignation and Removal of Depositary

The depositary may resign at any time by delivering notice to us. We may also remove the depositary at any time. Resignations or removals will take effect upon the appointment of a successor depositary and its acceptance of the appointment. The successor depositary must be appointed within 60 days after delivery of the notice of resignation or removal.

## PLAN OF DISTRIBUTION

We may sell the securities being offered hereby: (i) directly to purchasers, (ii) through agents, (iii) through dealers, (iv) through underwriters, or (v) through a combination of any such methods of sale.

The distribution of the securities may be effected from time to time in one or more transactions either (i) at a fixed price or prices, which may be changed, (ii) at market prices prevailing at the time of sale, (iii) at prices related to such prevailing market prices, or (iv) at negotiated prices.

Offers to purchase the securities may be solicited directly by us or by agents designated by us from time to time. Any such agent, which may be deemed to be an underwriter as that term is defined in the Securities Act, involved in the offer or sale of the debt securities in respect of which this prospectus is delivered will be named, and any commissions payable by us to such agent will be set forth in the prospectus supplement relating to the offering of the securities. Unless otherwise indicated in the applicable prospectus supplement, any such agent will be acting on a best efforts basis for the period of its appointment.

If a dealer is utilized in the sale of the securities in respect of which this prospectus is delivered, we will sell the securities to the dealer, as principal. The dealer, which may be deemed to be an underwriter as that term is defined in the Securities Act, may then resell the securities to the public at

24

varying prices to be determined by such dealer at the time of resale. Dealer trading may take place in certain of the securities, including securities not listed on any securities exchange.

If an underwriter or underwriters are utilized in the sale, we will execute an underwriting agreement with such underwriters at the time of sale to them and the names of the underwriters will be set forth in the applicable prospectus supplement, which will be used by the underwriters to make resales of the securities in respect of which this prospectus is delivered to the public. The obligations of underwriters to purchase securities will be subject to certain conditions precedent and the underwriters will be obligated to purchase all of the securities of a series if any are purchased.

Underwriters, dealers, agents and other persons may be entitled, under agreements that may be entered into with us, to indemnification against certain civil liabilities, including liabilities under the Securities Act, or to contribution with respect to payments that they may be required to make in respect thereof. Underwriters, dealers and agents may engage in transactions with, or perform services for, us in the ordinary course of business.

Except as indicated in the applicable prospectus supplement, the securities are not expected to be listed on a securities exchange, except for our common stock, which is listed on The New York Stock Exchange, and any underwriters or dealers will not be obligated to make a market in securities. We cannot predict the activity or liquidity of any trading in the securities.

## LEGAL MATTERS

The legality of the securities offered by this prospectus will be passed upon by Heller Ehrman White & McAuliffe LLP, Seattle, Washington. As of September 30, 2003, Heller Ehrman White & McAuliffe LLP and individual attorneys at the firm who participated in this transaction owned an aggregate of 13,793 shares of our common stock.

## EXPERTS

The consolidated financial statements incorporated by reference from our Annual Report on Form 10-K for the year ended December 31, 2002 have been audited by Deloitte & Touche LLP, independent auditors, as stated in their report, which is incorporated herein by reference (which report expresses an unqualified opinion and includes an explanatory paragraph relating to the adoption of Statement of Financial Accounting Standards (SFAS) No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as amended, on January 1, 2001; SFAS No. 142, *Goodwill and Other Intangible Assets*, on January 1, 2002; and SFAS No. 147, *Acquisitions of Certain Financial Institutions*, on October 1, 2002), and have been so incorporated in reliance upon the report of such firm upon their authority as experts in accounting and auditing.

25

EXHIBIT 4

# CHASE FAX COVER SHEET

**Date:** 8/5/2011

If you do not receive a clear transmission, please call us at the Customer Care number referenced below.

| **Deliver To:** | Anita Gozzi | **Sent From:** | Chase (OH4-7302) |
| | | | 3415 Vision Drive |
| | | | Columbus, OH 43219-6009 |
| **Fax:** | (831) 625-1481 | | |

**Confidentiality Notice:**

Per your request, the documents were sent via the fax number provided to Chase by you or your representative. If you do not receive any or all of the pages properly, please call us at (800) 848-9136. This transmission is only intended for the use of the individual or entity to which it is addressed, and may contain information that is confidential or privileged under law. If the reader of this message is not the intended recipient, you are hereby notified that retention, dissemination, distribution, disclosure, printing, copying, or use of any of the information contained in or attached to this fax is strictly prohibited. If you received this fax in error, please notify the sender immediately by telephone and destroy the original. Thank you.

Chase (OH4-7302)
3415 Vision Drive
Columbus, OH 43219-6009



August 05, 2011


Anita Gozzi
PO BOX 22881
Carmel, CA 93922-0881



Re:  Account Number: ******7478
     Anita Gozzi

**Loan Investor**

Dear Anita Gozzi:

I am writing in response to the inquiry Chase received about the loan referenced above.

Your loan was sold into a public security managed by JPMorgan Chase Bank N.A. and may include a number of investors.  As the servicer of your loan, Chase is authorized by the security to handle any related concerns on their behalf.  The address of your investor is:

> 3415 Vision Drive
> Columbus, OH  43219

We appreciate your business. If you have questions, please call us at the telephone number below.

Sincerely,

Chase
(800) 848-9136
(800) 582-0542 TDD / Text Telephone
www.chase.com


CC278

EXHIBIT 5

RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO                07/26/2010 INST# 2010040537

CALIFORNIA RECONVEYANCE COMPANY
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA 91311
800 892-6902
(818)775-2258 (Fax)

_____

Space above this line for recorder's use only

Trustee Sale No. 244012CA   Loan No. 3013987478   Title Order No. 523038

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is $96,470.80 as of July 23, 2010 and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of property by paying the entire amount demanded by your creditor.



Trustee Sale No. 244012CA  Loan No. 3013987478  Title Order No. 523038

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact: JPMorgan Chase Bank, National Association, at 7301 BAYMEADOWS WAY , JACKSONVILLE, FL 32256, 800-848-9380.

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

**REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION. NOTICE IS HEREBY GIVEN THAT: CALIFORNIA RECONVEYANCE COMPANY is the duly appointed Trustee under a Deed of Trust dated 08-10-2007, executed by DANIELE GOZZI AND ANITA GOZZI, HUSBAND AND WIFE AS JOINT TENANTS, as trustor, to secure obligations in favor of WASHINGTON MUTUAL BANK, FA, as Beneficiary Recorded 08-28-2007, Book , Page , Instrument 2007067285 of official records in the Office of the Recorder of MONTEREY County, California, as more fully described on said Deed of Trust. APN: 243-221-027-000 Situs: 31549 HIGHWAY 1, , CARMEL, CA 93923 Including the note(s) for the sum of $5,800,000.00 that the beneficial interest under said Deed of Trust and the obligations secured thereby are presently held by the beneficiary; that a breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that the payment has not been made of: THE 04/01/2010 INSTALLMENT OF PRINCIPAL AND INTEREST AND ALL SUBSEQUENT MONTHLY INSTALLMENTS OF PRINCIPAL AND INTEREST; PLUS ANY ADDITIONAL ACCRUED AND UNPAID AMOUNTS INCLUDING, BUT NOT LIMITED TO, LATE CHARGES, ADVANCES, IMPOUNDS, TAXES, HAZARD INSURANCE, ADMINISTRATIVE FEES, INSUFFICIENT AND PARTIAL RETURN CHECK FEES, STATEMENT FEES, AND OBLIGATIONS SECURED BY PRIOR ENCUMBRANCES.**

That by reason thereof, the present beneficiary under such Deed of Trust, has executed and delivered to said Trustee, a written Declaration and Demand for Sale, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing the obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

**SEE ATTACHED DECLARATION**

DATE: July 23, 2010

CALIFORNIA RECONVEYANCE COMPANY, as Trustee

**LAURA MATTHIES,**
**Assistant Secretary**

CALIFORNIA RECONVEYANCE COMPANY IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT, ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

**Borrowers**   ANITA GOZZI

**Property address:**   31549 HWY 1
CARMEL CA 93923

**Loan Number:**   3013987478

# DECLARATION OF COMPLIANCE
### (California Civil Code Section 2923.5(b))

The undersigned mortgagee, beneficiary or authorized agent hereby declares under penalty of perjury, under the laws of the State of California, as follows:

☐   The mortgagee, beneficiary or authorized agent has contacted the borrower to discuss the borrower's financial situation and to explore options for the borrower to avoid foreclosure in compliance with Cal. Civ. Code Section 2923.5. Thirty days or more have elapsed since the borrower was contacted.

☒   The mortgagee, beneficiary or authorized agent tried with due diligence but was unable to contact the borrower to discuss the borrower's financial situation and to explore options for the borrower to avoid foreclosure as required by Cal. Civ. Code Section 2923.5. Thirty days or more have elapsed since these due diligence efforts were completed.

☐   The mortgagee, beneficiary or authorized agent was not required to comply with Cal. Civ. Code Section 2923.5 because:

   ☐   The real property is not an owner-occupied single family residence.

   ☐   The loan was not originated between January 1, 2003 and December 31, 2007.

   ☐   The borrower has surrendered the property as evidenced by either a letter confirming the surrender or delivery of the keys to the property to the mortgagee, trustee, beneficiary or authorized agent.

   ☐   The borrower has contracted with someone whose primary business is advising people who have decided to leave their homes on how to extend the foreclosure process and avoid their loan obligations.

   ☐   The borrower has filed for bankruptcy, and the proceedings have not yet been finalized.

I certify under penalty of perjury under the laws of the State of California that the above is true and correct.

JP Morgan Chase Bank, National Association

Date: 7/15/2010
City/State: Jacksonville, FL

_John Gilvarry_
John Gilvarry



EXHIBIT 6

*Attention*

RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO

CALIFORNIA RECONVEYANCE COMPANY
9200 Oakdale Avenue – CA2-4379
Chatsworth, CA 91311
800-892-6902

**Trustee Sale No.**   **244012CA**
Loan No.            3013987476
Title Order No.     523036

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 08-10-2007. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On 11-29-2010 at 10:00 AM, CALIFORNIA RECONVEYANCE COMPANY as the duly appointed Trustee under and pursuant to Deed of Trust Recorded 08-28-2007, Book , Page , Instrument 2007067285 of official records in the Office of the Recorder of MONTEREY County, California, executed by: DANIELE GOZZI AND ANITA GOZZI HUSBAND AND WIFE AS JOINT TENANTS, as Trustor, WASHINGTON MUTUAL BANK, FA, as Beneficiary, will sell at public auction sale to the highest bidder for cash, cashier's check drawn by a state or national bank, a cashier's check drawn by a state or federal credit union, or a cashier's check drawn by a state or federal savings and loan association, savings association, or savings bank specified in section 5102 of the Financial Code and authorized to do business in this state. Sale will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to the Deed of Trust. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, interest thereon, estimated fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Place of Sale: AT THE FRONT OF THE MAIN ENTRANCE OF THE ADMINISTRATION BUILDING LOCATED AT 168 W. ALISAL STREET, SALINAS, CA 93901

Legal Description: PARCEL ONE:

PARCEL B-2 AS SAID PARCEL IS SHOWN ON THE PARCEL MAP RECORDED JULY 22, 1983 IN VOLUME 15 OF PARCEL MAPS, AT PAGE 157, MONTEREY COUNTY RECORDS.
PARCEL TWO:

EASEMENT FOR ROAD AND UTILITIES 60 FEET WIDE OVER PARCELS B-3 AND B-1, AS SAID EASEMENT AND PARCELS ARE SHOWN ON THE PARCEL MAP RECORDED JULY 22, 1983 IN VOLUME 15 OF PARCEL MAPS, AT PAGE 157, MONTEREY COUNTY RECORDS.
PARCEL THREE:

AN EASEMENT FOR ROAD AND UTILITIES, OVER THAT STRIP OF LAND DESCRIBED IN THE DEED FROM ROSEMARIE PREH, A WIDOW, TO THE UNIVERSITY OF CALIFORNIA SAN FRANCISCO FOUNDATION, A NONPROFIT PUBLIC BENEFIT CORPORATION, ET AL, RECORDED JUNE 14, 1991 IN REEL 2656 AT PAGE 47, OFFICIAL RECORDS OF MONTEREY COUNTY, CALIFORNIA.
PARCEL FOUR:

AN EASEMENT FOR ROAD AND UTILITY PURPOSES, IN THE RANCHO SAN JOSE Y SUR CHIQUITA COUNTY OF MONTEREY, STATE OF CALIFORNIA, OVER THAT PORTION OF THE LAND DESCRIBED IN DEED TO CLINTON AND MARGARET EASTWOOD FILED FOR RECORD ON 15 MAY 1980 IN REEL 1408 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 585, LYING WITHIN THE EASEMENT STRIP 50 FEET WIDE DESCRIBED IN THE DEED OF EASEMENT EXECUTED BY ROSEMARIE PREH, AS



Daniel Gozzi    8899
Anita Gozzi    - 6956

GRANTOR TO HELEN BIBBERO ET AL, GRANTEES, FILED FOR RECORD ON JUNE 14 1991 IN REEL 2659 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 47, SAID PORTION BEING GRAPHICALLY SHOWN ON THE SKETCH MAP ATTACHED THERETO AS EXHIBIT "BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, A NATIONAL BANKING ASSOCIATION" AS CONTAINED IN THE DEED FROM CLINTON EASTWOOD, ET AL TO THE STATE OF CALIFORNIA, ET AL RECORDED SEPTEMBER 16, 1995, IN REEL 3276, AT PAGE 1386 AND RERECORDED NOVEMBER 20, 1995 IN REEL 3302 OF OFFICIAL RECORDS, PAGE 1429.

PARCEL FIVE:

AN EASEMENT FOR ROAD AND UTILITY PURPOSES; IN THE RANCHO SAN JOSE Y SUR CHIQUITO, COUNTY OF MONTEREY, STATE OF CALIFORNIA, OVER THAT PORTION OF THE PARCEL OF LAND DESCRIBED IN DEED FROM CHARLES G. SAWYER, ET UX TO CLINTON EASTWOOD, ET UX, DATED DECEMBER 24, 1967 AND RECORDED DECEMBER 28, 1967 IN REEL 536 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 947, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE ANGLE POINT CONNECTING COURSES NUMBERED (1) AND (2) OF THE BOUNDARY OF SAID PARCEL AS DESCRIBED IN SAID DEED THENCE;

(1) NORTH 8°05` WEST ALONG SAID COURSES NUMBERED (1) OF SAID BOUNDARY, DISTANCE OF 60.00 FEET; THENCE LEAVING SAID COURSES AND BOUNDARY.

(2) EAST, 55.00 FEET; THENCE

(3) SOUTH 54°28` EAST, 54.42 FEET, TO SAID COURSES NUMBERED (2) OF SAID PARCEL BOUNDARY; THENCE

(4) SOUTH 73°00" WEST, ALONG SAID COURSE NUMBERED (2), A DISTANCE OF 95.00 FEET, TO THE POINT OF BEGINNING, AS CONTAINED IN THE DEED FROM CLINTON EASTWOOD, ET AL TO THE STATE OF CALIFORNIA, ET AL, RECORDED SEPTEMBER 16, 1995, IN REEL 3276, PAGE 1386 AND RE-RECORDED NOVEMBER 20, 1995 IN REEL 3302 OF OFFICIAL RECORDS, PAGE 1429.

PARCEL SIX:

AN EASEMENT FOR ROAD AND UTILITY PURPOSES, LOCATED IN THE RANCHO SAN JOSE Y SUR CHIQUITO, COUNTY OF MONTEREY, STATE OF CALIFORNIA, OVER A PORTION OF PARCEL OF LAND DESCRIBED IN THE DEED FROM GERHARD R. FISHER, ET AL, TO ROSEMARIE PREH, DATED MARCH 15, 1973 AND RECORDED APRIL 12, 1973, IN REEL 840 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 472 AND ALSO OVER A PORTION OF THE PARCEL OF LAND DESCRIBED IN THE

DEED FROM GORDON A. VETTER TO ROSEMARIE PREH, DATED MARCH 15, 1973 AND RECORDED APRIL 12, 1973, IN REEL 840 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 477, SAID PORTION BEING A STRIP OF LAND 60 FEET WIDE, THE CENTERLINE OF WHICH IS DESCRIBED AS FOLLOWS: BEGINNING AT A POINT ON THE EASTERLY LINE OF STATE HIGHWAY NO.1, WHICH BEAR SOUTH 8°05` EAST, 1382.36 FEET ALONG THE EASTERLY LINE OF SAID STATE HIGHWAY FROM CONCRETE MONUMENT STANDING NORTH 81°55` EAST, 40.00 FEET FROM SAID HIGHWAY CENTERLINE STATION 240+95.16, AS SAID HIGHWAY AND SAID MONUMENT ARE SHOWN ON THAT CERTAIN MAP ENTITLED "STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC WORKS, DIVISION OF HIGHWAYS, PLAN AND PROFILE OF STATE HIGHWAY IN MONTEREY COUNTY BETWEEN ROCK CREEK AND SAN REMO DIVIDE, V-MONT -56-18-23"; THENCE ALONG THE CENTERLINE OF SAID EASEMENT.

(1) NORTH 81°55` EAST, 36.79 FEET; THENCE

(2) ALONG A TANGENT CIRCULAR CURVE TO THE LEFT WITH RADIUS OF 75 FEET; THROUGH A CENTRAL ANGLE OF 82°59`36", AN ARC DISTANCE OF 108.64 FEET; THENCE TANGENTIALLY,

(3) NORTH 1°04`36" WEST, 343.83 FEET; THENCE

(4) ALONG A TANGENT CIRCULAR CURVE TO THE RIGHT WITH RADIUS OF 225 FEET, THROUGH A CENTRAL ANGLE OF 100°35`36", AN ARC DISTANCE OF 395.03 FEET; THENCE, TANGENTIALLY

(5) SOUTH 80°29`00" EAST, 43.90 FEET TO A POINT HEREIN DESIGNATED "POINT A" FOR PURPOSES OF FURTHER DESCRIPTION HEREIN, THENCE

(6) SOUTH 80°29`00" EAST, 19.52 FEET; THENCE

(7) ALONG A TANGENT CIRCULAR CURVE TO THE RIGHT WITH RADIUS OF 250 FEET, THROUGH A CENTRAL ANGLE OF 51°51`17", AN ARC DISTANCE OF 226.26 FEET; THENCE TANGENTIALLY

(8) SOUTH 28°37`43" EAST, 33.93 FEET TO A POINT IN THE APPROXIMATE CENTERLINE OF AN EXISTING PRIVATE ROAD, AND THE END OF THE EASEMENT HEREIN BEING DESCRIBED AS CONTAINED IN THAT CONDITIONAL EASEMENT GRANT DEED, EXECUTED BY ROSEMARIE PREH, A WIDOW TO THE STATE OF CALIFORNIA, RECORDED AUGUST 12, 1996, IN REEL 3406 OF OFFICIAL RECORDS, PAGE 13.

PARCEL SEVEN:

AN EASEMENT FOR ROAD AND UTILITY PURPOSES, LOCATED IN THE RANCHO SAN JOSE Y SUR CHIQUITO, COUNTY OF MONTEREY, STATE OF CALIFORNIA, OVER A PORTION OF THE PARCEL OF LAND DESCRIBED IN DEED FROM GERHARD R. FISHER, ET AL TO ROSEMARIE PREH, DATED MARCH 15, 1973 AND RECORDED APRIL 12, 1973 IN REEL 840 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 472 AND ALSO OVER A PORTION OF THE PARCEL OF LAND DESCRIBED IN THE DEED

FROM GORDON A. VETTER TO ROSEMARIE PREH DATED MARCH 15, 1973 AND RECORDED APRIL 12, 1973 IN REEL 840 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 477, SAID PORTION BEING A STRIP OF LAND 60 FEET WIDE, THE CENTERLINE OF WHICH IS DESCRIBED AS FOLLOWS: BEGINNING AT A POINT IN THE APPROXIMATE CENTERLINE OF AN EXISTING PRIVATE ROAD, LYING WITHIN THE PROPERTY DESCRIBED IN SAID DEED FROM VETTER TO PREH, WHICH POINT BEARS SOUTH 41°43`16" EAST, 700.19 FEET FROM A CONCRETE MONUMENT STANDING NORTH 81°55` EAST, 40.00 FEET FROM SAID HIGHWAY CENTERLINE STATION 240+95.16 AS SAID HIGHWAY AND SAID MONUMENT ARE SHOWN ON THAT CERTAIN MAP ENTITLED, "STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC WORKS, DIVISION OF HIGHWAYS, PLAN AND PROFILE OF STATE HIGHWAY IN MONTEREY COUNTY BETWEEN ROCK CREEK AND SAN REMO DIVIDE V-MONT-56-18-23"; THENCE ALONG THE CENTERLINE OF SAID EASEMENT.

(1) SOUTH 24°45`23" EAST, 90.62 FEET; THENCE

(2) ALONG A TANGENT CIRCULAR CURVE TO THE LEFT WITH A RADIUS OF 200 FEET, THROUGH A CENTRAL ANGLE OF 14°37`20" AN ARC DISTANCE OF 51.04 FEET; THENCE

(3) SOUTH 39°22`42" EAST, 99.75 FEET TO A POINT HEREIN BEFORE DESIGNATED "POINT PAGE"; THENCE

(4) SOUTH 39°22`42" EAST 79.83 FEET THENCE

(5) ALONG A TANGENT CIRCULAR CURVE TO THE RIGHT WITH RADIUS OF 150 FEET, THROUGH A CENTRAL ANGLE OF 37°49`43", AN ARC DISTANCE OF 99.03 FEET; THENCE



TANGENTIALLY

(6) SOUTH 1°33'00" EAST, 49.60 FEET TO A POINT HEREIN DESIGNATED "POINT B" FOR PURPOSES OF FURTHER DESCRIPTION HEREIN THENCE

(7) SOUTH 1°33'09" EAST, 3.14 FEET; THENCE

(8) ALONG A TANGENT CIRCULAR, CURVE TO THE LEFT WITH RADIUS OF 150 FEET, THROUGH A CENTRAL ANGLE OF 22°55'15" AN ARC DISTANCE OF 60.01 FEET; THENCE

(9) SOUTH 24°28'15" EAST, 132.34 FEET; THENCE

(10) ALONG A TANGENT CIRCULAR CURVE TO THE LEFT WITH RADIUS OF 200 FEET, THROUGH A CENTRAL ANGLE OF 54°46'48" AN ARC DISTANCE OF 191.22 FEET TO A POINT IN THE SOUTHEASTERLY BOUNDARY OF SAID PROPERTY DESCRIBED IN SAID DEED FROM FISHER, ET AL, TO PREH, AND THE END OF THE EASEMENT HEREIN BEING DESCRIBED AS CONTAINED IN THAT CONDITIONS EASEMENT GRANT DEED, EXECUTED BY ROSEMARIE PREH, A WIDOW TO THE STATE

OF CALIFORNIA, RECORDED AUGUST 12, 1996 IN REEL 3406, OF OFFICIAL RECORDS, PAGE 13.

PARCEL EIGHT:

AN EASEMENT FOR ROAD AND UTILITY PURPOSES, LOCATED IN THE RANCHO SAN JOSE Y SUR CHIQUITO, COUNTY OF MONTEREY, STATE OF CALIFORNIA, OVER A PORTION OF THE PARCEL OF LAND DESCRIBED IN THE DEED FROM GERHARD R. FISHER, ET AL, TO ROSEMARIE PREH, DATED MARCH 15, 1973 AND RECORDED APRIL 12, 1973 IN REEL 840 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 472, SAID PORTION BEING A STRIP OF LAND 60 FEET WIDE, THE CENTERLINE

OF WHICH IS DESCRIBED AS FOLLOWS: BEGINNING AT A POINT IN THE NORTHERLY BOUNDARY OF SAID PROPERTY DESCRIBED IN SAID DEED FROM FISHER ET AL, TO PREH, WHICH BEARS NORTH 80°29' WEST, 516.10 FEET FROM THE MOST NORTHEASTERLY CORNER OF SAID PROPERTY, SAID POINT ALSO LYING IN THE APPROXIMATE CENTERLINE OF AN EXISTING PRIVATE ROAD; THENCE ALONG THE CENTERLINE OF SAID EASEMENT.

(1) SOUTH 33°40'24" EAST, 12:21 FEET; THENCE

(2) ALONG A TANGENT OF 88°41'52", AN ARC DISTANCE OF 116.10 FEET; THENCE TANGENTIALLY

(3) SOUTH 55°01'28" WEST, 48.15 FEET; THENCE

(4) ALONG A TANGENT CIRCULAR CURVE TO THE LEFT WITH A RADIUS OF 75 FEET, THROUGH A CENTRAL ANGLE OF 56°34'27", AN ARC DISTANCE OF 74.06 FEET TO A POINT HEREINBEFORE DESIGNATED "POINT B" AND THE END OF THE EASEMENT HEREIN BEING DESCRIBED, AS CONTAINED IN THAT CONDITIONS EASEMENT GRANT DEED, EXECUTED BY ROSEMARIE PREH, A WIDOW TO THE STATE OF CALIFORNIA, RECORDED AUGUST 12, 1996, IN REEL 3406 OF OFFICIAL

RECORDS, PAGE 13.

Amount of unpaid balance and other charges: $8,038,792.12 (estimated)

Street address and other common designation of the real property:    31549 HIGHWAY 1
                                                                     CARMEL, CA 93923
                                          APN Number:   243-221-027-000

     The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. The property heretofore described is being sold "as is".

In compliance with California Civil Code 2923.5(c) the mortgagee, trustee, beneficiary, or authorized agent declares: that it has contacted the borrower(s) to assess their financial situation and to explore options to avoid foreclosure; or

that it has made efforts to contact the borrower(s) to assess their financial situation and to explore options to avoid foreclosure by one of the following methods: by telephone;  by United States mail; either 1st class or certified;  by overnight delivery; by personal delivery; by e-mail; by face to face meeting.

**SEE ATTACHED EXHIBIT**

DATE: 11-01-2010
CALIFORNIA RECONVEYANCE COMPANY, as Trustee
714) 730-2727 or www.fidelityasap.com
(714) 573-1965 or www.priorityposting.com

*Deborah Brignac*
DEBORAH BRIGNAC, VICE PRESIDENT
9200 OAKDALE AVENUE, CHATSWORTH, CA 91311

CALIFORNIA RECONVEYANCE COMPANYIS A
DEBT COLLECTOR ATTEMPTING TO COLLECT
A DEBT. ANY INFORMATIONOBTAINED WILL
BE USED FOR THAT PURPOSE.



EXHIBIT 7

Recording Requested By
ServiceLink

WHEN RECORDED MAIL TO

California Reconveyance Company
PO Box 6200
Northridge, CA 91328-6200

MAIL TAX STATEMENTS TO

JPMorgan Chase Bank
7255 Baymeadows Way
Jacksonville, FL 32256
Mail Stop: JAXB2007



**CONFORMED COPY**

**COPY** of Document Recorded
on ___V/10/11___ as No._2011 001829
Has not been compared with original

Space above this line for recorder's use only

Trustee Sale No. 244012CA    Loan No. 3013987478    Title Order No. 523038

## TRUSTEE'S DEED UPON SALE

APN 243-221-027-000    T.R.A. No.
The undersigned grantor declares:
1)    The Grantee herein <u>was</u> the foreclosing beneficiary.
2)    The amount of the unpaid debt together with costs was ................$6,288,311.75
3)    The amount paid by the grantee at the trustee sale was..................$4,013,500.00
4)    The documentary transfer tax is .....................................................$0
5)    Said property is in CARMEL
and CALIFORNIA RECONVEYANCE COMPANY (herein called Trustee), as the duly appointed
Trustee or substituted Trustee under the Deed of Trust hereinafter described, does hereby grant and
convey, but without covenant or warranty, express or implied, to **JPMorgan Chase Bank, National
Association** (herein called Grantee), all of its right, title and interest in and to that certain property
situated in the County of MONTEREY, State of California, described as follows:  SEE EXHIBIT "A"

**Situs:** 31549  HIGHWAY 1, , CARMEL, CA 93923
RECITALS:
This conveyance is made pursuant to the powers conferred upon Trustee by that certain Deed of
Trust dated 08-10-2007 and executed by DANIELE GOZZI AND ANITA GOZZI, HUSBAND AND
WIFE AS JOINT TENANTS, as Trustor, and Recorded 08-28-2007, Book , Page , Instrument
2007067285 of official records of MONTEREY County, California, and after fulfillment of the
conditions specified in said Deed of Trust authorizing this conveyance.

Default occurred as set forth in a Notice of Default and Election to Sell which was recorded in the
Office of the Recorder of said County, and such default still existed at the time of sale.

All requirements of law regarding the mailing of copies of notices or the publication of a copy of the
Notice of Default or the personal delivery of the copy of the Notice of Default and the posting and
publication of copies of the Notice of a Sale have been complied with.

Trustee, in compliance with said Notice of Trustee's Sale and in exercise of its powers under said
Deed of Trust, sold the herein described property at public auction on 12-13-2010. Grantee, being
the highest bidder at said sale, became the purchaser of said property for the amount bid being
$4,013,500.00 in lawful money of the United States, or by credit bid if the Grantee was the
beneficiary of said Deed of Trust at the time of said Trustee's Sale.

Trustee Sale No.: 244012CA Loan No.: 3013987478 Title Order No.: 523038

DATE: January 06, 2011

CALIFORNIA RECONVEYANCE COMPANY, as Trustee

Dalila Ochoa, Assistant Secretary

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

On January 06, 2011, before me, LOREN LOPEZ, "Notary Public", personally appeared DALILA OCHOA, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

LOREN LOPEZ
Commission # 1812959
Notary Public - California
Los Angeles County
My Comm. Expires Sep 12, 2012

## Exhibit A

PARCEL ONE: PARCEL B-2 AS SAID PARCEL IS SHOWN ON THE PARCEL MAP RECORDED JULY 22, 1983 IN VOLUME 15 OF PARCEL MAPS, AT PAGE 157, MONTEREY COUNTY RECORDS. PARCEL TWO: EASEMENT FOR ROAD AND UTILITIES 60 FEET WIDE OVER PARCELS B-3 AND B-1, AS SAID EASEMENT AND PARCELS ARE SHOWN ON THE PARCEL MAP RECORDED JULY 22, 1983 IN VOLUME 15 OF PARCEL MAPS, AT PAGE 157, MONTEREY COUNTY RECORDS. PARCEL THREE: AN EASEMENT FOR ROAD AND UTILITIES, OVER THAT STRIP OF LAND DESCRIBED IN THE DEED FROM ROSEMARIE PREH, A WIDOW, TO THE UNIVERSITY OF CALIFORNIA SAN FRANCISCO FOUNDATION, A NONPROFIT PUBLIC BENEFIT CORPORATION, ET AL, RECORDED JUNE 14, 1991 IN REEL 2656 AT PAGE 47, OFFICIAL RECORDS OF MONTEREY COUNTY, CALIFORNIA. PARCEL FOUR: AN EASEMENT FOR ROAD AND UTILITY PURPOSES, IN THE RANCHO SAN JOSE Y SUR CHIQUITA COUNTY OF MONTEREY, STATE OF CALIFORNIA, OVER THAT PORTION OF THE LAND DESCRIBED IN DEED TO CLINTON AND MARGARET EASTWOOD FILED FOR RECORD ON 15 MAY 1980 IN REEL 1408 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 585, LYING WITHIN THE EASEMENT STRIP 50 FEET WIDE DESCRIBED IN THE DEED OF EASEMENT EXECUTED BY ROSEMARIE PREH, AS GRANTOR TO HELEN BIBBERO ET AL, GRANTEES, FILED FOR RECORD ON JUNE 14, 1991 IN REEL 2659 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 47, SAID PORTION BEING GRAPHICALLY SHOWN ON THE SKETCH MAP ATTACHED THERETO AS EXHIBIT "BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, A NATIONAL BANKING ASSOCIATION" AS CONTAINED IN THE DEED FROM CLINTON EASTWOOD, ET AL TO THE STATE OF CALIFORNIA, ET AL RECORDED SEPTEMBER 16, 1995, IN REEL 3276, AT PAGE 1386 AND RERECORDED NOVEMBER 20, 1995 IN REEL 3302 OF OFFICIAL RECORDS, PAGE 1429. PARCEL FIVE: AN EASEMENT FOR ROAD AND UTILITY PURPOSES; IN THE RANCHO SAN JOSE Y SUR CHIQUITO, COUNTY OF MONTEREY, STATE OF CALIFORNIA, OVER THAT PORTION OF THE PARCEL OF LAND DESCRIBED IN DEED FROM CHARLES G. SAWYER, ET UX TO CLINTON EASTWOOD, ET UX, DATED DECEMBER 24, 1967 AND RECORDED DECEMBER 28, 1967 IN REEL 536 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 947, BOUNDED AND DESCRIBED AS FOLLOWS: BEGINNING AT THE ANGLE POINT CONNECTING COURSES NUMBERED (1) AND (2) OF THE BOUNDARY OF SAID PARCEL AS DESCRIBED IN SAID DEED THENCE; (1) NORTH 8°05` WEST ALONG SAID COURSES NUMBERED (1) OF SAID BOUNDARY, DISTANCE OF 60.00 FEET; THENCE LEAVING SAID COURSES AND BOUNDARY. (2) EAST, 55.00 FEET; THENCE (3) SOUTH 54°28` EAST, 54.42 FEET, TO SAID COURSES NUMBERED (2) OF SAID PARCEL BOUNDARY; THENCE (4) SOUTH 73°00" WEST, ALONG SAID COURSE NUMBERED (2), A DISTANCE OF 95.00 FEET, TO THE POINT OF BEGINNING, AS CONTAINED IN THE DEED FROM CLINTON EASTWOOD, ET AL TO THE STATE OF CALIFORNIA, ET AL, RECORDED SEPTEMBER 16, 1995, IN REEL 3276, PAGE 1386 AND RE-RECORDED NOVEMBER 20, 1995 IN REEL 3302 OF OFFICIAL RECORDS, PAGE 1429. PARCEL SIX: AN EASEMENT FOR ROAD AND UTILITY PURPOSES, LOCATED IN THE RANCHO SAN JOSE Y SUR CHIQUITO, COUNTY OF MONTEREY, STATE OF CALIFORNIA, OVER A PORTION OF PARCEL OF LAND DESCRIBED IN THE DEED FROM GERHARD R. FISHER, ET AL, TO ROSEMARIE PREH, DATED MARCH 15, 1973 AND RECORDED APRIL 12, 1973, IN REEL 840 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 472 AND ALSO OVER A PORTION OF THE PARCEL OF LAND DESCRIBED IN THE DEED FROM GORDON A. VETTER TO ROSEMARIE PREH, DATED MARCH 15, 1973 AND RECORDED APRIL 12, 1973, IN REEL 840 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 477, SAID PORTION BEING A STRIP OF LAND 60 FEET WIDE, THE CENTERLINE OF WHICH IS DESCRIBED AS FOLLOWS: BEGINNING AT A POINT ON THE EASTERLY LINE OF STATE HIGHWAY NO 1, WHICH BEAR SOUTH 8°05` EAST, 1382.36 FEET ALONG THE EASTERLY LINE OF SAID STATE HIGHWAY FROM CONCRETE MONUMENT STANDING NORTH 81°55` EAST, 40.00 FEET FROM SAID HIGHWAY CENTERLINE STATION 240+95.16, AS SAID HIGHWAY AND SAID MONUMENT ARE SHOWN ON THAT CERTAIN MAP ENTITLED "STATE OF CALIFORNIA, DEPARTMENT OF

PUBLIC WORKS, DIVISION OF HIGHWAYS, PLAN AND PROFILE OF STATE HIGHWAY IN MONTEREY COUNTY BETWEEN ROCK CREEK AND SAN REMO DIVIDE, V-MONT' -56-18-23"; THENCE ALONG THE CENTERLINE OF SAID EASEMENT. (1) NORTH 81°55' EAST, 36.79 FEET; THENCE (2) ALONG A TANGENT CIRCULAR CURVE TO THE LEFT WITH RADIUS OF 75 FEET; THROUGH A CENTRAL ANGLE OF 82°59'36", AN ARC DISTANCE OF 108.64 FEET; THENCE TANGENTIALLY, (3) NORTH 1°04'36" WEST, 343.83 FEET; THENCE (4) ALONG A TANGENT CIRCULAR CURVE TO THE RIGHT WITH RADIUS OF 225 FEET, THROUGH A CENTRAL ANGLE OF 100°35'36", AN ARC DISTANCE OF 395.03 FEET; THENCE, TANGENTIALLY (5) SOUTH 80°29'00" EAST, 43.90 FEET TO A POINT HEREIN DESIGNATED "POINT A" FOR PURPOSES OF FURTHER DESCRIPTION HEREIN, THENCE (6) SOUTH 80°29'00" EAST, 19.52 FEET; THENCE (7) ALONG A TANGENT CIRCULAR CURVE TO THE RIGHT WITH RADIUS OF 250 FEET, THROUGH A CENTRAL ANGLE OF 51°51'17", AN ARC DISTANCE OF 226.26 FEET; THENCE TANGENTIALLY (8) SOUTH 28°37'43" EAST, 33.93 FEET TO A POINT IN THE APPROXIMATE CENTERLINE OF AN EXISTING PRIVATE ROAD, AND THE END OF THE EASEMENT HEREIN BEING DESCRIBED AS CONTAINED IN THAT CONDITIONAL EASEMENT GRANT DEED, EXECUTED BY ROSEMARIE PREH, A WIDOW TO THE STATE OF CALIFORNIA, RECORDED AUGUST 12, 1996, IN REEL 3406 OF OFFICIAL RECORDS, PAGE 13. PARCEL SEVEN: AN EASEMENT FOR ROAD AND UTILITY PURPOSES, LOCATED IN THE RANCHO SAN JOSE Y SUR CHIQUITO,COUNTY OF MONTEREY, STATE OF CALIFORNIA, OVER A PORTION OF THE PARCEL OF LAND DESCRIBED IN DEED FROM GERHARD R. FISHER, ET AL TO ROSEMARIE PREH, DATED MARCH 15, 1973 AND RECORDED APRIL 12, 1973 IN REEL 840 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 472 AND ALSO OVER A PORTION OF THE PARCEL OF LAND DESCRIBED IN THE DEED FROM GORDON A. VETTER TO ROSEMARIE PREH DATED MARCH 15, 1973 AND RECORDED APRIL 12, 1973 IN REEL 840 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 477, SAID PORTION BEING A STRIP OF LAND 60 FEET WIDE, THE CENTERLINE OF WHICH IS DESCRIBED AS FOLLOWS: BEGINNING AT A POINT IN THE APPROXIMATE CENTERLINE OF AN EXISTING PRIVATE ROAD, LYING WITHIN THE PROPERTY DESCRIBED IN SAID DEED FROM VETTER TO PREH, WHICH POINT BEARS SOUTH 41°43'15" EAST, 700.19 FEET FROM A CONCRETE MONUMENT STANDING NORTH 81°55' EAST, 40.00 FEET FROM SAID HIGHWAY CENTERLINE STATION 240+95.16 AS SAID HIGHWAY AND SAID MONUMENT ARE SHOWN ON THAT CERTAIN MAP ENTITLED, "STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC WORKS, DIVISION OF HIGHWAYS, PLAN AND PROFILE OF STATE HIGHWAY IN MONTEREY COUNTY BETWEEN ROCK CREEK AND SAN REMO DIVIDE V-MONT-56-18-23"; THENCE ALONG THE CENTERLINE OF SAID EASEMENT. (1) SOUTH 24°45'23" EAST, 90.62 FEET; THENCE (2) ALONG A TANGENT CIRCULAR CURVE TO THE LEFT WITH A RADIUS OF 200 FEET, THROUGH A CENTRAL ANGLE OF 14°37'20" AN ARC DISTANCE OF 51.04 FEET; THENCE (3) SOUTH 39°22'42" EAST, 99.75 FEET TO A POINT HEREIN BEFORE DESIGNATED "POINT PAGE", THENCE (4) SOUTH 39°22'42" EAST 79.83 FEET THENCE (5) ALONG A TANGENT CIRCULAR CURVE TO THE RIGHT WITH RADIUS OF 150 FEET, THROUGH A CENTRAL ANGLE OF 37°49'43", AN ARC DISTANCE OF 99.03 FEET; THENCE TANGENTIALLY (6) SOUTH 1°33'00" EAST, 49.60 FEET TO A POINT HEREIN DESIGNATED "POINT B" FOR PURPOSES OF FURTHER DESCRIPTION HEREIN THENCE (7) SOUTH 1°33'09" EAST, 3.14 FEET; THENCE (8) ALONG A TANGENT CIRCULAR, CURVE TO THE LEFT WITH RADIUS OF 150 FEET, THROUGH A CENTRAL ANGLE OF 22°55'15" AN ARC DISTANCE OF 60.01 FEET; THENCE (9) SOUTH 24°28'15" EAST, 132.34 FEET; THENCE (10) ALONG A TANGENT CIRCULAR CURVE TO THE LEFT WITH RADIUS OF 200 FEET, THROUGH A CENTRAL ANGLE OF 54°46'48" AN ARC DISTANCE OF 191.22 FEET TO A POINT IN THE SOUTHEASTERLY BOUNDARY OF SAID PROPERTY DESCRIBED IN SAID DEED FROM FISHER, ET AL, TO PREH, AND THE END OF THE EASEMENT HEREIN BEING DESCRIBED AS CONTAINED IN THAT CONDITIONS EASEMENT GRANT DEED, EXECUTED BY ROSEMARIE PREH, A WIDOW TO THE STATE OF CALIFORNIA, RECORDED AUGUST 12, 1996 IN REEL 3406, OF OFFICIAL RECORDS, PAGE 13. PARCEL EIGHT: AN EASEMENT FOR ROAD AND UTILITY PURPOSES, LOCATED IN THE RANCHO SAN JOSE Y SUR CHIQUITO, COUNTY OF MONTEREY, STATE OF CALIFORNIA, OVER A PORTION OF THE PARCEL OF LAND DESCRIBED IN THE DEED FROM GERHARD R. FISHER, ET AL, TO ROSEMARIE PREH, DATED MARCH 15, 1973 AND RECORDED APRIL 12, 1973 IN REEL 840 OF OFFICIAL RECORDS OF SAID COUNTY AT PAGE 472, SAID PORTION BEING A STRIP OF LAND 60 FEET WIDE, THE CENTERLINE OF WHICH IS DESCRIBED AS FOLLOWS: BEGINNING AT A POINT IN THE NORTHERLY BOUNDARY OF SAID PROPERTY DESCRIBED IN SAID DEED FROM

FISHER, ET AL, TO PREH, WHICH BEARS NORTH 80°29' WEST, 516.10 FEET FROM THE MOST NORTHEASTERLY CORNER OF SAID PROPERTY, SAID POINT ALSO LYING IN THE APPROXIMATE CENTERLINE OF AN EXISTING PRIVATE ROAD, THENCE ALONG THE CENTERLINE OF SAID EASEMENT. (1) SOUTH 33°40'24" EAST, 12;21 FEET; THENCE (2) ALONG A TANGENT OF 88°41'52", AN ARC DISTANCE OF 116.10 FEET; THENCE TANGENTIALLY (3) SOUTH 55°01'28" WEST, 48.15 FEET; THENCE (4) ALONG A TANGENT CIRCULAR CURVE TO THE LEFT WITH A RADIUS OF 75 FEET, THROUGH A CENTRAL ANGLE OF 56°34'27", AN ARC DISTANCE OF 74.06 FEET TO A POINT HEREINBEFORE DESIGNATED "POINT B" AND THE END OF THE EASEMENT HEREIN BEING DESCRIBED, AS CONTAINED IN THAT CONDITIONS EASEMENT GRANT DEED, EXECUTED BY ROSEMARIE PREH, A WIDOW TO THE STATE OF CALIFORNIA, RECORDED AUGUST 12, 1996, IN REEL 3406 OF OFFICIAL RECORDS, PAGE 13.

EXHIBIT 8

Arizona Document Services
rae@azdocumentservices.com
AZCLDP #81339

1 | *DANIELE GOZZI*
2 | *ANITA GOZZI* )
     )
3 | ***Real Property Located:*** )
4 | *31549 Highway 1* )
     *Carmel, CA 93923* )
5

**AFFIDAVIT OF
WILLIAM McCAFFREY**

6 | I William McCaffrey, declare as follows:

7

8 | 1. I am over the age of 18 years and qualified to make this AFFIDAVIT. I am a resident of
9 | the State of Arizona and formulate this AFFIDAVIT based on my own personal
10 | knowledge. I have no direct or indirect interest in the outcome of the case at bar for
11 | which I offer my observations, analysis, opinions and testimony.

12

13 | 2. My experience in the Banking industry encompasses over 30 years employment for
14 | federally insured institutions. I was formerly Business Development Manager with Indy
15 | Mac Bank FSB, for over ten years and currently employed as Consultant for Housing
16 | Mortgage Consultants Inc.

17

18 | 3. I have personal knowledge and experience to render opinions in the topic areas
19 | related to the securitization of mortgage loans, derivative securities, the securities
20 | industry, Uniform Commercial Code practices, predatory lending practices, Truth in
21 | Lending Act requirements, loan origination and underwriting, accounting in the context
22 | of securitization and pooling and servicing of securitized loans, assignment and
23 | assumption of securitized loans, creation of trusts under deeds of trust, and issuance of
24 | asset backed securities and specifically mortgage-backed securities by special purpose
25 | vehicles in which an entity is named as trustee for holders of certificates of mortgage
26 | backed securities, the economics of securitized residential mortgages during the period
27 | of 2001-2008, appraisal fraud, and its effect on APR disclosure, usury and foreclosure
28 | of securitized and non-securitized residential mortgages.

Arizona Document Services
rae@azdocumentservices.com
AZCLDP #81339

4. I have been qualified to testify in Maricopa County Superior Court, and US District Court. In the past few years, I have served as Expert Witness in numerous civil cases. I have testified at trial in Federal and Superior Court including Nevada and Arizona. Superior Court Cases include *Marshall and Isley Bank v. Izzo, Slikker v. Kondaur, Brokalakis v. National City Mortgage, and Wells Fargo Bank v. Dutson.* Superior Court Judges' Ronan, Garcia, and Budoff, Federal Bankruptcy Judges Merkel and Regal of Nevada, Federal Chief Judge Biery as well as Commissioners' Davis, Ellis, and Hamner have affirmed my expert testimony.

5. I am also a Securitization Analyst and use specialty-licensed software, which permits investors and licensed users to access any "named Trust-Entity" which are The Corporate/Trust Documents officially filed with the Securities and Exchange Commission. I can find each Mortgage Note that is held by this named Trust-Entity, and can verify its status at any given time. I have the knowledge and experience to perform these searches with accuracy.

6. At the request of The GOZZI's I submit this AFFIDAVIT and have personal first hand knowledge of the following facts:

7. The GOZZI Note with loan number of 3013987478-057 dated AUGUST 10, 2007 for the subject property 31549 HIGHWAY 1 CARMEL, CA 93923 initially listed lender as WASHINGTON MUTUAL BANK, FA. WASHINGTON MUTUAL BANK, FA then assigned said Note to WASHINGTON MUTUAL INC. INVESTMENTS who then reassigned subject Note to a WASHINGTON MUTUAL SENIOR DEBT SECURITY.

8. This Security was created by aggregating loans (typically with large amounts) or Notes by the Issuer WASHINGTON MUTUAL INC. INVESTMENTS and then selling the SENIOR DEBT SECURITY to investors with the promise to pay quarterly reset interest on the fluctuating rate of the notes as well as payment at commencement and maturity.

Arizona Document Services
rae@azdocumentservices.com
AZCLDP #81339

9. In other words the loans or Notes "FLOAT" and are unsecured. These sales that my research shows took place would have fractionalized possession of the Gozzi Floating Note over many different investors.

10. BANK OF NEW YORK MELLON acts as Trustee of the SENIOR DEBT SECURITY. The trustee is responsible for performing certain calculations relating to distributions on the certificates, making payments on the certificates, acting as certificate Registrar and transfer agent for the trust, making payments to the swap provider under the swap agreement and holding the trust accounts on behalf of the certificate holders.

11. WASHINGTON MUTUAL INC. INVESTMENTS intended to use the almost $100 million proceeds of the GOZZI Floating Note and other Floating Notes bundled along with for their own short term indebtedness or temporary investments.

12. The only potential party to a foreclosure wherein the allege financial injury and therefore a right to collect the obligation, enforce the note or enforce the security instrument is either a party who has actually lost money or stands to lose money, or an authorized representative who can show such authority and is answerable to the claims, affirmative defenses and counterclaims of the borrowers for such causes of action or defenses as might be applicable.

    (a)  JPMORGAN CHASE, WASHINGTON MUTUAL INC. INVESTMENTS, WASHINGTON MUTUAL BANK FA and their successors in interest do not fall within any of the classifications of holders in due course.

    (b)  JPMORGAN CHASE, WASHINGTON MUTUAL INC. INVESTMENTS, WASHINGTON MUTUAL BANK FA and their successors in interest, have not suffered any financial loss relating to the loan.

Arizona Document Services
rae@azdocumentservices.com
AZCLDP #81339

1      (c)     JPMORGAN   CHASE   WASHINGTON   MUTUAL   INC.   INVESTMENTS,

2  WASHINGTON MUTUAL BANK FA and their successors in interest, suffered no

3  monetary loss through loan non-performance.

4

5  13. The only course of action available to challenge foreclosure in these instances is a

6  judicial lawsuit brought by the borrower/obligor. Unfortunately the burden of proof is

7  on the borrowers to allege facts that are solely within the knowledge of the lenders, and

8  which facts that are intentionally withheld from them.

9

10      FURTHER AFFIANT SAYETH NAUGHT.

11

12                          William McCaffrey

13

14  All factual testimony or statements made in this Affidavit are true and correct to the best of

15  my knowledge and belief. All opinions stated herein are based upon a high likelihood of

16  probability pursuant to my decades of relevant experience within the banking industry.

17

18  SWORN TO AND SUBSCRIBED before me, the undersigned notary public this __5__ day

19

20  of _____ 2012.

21

22

23  NOTARY PUBLIC
      STATE OF ARIZONA
      Maricopa County             Notary Public

24  AARON ARGANDONA
     My Commission Expires 10/23/15

25

26  My commission expires:      _10.22.15_

27

28

AFFIDAVIT of William McCaffrey

EXHIBIT 9

JPMorgan Chase Bank, National Association, suc
BANK, FA
(so vo.

Deborah Brignac, Vice President

CALIFORNIA RECONVEYANCE COMPANY,
(714) 259-7850 or www.fidelityasap.com
(714) 573-1965 or www.priorityposting.com

DEBORAH BRIGNAC, VICE PRESIDENT
9200 OAKDALE AVE
MAILSTOP N110612
CHATSWORTH, CA 91311

Deborah Brignac (FRum mailed N

CALIFORNIA RECONVEYANCE COMPANY IS
ATTEMPTING TO COLLECT A DEBT. ANY IN
BE USED FOR THAT PURPOSE.

CALIFORNIA RECONVEYANCE COMPANY, as Trustee
(714) 259-7850 or www.fidelityasap.com
(714) 573-1965 or www.priorityposting.com

DEBORAH BRIGNAC, VICE PRESIDENT
9200 OAKDALE AVE
MAILSTOP N110612
CHATSWORTH, CA 91311

CALIFO
COLLEC
INFORM

CALIFORNIA RECONVEYANCE COMPANY,
(714) 259-7850 or www.fidelityasap.com
(714) 573-1965 or www.priorityposting.com

DEBORAH BRIGNAC, VICE PRESIDENT
9200 OAKDALE AVE
MAILSTOP N110612
CHATSWORTH, CA 91311

CALIFORNIA RECONVEYANCE COMPANY,
(714) 259-7850 or www.fidelityasap.com
(714) 573-1965 or www.priorityposting.com

DEBORAH BRIGNAC, VICE PRESIDENT
9200 OAKDALE AVE
MAILSTOP N110612
CHATSWORTH, CA 91311

CALIFORNIA RECONVEYANCE COMPANY
(714) 259-7850 or www.fidelityasap.com
(714) 573-1965 or www.priorityposting.com

DEBORAH BRIGNAC, VICE PRESIDENT
9200 OAKDALE AVE
MAILSTOP N110612
CHATSWORTH, CA 91311

CALIFORNIA RECONVEYANCE COMPANY,
(714) 259-7850 or www.fidelityasap.com
(714) 573-1965 or www.priorityposting.com
Deborah Brignac (9p

DEBORAH BRIGNAC, VICE PRESIDENT
9200 OAKDALE AVE
MAILSTOP N110612
CHATSWORTH, CA 91311

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

Deborah Brignac, Vice President (Note

JPMorgan Chase Bank, National Association,

Deborah Brignac, Vice President

Deutsche Bank National Trust Company, as Trustee
National Association, as attorney-in-fact
(Sc

Deborah Brignac, Vice President

CALIFORNIA RECONVEYANCE COMPANY (as Trustee
(714) 259-7850 or www.fidelityasap.com
(714) 573-1965 or www.priorityposting.com

DEBORAH BRIGNAC, VICE PRESIDENT
CALIFORNIA RECONVEYANCE COMPANY IS A DEBT
COLLECT A DEBT. ANY INFORMATION OBTAINED

EXHIBIT 10

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

## MINUTE ORDER

DATE: 09/07/2012           TIME: 02:00:00 PM      DEPT: C12

JUDICIAL OFFICER PRESIDING: Jamoa A. Moberly
CLERK: Gus Hernandez
REPORTER/ERM: Kimberly Rex-6638 CSR# 6638
BAILIFF/COURT ATTENDANT: Maria Concepcion

CASE NO: **30-2012-00560082-CU-OR-CJC** CASE INIT.DATE: 04/06/2012
CASE TITLE: **Suarez vs. Bank of New York Mellon, National Association, as Trustee**
CASE CATEGORY: Civil - Unlimited    CASE TYPE: Other Real Property

EVENT ID/DOCUMENT ID: 71530128

**EVENT TYPE**: Demurrer to Amended Complaint
MOVING PARTY: The Bank of New York Mellon
CAUSAL DOCUMENT/DATE FILED: Demurrer to Amended Complaint, 07/30/2012

**APPEARANCES**
John T Madden, from Brian Cave LLP, present for Defendant(s) telephonically.
Amanda L Gray of Bergman and Gutierrez for Plaintiff

The Court hears oral argument and rules as follows:

1) Defendants Bank of America, The Bank of New York Mello (erroneously named as Bank of New York Mellon National Association, as Trustee for the Certificate holders of Cwalt, Inc. Alternative Loan Trust 2006-OA16, Mortgage Pass-through Certificates, Series 2006-OA16) Demurrer to the Plaintiff Pauline Suarez's First Amended Complaint

Overrule in part and sustain in part. Defendant's Demurrer to the First Amended Complaint is overruled, as to the First and Second Causes of Action. Defendant's Demurrer is sustained, without leave to amend, as to the Third Cause of Action.

Defendant's Request for Judicial Notice is granted.

First Cause of Action: Cancellation of Instrument:

Firstly, the Deed of Trust which is the subject of this action indicates that the "Lender" was Countrywide Home Loans and "MERS" "is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns." (Exhibit "A" of the RJN).

Secondly, a review of the Assignment of Deed of Trust, reveals that the document was executed, only, by "Mortgage Electronic Registration Systems, Inc." (Exhibit "B" of the RJN).

Under similar circumstances, the Court in Fontenot v. Wells Fargo Bank, N.A. (2011) 198 Cal.App.4th 256, stated the following:

...[T]he complaint alleges MERS lacked the authority to assign the note because it was merely a nominee of the lender and had no interest in the note. Contrary to plaintiff's claim, the lack of a possessory interest in the note did not necessarily prevent MERS from having the authority to assign the note. While it is true MERS had no power in its own right to assign the note, since it had no interest in the note to assign, MERS did not purport to act for its own interests in assigning the note. Rather, the assignment of deed of trust states that MERS was acting as nominee for the lender, which did possess an assignable interest. A "nominee" is a person or entity designated to act for another in a limited role-in effect, an agent.

Id. at 270-271. Thus, pursuant to Fontenot, a nominee for a lender may properly assign a Deed of Trust, when it does so on behalf of the lender.

Additionally, the Court in McNear v. Petroleum Export Corp. (1929) 208 Cal. 162, in determining whether a contract signed by "W.K. Thompson," who purported to be acting as agent for a Mr. Smith, of Petroleum Export Corp., was sufficient to satisfy Civil Code §1624, stated the following:

It must be concluded that the signature "W. K. Thompson" at the bottom of the telegram is not a signature by the party to be charged or by his agent sufficient to satisfy the requirements of the statute. Thompson did not purport to sign as the agent of the defendant, and even if he had done so there was no offer of proof that he had written authority so to do.

...
Here the telegram relied upon as binding the defendant is not signed by the defendant nor by anyone purporting to act for the defendant in a representative capacity.

...
It appears beyond cavil that it was signed at the usual place for signing by W. K. Thompson individually and not in any representative capacity whatever.

Id. at 166-167. Thus, McNear concluded that the subject contract was void, as Mr. Thompson signed the contract as an individual without the individual authority to bind Petroleum Export Corp. to the agreement.

Thus, the contract violated Civil Code §1624, as the agreement was not "subscribed by the party to be charged or by the party's agent."

Lastly, the Court in Fisher v. Salmon (1851) 1 Cal. 413, stated the following, on this issue:

The consideration of the note was a deed of conveyance of certain lots in the City of San Francisco, executed by the respondent in his own name, representing that he was the attorney and agent of certain heirs, and was executed under his hand and seal, and not in the name of the principals. It is not necessary to cite authorities to show that such a deed is a nullity as to the principals of the agent Fisher, and the most that could be made of it, would be a mere contract on his part to procure a conveyance, but even as a contract it is not binding in law upon the principals.

Id. at 414. Thus, the Court in Fisher, clearly concluded that a contract signed by an individual "in his own name" is a nullity, as against the principals.

Therefore, as the Deed of Trust clearly indicates that MERS' authority is limited to its title as "nominee for the lender" and, additionally, as the Assignment of the Deed of Trust indicates that MERS executed

the assignment in its individual capacity, judicially noticeable documents support Plaintiff's claim and demonstrate that the Assignment of the Deed of Trust is void.

As a result, Defendant's Demurrer is overruled.

Second Cause of Action: Violation of Business & Professions Code §17200:

In this instance, as Plaintiff alleges conduct by Defendant, which affects Plaintiff's title to the property, Plaintiff has sufficiently demonstrated that a "present or future property interest" has been diminished, sufficient to support standing under the UCL. Kwikset Corp. v. Superior Court (2011) 51 Cal.4th 310.

Further, while Defendants assert that Plaintiff's claim fails, as Penal Code §115 does not create a private right of action, pursuant to Kasky v. Nike, Inc. (2002) 27 Cal.4th 939, a private right is not required.

Lastly, Penal Code §115 states the following:

Every person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony.

As Plaintiff alleges Defendant caused a false Assignment of Deed of Trust to be recorded, Plaintiff sufficiently alleges a violation of this provision. (¶30 of the FAC). Additionally, this allegation sufficiently establishes "fraudulent" conduct, for purposes of §17200, as the recording of the Assignment of the Deed of Trust is likely to deceive members of the public.

Further, while Defendant asserts that Plaintiff failed to allege sufficient facts, within the Complaint, demonstrating that Defendant knowingly recorded a false document, this argument fails.

Firstly, Penal Code §115 does not appear to require such knowledge and, second, judicially noticeable documents clearly demonstrate that MERS lacked individual authority to record the subject assignment.

Thus, judicially noticeable documents support Plaintiff's claim.

As a result, the instant Demurrer is overruled.

Third Cause of Action: Declaratory Relief:

In this instance, Plaintiff asserts the existence of an actual controversy, based on Plaintiff's dispute of the validity and legal effect of the Assignment. (¶47 of FAC).

As Plaintiff's First Cause of Action for Cancellation of Instrument is brought under identical grounds and will, therefore, address this issue, the Court concludes, pursuant to California Ins. Guarantee Assn. v. Superior Court (1991) 231 Cal.App.3d 1617, that declaratory relief is neither necessary or proper, given the circumstances.

Thus, the Demurrer to this Cause of Action is sustained without prejudice to bringing a motion seeking leave of Court to amend to state a declaratory relief cause of action if there are grounds for such.

Moving party to give notice.